Davis, Judge,
delivered the opinion of the court:[1]
Plaintiff’s first experience as a defense contractor was to bid on and win two negotiated Ordnance Corps contracts, both of which soured into litigation.[2] In January 1953, Army Ordnance awarded a contract for the manufacture of 75 mm. recoilless rifles. This project was largely subcontracted, leaving for Acme only the final finishing and assembly of components, and the earlier job of fashioning the rifle barrels from rough forgings with machines furnished *332 by the Government under a separate facilities contract. From the start, Acme was beset by serious production delays due to a combination of causes, among them its own inexperience, defaults by subcontractors, and defects in some of the government-furnished machines. Generous time extensions forgave many delinquent deliveries, but liquidated damages were assessed on others. After uncovering alleged violations of statutes relating to kickbacks, contingent fees, and conflicts of interest, Ordnance suspended work under the contract in July 1954 and canceled it two months later in August 1954. The purported infractions involved a clique of unprincipled employees of Acme, aligned with a stock-holding minor executive of the corporation. In this suit for breach of contract Acme denies any violations and alleges that the charges of malfeasance were a smokescreen to enable the Government to cancel without cost a contract for the production of obsolete weapons no longer needed. In that manner, it is said, defendant hoped to avoid the heavy cost of a termination for its own convenience. Cancellation left Acme financially crippled, since it was unreimbursed for much of its large investment in contract performance. Plaintiff spent years in fruitless but nearly successful efforts to obtain settlement.
The Government’s major defense still is that Acme is entitled to no recovery because it violated certain statutes and covenants (concerning contingent fees, kickbacks, false claims, and conflicts of interest). Should each of these absolute defenses be rejected, the plaintiff has requested us to grant recovery based on the theory of restitution, rather than the traditional remedy of damages usually awarded by this court. In addition to its objection to this form of relief, the Government asserts a partial defense based on plaintiff’s lack of standing to sue on behalf of its subcontractors. The defendant also argues that, since plaintiff itself was responsible for delays, it is not entitled to recover delay-damages, and the contracting officer’s assessment of liquidated damages was proper. Finally, Acme urges its right to interest on amounts due, on the ground that the Govern- *333 meat’s actions constituted a taking within the Fifth Amendment. We consider each of these aspects of the case.[3]
I. CANCELLATION
A. COVENANT AGAINST CONTINGENT TEES
The defendant contends that it validly canceled the contract in the summer of 1954 because (1) Acme misrepresented and concealed its employment of a part-time agent to secure government contracts; and (2) such an arrangement violated the covenant against contingent fees.
For many years prior to the events with which we are concerned, Acme enjoyed some prestige as a manufacturer of processing tanks, boilers, containers, and related equipment for the distillery, brewery, and sugar industries — a predominantly civilian market. In 1952 it sought to enter the field of government procurement to provide a cushion against the fluctuations of its commercial sales, particularly in periods of war-born material shortages. Lacking expertise in this prospective market, plaintiff engaged, in the early fall of 1952, the services of Harry K. Tucker, Jr., and James S. Norris, who represented accurately that they were experienced in government procurement procedures, but concealed their dishonorable intentions to victimize their employer. At first, the team was paid under an informal arrangement providing for commissions on sales and a minimum salary guarantee. On October 13,1952, Tucker entered into an express one-year contract with Acme, whereby he and/or his “organization” agreed to serve as a “bona fide sales agent” on a part-time basis.[4] Under the agreement, Tucker was to be paid a weekly minimum salary of $150, which would be increased to five percent of his weekly gross sales up to $10,000 (i.e., sales by Acme under contracts obtained through him), plus three percent of such weekly gross *334 sales in excess of $10,000. Minimum salaries paid prior to any sales by Tucker were to be deducted, later, from the excess of his commissions over his minimum weekly guarantee. The result was that the guaranteed weekly salary was a nonrecoverable advance against commissions; Acme could, however, cancel the contract if commissions failed to cover the minimum salary guarantee. Norris and Tucker also entered into an agreement with each other that Norris would receive fifty percent of any fees paid Tucker by his other clients for enabling them to obtain subcontracts from Acme. Plaintiff was unaware of this latter arrangement.
Tucker shortly produced a deluge of inquiries, bid proposals, and invitations from both commercial and government sources. Among these were the invitations to bid on the contract at bar (Contract 1213), as well as the agreement (Contract 8580) which is the subject matter of the other suit, No. 538-59.
On October 23, 1952, Acme submitted its original bid for Contract 1213 to the Philadelphia Ordnance District. The bid form contained a provision requiring the contractor to represent whether it had or had not (boxes were supplied after each of the alternatives for inserting a mark to denote the correct fact) “employed or retained a company or person (other than a full time employee) to solicit or secure this contract.” In its October 23rd.bid, James S. Norris, as “General Manager of the Defense Work Department,” certified that plaintiff had not retained such a person. Under a revised proposal, dated December 10,1952, and also signed by Norris, plaintiff made a directly contrary representation. On December 18,1952, however, Acme once again reversed its position. Joshua Epstein, president of Acme, executed a government form entitled “Contractor’s Statement of Contingent or Other Fees”, in which he, either accidentally or deliberately, filled in one of the two alternative boxes to indicate that Acme had not retained a part-time employee to secure the contract. This representation was incorrect, since plaintiff had, in early October, hired Tucker on a part-time basis to solicit government contracts.
We assume, for this part of the case, that these misrepresentations, or the substance of the Acme-Tucker contingent *335 fee arrangement, or both, breached tbe contract. But the crucial point is that the defendant, after obtaining knowledge of the facts, waited until over a year later before canceling the agreement. Could an election to cancel be delayed for such a time? We hold not. In our view, an election to annul the contract had to he made with reasonable promptness after the Government gained knowledge of the facts; by putting off its decision for an inordinately long period, the defendant lost the right it earlier had to terminate the contract without incurring any cost.[5]
As early as May 1953, the Philadelphia Ordnance District had sufficient information to determine whether Acme had previously made any misrepresentations relating to contingent fees or had violated the covenant. In June 1953, defendant nevertheless issued a supplemental agreement, which increased the number of rifles to be manufactured under the contract from 2,322 to 2,751 (an 18% increment). Despite the production difficulties it encountered, plaintiff continued manufacturing the rifles until Ordnance directed it to suspend all work under the contract on July 22, 1954. Cancellation for unspecified “statutory violations” followed on August 18', 1954.
This phase of the case — as distinguished from the Government’s responsibility to reimburse Acme for payments to Tucker in violation of the covenant against contingent fees— is governed by the rule that, “[Wjhere a contract is breached in the course of its performance, the injured party has a choice presented to Mm of continuing the contract or of refusing to go on. If he chooses to continue performance he has doubtless lost his right to stop performance * * 5
Williston, Contracts § 683 (3d ed. 1961) (footnotes omitted); e.g., Lummus Co. v. Commonwealth Oil Refining Co., 280 F. 2d 915, 929-30 (C.A. 1), cert. denied, 364 U.S. 911 (1960); Lichter v. Goss, 232 F. 2d 715, 720 (C.A. 7, 1956). After discovering the contingent-fee violations, defendant could not wait for over a year to decide whether it wished to annul the contract as a whole, on that basis. The sanction of contract *336 cancellation is too drastic to permit a long delay. Beyond the time reasonably necessary to determine if there has been a misrepresentation or a violation of the covenant,[6] the defendant cannot allow an .unwary contractor to continue per-íormancé and thus incur large expenses, all of which the Government will refuse to reimburse if and when it decides to caneel the contract on the ground of the violation. As this court said in Companhia Atlantica v. United States, 148 Ct. Cl. 71, 78, 180 F. Supp. 342, 347, cert. denied, 364 U.S. 862 (1960), “it would be a great wrong to permit the Government to awaken such a ‘sleeper’ to justify its cancellation * *
In that case, the plaintiff had fully apprised the defendant of the contingent fee arrangement at the outset of negotiations, which lasted over a year. The Government then canceled its contract for the purchase of tungsten from the plaintiff less than two months after the agreement had been signed, and later sought to defend its action on the grounds that the covenant against contingent fees had been violated. Although the court found that there was no violation, it also based ..its decision on the alternative ground that the defendant had waited too long before annulling the contract. Here, too, we refuse “to awaken such a ‘sleeper’.”
The severity of contract cancellation makes the present case, in this aspect, wholly unlike one in which the Government simply attempts to recover or withhold funds paid in violation of the covenant against contingent fees. That type of action is governed by the principle that, where government officials have erroneously or illegally paid out money, mere delay in seeking its recovery will not preclude a suit by the United States. See Acme Process Equipment Co. v. United States, Ct. Cl. No. 538-59, ante, pp. 272-75, decided this day. But when the Government cancels an entire contract because of a breach of the covenant, it can refuse to reimburse the contractor, not only for wrongful or illegal expenditures, but *337 also for amounts to which tbe contractor would otherwise be legally entitled. To avert extreme hardship, we think that the Government is obliged to take such a course within a reasonable time after it has discovered the breach.[7]
The defendant does not seem to question that an unconscionable delay in raising a misrepresentation or a violation of the covenant against contingent fees as a ground for annulment will preclude the Government from thereafter urging that defense. It contends instead that there was no unreasonable delay, because the Government did not discover all the material facts until shortly before the actual cancellation. The evidence fails to bear out this argument.
In connection with its other major government contract (“8580”), Acme correctly represented, on November 4,1952, in the bid which it submitted to Eock Island Arsenal that it had employed a part-time agent to obtain the contract. On or about December 12,1952, Eock Island received from plaintiff a formal “Contractor’s Statement of Contingent or Other Fees,” to which was attached a copy of Acme’s employment contract with Tucker dated October 13,1952. Contract 8580 was awarded to plaintiff by Eock Island on January 8, 1953, but was administered by the Philadelphia Ordnance District, the same agency which handled present Contract 1213 from *338 its inception. Thus, even prior to the award of Contract 1213 to Acme on January 27,1953, the contracting Ordnance District bad access to the Tucker employment agreement, which was physically incorporated in the Contract 8580 file, although the District had no particular reason to refer to that part of the file.[8]
On May 18, 1953, the Ordnance District was again told of the agreement between Acme and Tucker. Plaintiff informed representatives of the Ordnance District that Tucker had been a full-time employee since January 1953, that his original part-time contract on a commission basis had been ended, and that he had received no commissions under the prior agreement. The letter also referred to the contingent-fee statement previously filed with the Pock Island Arsenal and asked that it be withdrawn.[9] See finding 8(f). The defendant was thus told that (1) at the time that the plaintiff made its bid 'and negotiated for Contract 1213, it had in its employ a part-time agent whom it had hired to solicit government contracts; and (2) that agent was Harry K. Tucker, Jr., who, along with his father, had been under surveillance by the Government for suspected statutory violations in connection with prior contingent fee arrangements. Finding 3. Furthermore, by referring back to the bid and the related forms which Acme submitted to Ordnance in connection with Contract 1213 (and to which Acme specifically referred), the Philadelphia Ordnance District could easily have discovered the prior misrepresentations. Yet the defendant waited for fourteen months before canceling the contract. During this period the plaintiff continued to perform and to incur expense.
The Government seeks also to justify the delay on the ground that it was not told all the relevant facts until shortly before it canceled. It emphasizes an alleged informal agreement between Tucker and plaintiff’s president, entered into when he first began working for Acme in the fall of 1952. *339 Under that agreement, Tucker was to receive a three percent commission, which he agreed to share equally with Norris. But the only evidence in the record of this arrangement is a written statement made by a General Accounting Office investigator in June 1955, on the basis of an interview with Joshua Epstein, Acme’s president. Even if we accept at full value this second-hand statement made three years after the events, there is no way of knowing whether the alleged informal agreement was superseded by Tucker’s written contract. If that was the case — which it might well have been — this commission-splitting agreement lasted no more than two weeks. In this state of the proof we cannot give any significance to this alleged side-agreement. Other than the information referred to in footnote 9, supra, this is the only “fact” which the Government can point to as remaining undisclosed after May 1953. We do not hesitate, therefore, to conclude that the defendant had sufficiently full knowledge of the contingent-fee arrangement as of May 1953, and could not delay until July 1954 to elect on that ground to exercise the drastic remedy of complete cancellation.[10]
B. ANTI-KICKBACK ACT
The Tucker organization victimized Acme chiefly through the receipt of illegal kickbacks. Unknown to plaintiff, various small manufacturers in the metals field had service contracts with Tucker similar to the one he had with Acme. Under those agreements, Tucker received a minimum weekly guarantee, as well as commissions for obtaining contracts. When plaintiff, through Tucker and Norris, let subcontracts to secret clients of the two conspirators, each subcontract necessarily contained an amount to cover the fee paid to Tucker and shared by Norris. Since the pair not only prepared Acme’s government contract bids, but also negotiated all its related subcontracts, they were in a splendid position to mulct their employer.
*340 The subcontract let to All Metal Industries, Inc. is the most flagrant example of the Tucker-Norris extortion scheme. More is involved than the secret commissions which the two received from All Metals for enabling it to secure subcontracts from the plaintiff. In addition, Tucker, Norris, and Jack Epstein, who was a plant superintendent and minor stockholder of Acme,[11] forced All Metals to agree to pay $23,500 to them through Gunn Engineering Company, a dummy corporation. It was understood that All Metals would pass this cost on to Acme by including it in the subcontract price. All Metals actually paid $12,000 to Gunn under the agreement. When the conspirators later became fearful of exposure, they attempted to expunge all evidence of the transaction from the subcontractor’s books. Through an oversight, however, they left in the cost-structure of All Metals’ ultimate subcontract price to Acme the $12,000 already paid to Gunn Engineering Company (although this sum was more than offset by Tucker’s waiver of certain commissions which All Metals owed; him). Even after All Metals decreased its ultimate price to less than that contemplated prior to the extortion scheme, the reduced price still reflected some portion of the combined fees which All Metals had paid or agreed to pay to Tucker and Gunn. Bookkeeping technicalties tend to obscure this fact, but, in the final analysis, had Contract 1213 been of a cost-reimbursable nature, the Government would ultimately have borne part of the cost of the kickbacks. See findings 20 and 21.
The arrangements between Tucker and other firms for which he obtained subcontracts from Acme were less complex, but hardly less reprehensible. For instance, Manala-pan hired Tucker in November 1952 and agreed to pay him $100 weekly as a nonrecoverable advance against commissions. As a result, Manalapan obtained a series of small purchase orders from Acme under Contract 1213 from February *341 through July 1953. The subcontract prices hid the $1,350 in commissions and/or salaries which Manalapan paid Tucker and which Tucker shared with Norris. . The conspirators entered into comparable agreements with several other subcontractors. See findings 18-25. These subcontractors knew or should have known that Tucker was Acme’s agent, but the responsible officials of Acme were not aware of the double agency.[12]
In these circumstances, the defendant claims that Acme violated the Anti-Kickback Act, 60 Stat. 31, as amended, 41 U.S.C. § 51, and that that violation authorized the Government to cancel the contract. The Anti-Kickback Act, first enacted in 1946, was significantly amended in 1960. 74 Stat. 740. Both versions retroactively prohibit the payment of any compensation or gratuity by a subcontractor to an agent, employer, or official of a higher tier subcontractor or a prime contractor with the United States. By the terms of the statute, such compensation is conclusively presumed to be included in the price ultimately paid by the Government, and the United States may bring a civil action against the prime contractor, subcontractor, or the agent to recover that amount. Along with this civil remedy, the statute provides criminal penalties against persons knowingly making or receiving prohibited payments. Under the 1946 Act, coverage is limited to government contracts on a “cost-plus-a-fixed-fee. or other cost reimbursable basis.”[13]
*342 Tucker, Norris, and Jack Epstein were indicted for violation of the Anti-Kickback Act and brought to trial in the United States District Court for the Eastern District of Pennsylvania. After presentation of the Government’s case, in April 1956, a defense motion for acquittal was granted on the ground that the statute did not apply to this type of contract. The district judge felt that a negotiated fixed-price contract, with a price redetermination provision permitting a retrospective or prospective increase within a narrow range, was not a cost-reimbursable contract within the meaning of the Act. The court made scathing comments as to the conduct of the accused, observed that Acme had been victimized, and recommended legislation to amend the statute to apply to this situation. Because of the uncertainty with regard to the coverage of the 1946 Act, the Comptroller General thereafter recommended to Congress that it be revised. In the Act of September 2,1960, an amendment was adopted which retroactively broadened the coverage of the statute to include all negotiated contracts (defined to mean all contracts made without formal advertising). No other essential change was made. 74 Stat. 740, 41 U.S.C. § 51.
The Government first claims that it was entitled to cancel Contract 1213 for violation of the original Anti-Kickback *343 Act. It asserts that when. Congress, in 1946, provided a civil remedy entitling the Government to recover the amount of the kickback, it did not intend to alter the pre-existing common law remedy of contract cancellation. The major stumbling block is the absence, so far as we know, of any decision or comment in support of the proposition that there was such a remedy at common law. In fact, the House Report on the 1946 Act states, “There is no existing statutory or other authority of law under which it may be said that the United States clearly has a right to recover the amounts of any such fees or gratuities.” H.R. Kept. No. 212,79th Cong., 1st Sess. 2 (1945). A fortiori, it is highly doubtful that there was any pre-existing right of the Government to cancel the entire contract of a prime contractor whose agents received improper kickbacks of which he was unaware.
In its effort to invoke a forfeiture, the most drastic civil penalty known to common law, the Government has cited only sparse collateral support. There are statements in United States v. Davio, 136 F. Supp. 423, 428 (E.D. Mich., 1955), that the Anti-Kickback Act codified the prior common law remedy. But that suit was for the recovery of amounts paid as kickbacks. Nowhere does the court hint that the Government had a pre-existing right of contract cancellation in the present circumstances.[14] Whether it was codifying an existing right or creating a new one, Congress, when it enacted the 1946 legislation, gave the Government only one civil remedy against contractors whose agents had received secret kickbacks. Had the legislature wished to provide the additional remedy of contract annulment, it could have done so. Cf. Armed Services Procurement Act of 1947, § 4, 62 Stat. 21, 23, 10 U.S.C. § 2306(b). In the absence of any statutory indication that the Government has a right to cancel the contract in this situation, it is not for the court to engraft a new *344 and drastic remedy onto the Anti-Kickback Act. Cf. Unexcelled Chemical Corp. v. United States, 137 Ct. Cl. 681, 684 149 F. Supp. 383, 385 (1957).
Furthermore, we have grave doubts about the applicability of the 1946 Act to the present contract. If it is not applicable, the Government’s position must be rejected for the additional reason that in 1953 and 1954 there was no recognized federal public policy invalidating Contract 1213. Cf. Muschany v. United States, 324 U.S. 49, 66-67 (1945) .[15] If the 1960 anti-kickback legislation was the first provision covering Contract 1213, the improper actions which took place in 1953 hardly contravened “long government practice or statutory enactments.”[16] When Acme’s agents received kickbacks about which plaintiff had no knowledge, it can scarcely be said that plaintiff (as distinguished from the agents) violated “obvious ethical or moral standards”, and that its contract with the defendant could therefore be canceled on that ground.
The unreported district court decision granting the motion for acquittal of Tucker, Norris, and Jack Epstein is, of course, a direct holding that the 1946 anti-kickback legislation did not cover the present contract.[17] One of the primary reasons behind the enactment of the 1960 amendment was to remove serious doubt that fixed-price contracts with redetermination clauses were included in the act’s coverage. See S. Eep. No. 1585,86th Cong., 2d Sess. 2-6 (1960). While the Tenth Circuit has held that the 1946 Act covers certain contracts having price-redetermination provisions, *345 it emphasized that the contract with which it was dealing had “no limitation * * * upon the range of redetermination or revision of prices, upward or downward.” United States v. Barnard, 255 F. 2d 583, 588 (C.A. 10), cert. denied, 358 U.S. 919 (1958). Acme’s contract, however, had a limited range of upward revision. See finding 15. The applicability of the 1946 Act to Contract 1213 is thus highly questionable.
For these reasons, the present case is not like United States v. Mississippi Valley Generating Co., 364 U.S. 520 (1961). There, the dual agent violated a federal conflict-of-interest statute, 62 Stat. 703, 18 U.S.C. § 434, in the negotiation of a contract entered into with the United States. Unlike our case, the statutory provision which the agent violated was undoubtedly on the books at the time of the misconduct. Also, the statute itself provided no more than a criminal sanction. Had the Supreme Court refused to imply a civil remedy, “the public [would] be forced to bear the burden of complying with the very sort of contract which the statute sought to prevent.” 364 U.S. at 563. Here, the civil remedy established by the statute enables the Government to recover any amounts it has paid out as a result of kickbacks; the public does not bear any part of the expenses illegally incurred. And most significantly, the violation in Mississippi Valley Generating Co. affected the validity of the entire transaction. In the negotiations preceding the contract, the Government was represented by a consultant who was, at the same time, associated with an investment banking company which stood to profit if the plaintiff was awarded the contract. The contract was the result of these tainted negotiations. In addition, the plaintiff itself was not altogether innocent, since it was well aware of the possible conflict of interest. 364 U.S. at 565 n.19. The kickbacks with which we are concerned, however, were in no way related to the negotiation and execution of Contract 1213, and do not affect its validity. They were separate transactions made without the knowledge of the plaintiff, which certainly had nothing to gain by these secret dealings. The principles of Mississippi Valley Generating Co. do not *346 require or suggest that the contract at ¡bar could or should be canceled because of the secret receipt by Tucker-Norris of kickbacks from subcontractors.[18]
C. CONFUCT-OE-INTEREST STATUTES
Defendant urges that Acme’s employment of Harold J. Lee and Charles G. Hochstuhl contravened certain provisions of the federal conflict-of-interest statutes, thereby making the contract voidable by the Government.
In the early stages of contract performance Acme was experiencing production problems with machines and tooling supplied by the Government under a companion facilities contract. At plaintiff’s request Watervliet Arsenal ordered Harold J. Lee, a machinist lead foreman at the Arsenal, to report to Acme’s Lansdale plant to assist plaintiff in its technical problems. Under his official orders Lee worked at Acme’s plant from his arrival on April 20 until April 24, 1953, at government expense. The Arsenal refused Acme’s request that it loan Lee’s services for an additional week at government expense. Instead, Lee was given official permission to remain at the plant, advising plaintiff in an absent-without-pay status from April 27 to May 1, 1953. During this latter period he worked 96 hours, for which Acme paid him $5 per hour plus hotel expenses (compared to his government salary rate of $2.60 per hour). The amounts paid by Acme to Lee were charged against Contract 1213. Plaintiff was pleased with Lee’s services and commended him to Watervliet Arsenal. Upon his return Lee filed with the Arsenal a trip report, which described the production problems he had observed and the advice he had given Acme personnel for their solution. In large part the report reflects the inexperience of Acme’s persomiel 'and their lack of necessary equipment. There is no evidence of any improper *347 conduct on tbe part of plaintiff or of Lee — aside from the propriety of his being hired at all. The defendant concedes that Lee’s employment by plaintiff did not affect his impartiality, a fact which is evident from the contents of his report and the effect of his testimony as a witness 'at the trial of this case.
A federal statute precluded any “employee of the United States or any department or agency thereof” from receiving “any compensation for any services rendered * * * in relation to any * * * contract * * * in which the United States is a party.” 62 Stat. 697.[19] During the week he received a salary from Acme, Lee was not on the Government’s payroll at all. We are not concerned with the undercover activities of an employee who pretends to be working for the Government while secretly performing services for a contractor. During that week, Lee received a reasonable salary from plaintiff 'and performed valuable services about which the defendant was fully informed. It may well have been poor judgment for Acme to hire, or the defendant to permit the hiring of, Lee’s services under this arrangement (rather than detailing Lee for an extra week to Acme’s plant on the Government’s payroll).. The fact remains that both parties acquiesced in the arrangement so that, for one week, Lee was not working for the Government at all; in effect, he became an Acme employee. As such, the compensation which he received did not fall under the statute and the harsh sanction of forfeiture need not be considered.
After Contract 1213 was awarded to Acme, Charles G. Hochstuhl of Philadelphia Ordnance District was assigned to administer it, along with other contracts. As part of his duties in connection with 1213, Hochstuhl recommended! changes in the delivery schedule, and journeyed to Ohio in March T953 in the company of Acme officials to show them *348 existing gun-manufacturing facilities.[20] He was removed from bis position witb the Government effective August 4, 1953, “* * * for making material false statements and exaggerations on [his] application standard Form 57,” relating to prior private employment. During his notice period, Hoch-stuhl looked for other work and was employed by Acme in August 1953, immediately following his release. The defendant advised Acme at the time that, for two years thereafter, Hochstuhl could not engage in negotiations with his former employer concerning Acme’s contracts.
During the first few weeks of his employment by Acme, Hochstuhl helped Norris as a subcontract expediter. After Norris was discharged- in September 1953 and replaced by Jack Epstein as superintendent of the Lansdale plant, Hoch-stuhl was designated Epstein’s assistant. As such he was given a variety of assignments, all of them involving one form or 'another of paper work. He established a control system for subcontracts, prepared letters to Ordnance for signature by others, correlated plant inspections, and assisted in the preparation of requests for change orders. He had no personal contacts with government representatives in connection with plaintiff’s contracts.
3h the fall of 1953 Hochstuhl came across a number of vouchers and other cost records in the files, which related to repairs made by Acme to government-owned machines supplied under Facilities Contract 1214 (related to Contract 1213). On his own volition and in the interest of keeping adequate cost records, Hochstuhl undertook to segregate and allocate the cost records to individual machines; thereafter, as additional repairs were made to the machines, he kept a running record of them. There is no suggestion that this record was originally made for the purpose of a claim against the Government; in the fall of 1953 there was no prospect of the contract cancellation which took place in July-August 1954. In September 1954, at the direction of *349 his superiors, Hochstuhl prepared an up-to-date record of Acme’s expenditures in repairing the various government-owned machines. It was based on the data he had compiled a year earlier and had kept current in the meantime. The cost record was attached to a letter from Acme (signed by Sidney Cohen, its secretary-treasurer) to Ordnance on September 7, 1954, in which plaintiff refused to return the machines to the Government unless it gave assurance that Acme would be reimbursed .for its cost of repairs. See finding 53.
The defendant charges that Hochstuhl’s participation in the preparation of Acme’s claim for reimbursement violated a penal conflict-of-interest statute, which provided that, “within two years after the time when [federal] employment or service has ceased,” a former government employee may not “prosecute * * * any claims against the United States involving any subject matter directly connected with which such person was so employed.” 62 Stat. 698. Casting aside any doubts that Hochstuhl’s work for the defendant was “directly connected” with a claim made by Acme, we reach the question whether his services for Acme amounted to “prosecution” of such a claim. Hochstuhl simply compiled data on which his superiors based a claim which they presented to the Government. The basic information was first assembled by him purely as a matter of record-keeping, i.e., before there was any specific thought of a claim. Moreover, Hochstuhl’s participation in the total claim process was merely clerical in nature. Other personnel in plaintiff’s employ could just as readily have performed the relatively simple duties involved in compilation of costs relating to repair of machines, and his prior government service gave Hochstuhl no special knowledge or inside contacts which contributed to the undertaking in any way that we can see. There is a complete absence of evidence that Hochstuhl participated in the presentation of the claim to the Government after he had completed his assignment. On these facts, we hold that Hochstuhl’s activities did not violate any conflict-of-interest statute or afford the defendant a valid basis for annulment of the contract.
*350 D. FALSE CLAIMS ACT
The last reason which the defendant gives for vitiating the contract is the presentation of certain allegedly false claims for payment, both before and after cancellation. As a result of these submissions, the Government argues, Acme’s claim was subject to forfeiture under 62 Stat. 978, 28 TJ.S.C. § 2514,[21] and the corporation may be fined under the False Claims Act, 12 Stat. 696,31 U.S.C. '§ 231.[22]
In offering cost figures to the Government on April 29, 1954, in support of its request under the price-redetermination clause for allowance of the maximum ceiling price, plaintiff included certain costs which, while actually expended, are said by defendant not to have been properly chargeable to this contract. These were: subcontractors’ costs which included without specification commissions which they had paid to the Tucker group; $12,000 which All Metals had included in its subcontract price to Acme as a result of the extortion scheme carried out by Tucker, Norris and Jack Epstein; payments of salaries and/or commissions by plaintiff to Tucker; $1,045.52 charged by Norris against the contract for personal services rendered by plaintiff’s employees on Norris’ farm (the facts of which were first discovered by the Government in December 1953); $470 plus hotel expenses paid by plaintiff to Harold J. Lee, whose services have previously been described; and minor hotel, meal and entertainment charges for government employees. The defendant’s Board of Awards approved the requested increase in the price *351 on the basis of revised data, but final action was not taken because the contract had been canceled in the meantime.
Another set of allegedly false claims came during the pend-ency of this suit when the parties held settlement negotiations. In conjunction with these efforts, plaintiff submitted the fiscal aspects of its claim to the Government in August 1958 on a standard contract-termination form, certifying in part that “they have been prepared with knowledge that they will, or may, be used directly or indirectly as the basis of settlement of a claim or claims against the United States * * In its proposal, plaintiff reclassified several of the previously-mentioned cost items as General and Administrative expenses rather than direct charges, thus allocating only a portion of them to the performance of Contract 1213. This settlement claim was subsequently rej ected.
With some modifications the same cost items were again submitted by plaintiff in June 1961 in response to the issuance of an order by the court under former Rule 28(b). This last submission, which dealt separately with the plaintiff’s claims and those of its subcontractors, was accompanied by a letter in which plaintiff said that it had not audited the subcontractors’ claims but believed them to be accurate; the covering letter also invited the Government to confer with plaintiff as to any items in the claim which were not properly includable. This Rule 28 damage schedule eliminated certain costs which had been obj ected to in the termination settlement proposal (payments to Lee, expenses in connection with Norris’ farm, certain travel expenses of Tucker, and a. few entertainment expenses). Other controverted expenditures were, however, retained in the category of General and Administrative expenses, so that they were proportionately allocated to the contract in suit (i.e., Tucker’s salaries and/or commissions paid by plaintiff and the subcontractors).
The defendant has asked not only that the plaintiff’s entire claim be forfeited for practicing “fraud against the United States in the proof * * * thereof” (62 Stat. 978, 28 U.S.C. § 2514, supra); it has also filed a counterclaim under the False Claims Act, 12 Stat. 696, 31 U.S.C. § 231, *352 supra,, seeking an affirmative judgment of $6,000 for plaintiff’s misrepresentations in the price redetermination proceedings, in the termination settlement proposal, and in the schedule submitted pursuant to former Eule 28(b). But “fraud, resulting in forfeiture, can be found only on the basis of clear and convincing evidence.” Chelsea Factors, Inc. v. United States, 149 Ct. Cl. 202, 212, 181 F. Supp. 685, 691 (1960). In the Government’s effort to supply such “clear and convincing evidence,” there is at least one large gap. Plaintiff’s costs, exclusive of those challenged as improper, overwhelmingly exceeded the contract ceiling price for which the application in April 1954 was designed to obtain approval. In a letter sent to the Philadelphia Ordnance District in connection with the application, Acme’s accountants noted that certain “recommendations of the Army Audit Agent as to record keeping were not followed because the difference between the ceiling price and the actual costs incurred was so great that any further expenditures on this job should not be undertaken unless * * * absolutely necessary.” At the same time, the accounting firm pointed out that the Army would have to disallow $600,000 of Acme’s costs in order to fall below the ceiling price of $1,191,077. Defendant’s Exhibit 70. The inclusion of the controverted items was thus unnecessary to justify receipt of the ceiling price. Plaintiff had nothing to gain by insertion of these disputed amounts in its claim. That circumstance strongly tends to negate the affirmative intent to defraud which defendant must establish.[23]
Moreover, at the time of the submission of the 1958 and 1961 claims, and probably as early as the initial claim in April 1954, the defendant was aware of the facts concerning each of the allegedly false items. Also, the plaintiff had actually expended the sums involved and, at least in several instances, the propriety of charging them as contract *353 costs, either directly or indirectly by allocation through an overhead account, was debatable or a matter of judgment. While the inclusion of these items may have displayed poor judgment, we are not convinced, in the circumstances, that the plaintiff was endeavoring to deceive.[24]
Citing United States v. Fox Lake State Bank, 225 F. Supp. 723, 724-25 (N.D. Ill., 1963), defendant argues that it is required, as a precondition of forfeiture, to show only that Acme knowingly submitted false claims. But Fox Lake involved the False Claims Act, 12 Stat. 696, 31 U.S.C. § 231, which does not encompass forfeiture as a sanction. To justify cancellation of the contract, the Government must prove its case under 62 Stat. 978, 28 U.S.C. § 2514, which provides for forfeiture of claims made by “any person who corruptly practices or attempts to practice any fraud against the United States.” The statute also requires that the Court of Claims “specifically find such fraud or attempt.” An actual intent to defraud is a prerequisite to annulment of the contract under these provisions. See e.g., Pewee Coal Co. v. United States, 142 Ct. Cl. 796, 806, 161 F. Supp. 952, 958 (1958), cert. denied, 359 U.S. 912 (1959); Kamen Soap Products Co. v. United States, 129 Ct. Cl. 619, 641, 124 F. Supp. 608, 620 (1954).
For the same reasons, a related defense asserted by the Government must likewise fail. The defendant contends that, independently of 'any statutory provision, it was entitled, on the basis of Carrier Corp. v. United States, 164 Ct. Cl. 666, 328 F. 2d 328 (1964), to cancel the contract for the fraudulent and illegal acts of the contractor. But in Oarrier the court stated unequivocally, “There is no doubt that a fraud was committed.” 164 Ct. Cl. at 678, 328 F. 2d at 334. In the present case, we have, as we have said, very grave doubts that Acme, through submission of the disputed claims, ever intended to defraud the Government. *354 Defendant has failed to bear its burden of proving the defense of fraud.[25]
We come now to defendant’s counterclaim for $6,000 under the False Claims Act, 12 Stat. 696, 31 TJ.S.C. § 231, which imposes a $2,000 fine for “any claim upon or against the Government” submitted by one “knowing such claim to be false, fictitious or fraudulent.” If Acme included cost items in its 1954 price-redetermination statement even though it knew them to be false, it is subject to a $2,000 fine. See, e.g., United States v. Fox Lake State Bank, 225 F. Supp. 723, 724-25 (N.D. Ill., 1963) ; but see United States v. Park Motors, Inc., 107 F. Supp. 168, 174-77 (E.D. Tenn., 1952).[26] Although Acme could not be certain that expenses such as the salaries paid to Tucker were not reimbursable, it could have had no similar doubts regarding the personal services rendered by Acme employees on Norris’ farm. This matter was brought directly to the attention of Acme officials by the Federal Bureau of Investigation, but plaintiff failed to remove Norris’ personal expenditures from the charges claimed on Contract 1213. Finding 26. This $1,045 charge was subsequently included as a cost component in Acme’s April 1954 request for the contract ceiling price. In that manner, plaintiff knowingly submitted a false claim and is subject to a fine of $2,000.
The Government maintains that inclusion of the same items in the claims submitted by Acme in 1958 and 1961 justifies the imposition of two more civil penalties of $2,000 each. But Norris’ farming expenditures were not included in the 1961 statement, and it is difficult to imagine that plaintiff even recalled this item when it submitted the 1958’ termi *355 nation-cost proposal. Moreover, we are not dealing with different expenditures; the subsequent claims contained the same costs which the Government had previously challenged. The present case is unlike those in which numerous vouchers are submitted to the Government, and each contains a separate and distinct false claim for which the fine may be validly imposed. E.g., United States v. Ueber, 299 F. 2d 310, 313 (C.A. 6, 1962); United States v. National Wholesalers, 236 F. 2d 944, 950 (C.A. 9, 1956), cert. denied, 353 U.S. 930 (1957). We are faced, rather, with one false claim, which was denied by the Government and thereafter reasserted by the plaintiff. The court holds that the defendant cannot recover more than once for the very same false claim; it is therefore entitled only to $2,000 by way of counter-claim.
In sum, we conclude that none of the legal defenses which the Government has asserted justifies its cancellation of the contract in the summer of 1954 for the alleged fault of the contractor. When the Government is displeased with the contractor’s administration of an agreement, it may always sever contractual relations under the standard termination-for-convenience clause inserted in its contracts. John Reiner & Co. v. United States, 163 Ct. Cl. 381, 325 F. 2d 438 (1963), cert. denied, 377 U.S. 931 (1964). But if the United States seeks instead to annul a contract for fault, thereby leaving the contractor wholly uncompensated, it must have proper justification for such harsh consequences. Klein v. United States, 152 Ct. Cl. 8, 285 F. 2d 778 (1961); Nesbitt v. United States, 170 Ct. Cl. 666, 345 F. 2d 583 (1965), fn. 2.
n. plaintiff’s damages
A.. GENERAL STANDARD
Having rejected each of the absolute defenses urged by the Government, we must determine the appropriate measure of damages incurred as a result of the improper cancellation. The position advanced by the defendant, and accepted by the Trial Commissioner, is that plaintiff is entitled only to the traditional remedy of damages given by this court for breach of an express contract. The purpose of that remedy is to place the party against which the breach has been com *356 mitted in the position it would have held if the contract had been fully performed. Acme had suffered large losses in the performance of Contract 1213 at the time it was wrongly canceled by the defendant. According to projections, however, Acme would have been able to reduce its losses considerably had it been permitted to complete the contract. The Trial Commissioner therefore determined that plaintiff was entitled to recover any post-cancellation costs incurred as a result of the Government’s erroneous action, plus the amount by which it would have been able to decrease its losses through completion of the contract. In this way, the Commissioner reasoned, Acme would be given the same benefits it would have received had it been permitted to carry out the agreement.
. Plaintiff’s main argument is that it is entitled to restitution as an alternative remedy. Under that standard of relief, a party whose contract has been repudiated or otherwise breached may, if he meets certain conditions, recover the reasonable value of his services, measured as of the time of performance. The purpose is to restore the injured party to the pre-contract status quo, not to put him in his post-contract position. Restitution has long been recognized by the commentators as one of three possible remedies for the substantial breach of an express contract, the others being damages and specific performance. See Restatement, Contracts §§ 347-57; 5 Corbin, Contracts §§ 1102-21 (1951) ; 5 Williston, Contracts §§ 1454-85 (rev. ed. 1937). The Restatement contains a full discussion of restitution in its chapter entitled “Judicial Remedies for Breach of Contract.” Corbin states explicitly, “In the present chapter we are dealing with restitution as a remedy for breach of contract; a judgment for such restitution is as truly a remedy for a ‘breach’ as is a judgment for damages.” 5 Corbin, Contracts § 1104 (1951). The applicability of restitution as an alternative remedy for breach is also well-established in both the federal and the state courts. E.g., Michael Del Balso, Inc. v. Carozza, 136 F. 2d 280 (C.A.D.C., 1943) ; United States ex rel. Susi Contracting Co. v. Zara Contracting Co., 146 F. 2d 606, 610 (C.A. 2, 1944); Southern Painting Co. v. United States ex rel. Silver, 222 F. 2d 431, 433-34 (C.A. 10, 1955); *357 Valente v. Weinberg, 80 Conn. 134, 67 Atl. 369 (1907); Pelletier v. Masse, 49 R.I. 408, 143 Atl. 609 (1928) .[27]
Although, the Court of Claims has permitted quantum meruit recovery for contracts implied in fact (see, e.g., New York Mail & Newspaper Transp. Co. v. United States, 139 Ct. Cl. 751, 759, 154 F. Supp. 271, 276, cert. denied, 355 U.S. 904 (1957)), no past contractor has successfully sought restitutionary relief for breach of an express contract. But unless this form of recovery is precluded by our general jurisdictional statute, 28 U.S.C. § 1491, we must be guided by the principal that, “When the United States, with constitutional authority, makes contracts, it has rights and incurs responsibilities similar to those of individuals who are parties to such instruments.” Perry v. United States, 294 U.S. 330, 352 (1935). See, also, New York Mail & Transp. Co. v. United States, supra, 139 Ct. Cl. at 759, 154 F. Supp. at 276; Refining Associates, Inc. v. United States, 124 Ct. Cl. 115, 120, 109 F. Supp. 259, 261 (1953). Since contracts with the United States are to be governed by the same principles as “those between man and man” (Gilbert v. United States, 1 Ct. Cl. 28, 37 (1863), aff'd, 75 U.S. (8 Wall.) 358 (1869), and see Padbloc Co. v. United States, 161 Ct. Cl. 369, 377 (1963)), we are obliged to award restitution to a petitioner meeting the prescribed qualifications, unless there is some jurisdictional impediment.
The Tucker Act empowers this court “to render judgment upon any claim against the United States founded * * * upon any express or implied contract with the United States * * *.” 28 U.S.C. § 1491. Although this precludes recovery on the basis of a contract merely implied in law (see Sutton v. United States, 256 U.S. 575, 581 (1921)), the plaintiff seeks restitution for breach of an express contract, which clearly comes within the ambit of the Act. The cases cited by the Trial Commissioner simply denied “quantum meruit” (i.e. restitutionary) recovery for the alleged breach of an express contract where the court determined that no breach *358 bad in fact taken place. See Lacchi Constr. Co. v. United States, 102 Ct. Cl. 324, 355-56 (1944); Frazier-Davis Constr. Co. v. United States, 100 Ct. Cl. 120, 161-62 (1943) ; Steel Products Eng'r Co. v. United States, 78 Ct. Cl. 410, 418 (1933).[28]
The Government says that, even if restitution is an available remedy, Acme has not met the conditions necessary for recovery on that basis. The accepted rule is that,
If the performance that the contract required of the plaintiff has been wholly prevented, and if the result of his labor and expenditure still belongs to him, he has no remedy by way of restitution. If the performance required was the production and delivery of a finished article, and the defendant wrongfully prevents completion and delivery of the article, the plaintiff cannot get judgment for the reasonable value of his work and labor in preparation to perform, except so far as it may be included in a claim for damages. Such work and labor is not itself requested or received by the defendant.
Kestatement, Contracts § 348, Comment “c”. Defendant contends that Contract 1213 was for the purchase of (completed) 75 mm. recoilless rifles from plaintiff, and therefore contemplated “the production and delivery of finished article^],” for the breach of which plaintiff is entitled only to damages. This misconceives the nature of the contract which states, expressly, that Acme is to “furnish and deliver” specified items (emphasis added). The entire pre-contract negotiations were based on the assumption that it was Acme which would manufacture the requested rifles. The defendant at first had reservations about plaintiff’s ability to perform the contract, but, after investigating Acme’s plant and personnel, the Government concluded that Acme and its subcontractors would be capable of carrying out the agreement. Defendant’s Exhibit 12. One of the contemplated benefits of awarding the contract to Acme was that “placing this procurement [in] subject contractor’s plant will not only broaden the manufacturing base but create a salutary *359 effect, pricewise, on all other procurements of this type.” Ibid. Thus, the Government contracted not only for a finished product, but also for the manufacture of that product by Acme. When an agreement of this nature is breached, restitution is available.
The next argument is that plaintiff’s recovery must be limited to the reasonable value of the goods it actually delivered prior to cancellation. It is clear, however, that restitution is permitted as an alternative remedy for breach of contract in an effort to restore the innocent party to its pre-contract status quo, and not to prevent the unjust enrichment of the breaching party. “Judgment will be given for the value of service * * * rendered, even though the product created thereby has been lost or destroyed by the defendant, and even though there never was any product created by the service that added to the wealth of the defendant.'[1]'[1] Restatement, Contracts § 348, Comment “a” (emphasis added). It is when the plaintiff is the party in default that his recovery may be limited by the amount of the benefit to the defendant. See 8clmasnich v. Blandin, 6'5 F. 2d 354,357 (C.A. 2,1933). But “if the promisee has performed so far as he has gone, and the promisor breaks his promise, the promisee may abandon thfe contract and sue for restitution, in which he can recover the reasonable value of his services, measured by what he could have got for them in the market, and not by their benefit to the promisor.” Ibid. See, also, Restatement, Contracts § 347, Comment “c”. Acme’s recovery is not limited to the value of the goods received by the Government under the contract; rather, it can be based on the reasonable value of the entire performance.
Acme’s position is that the reasonable value of its services is most accurately reflected by the actual costs it incurred in the performance of Contract 1213. As the best means of restoring the status quo ante, cost of performance is often used as the basis for determining the amount of quantum meruit recovery, in the absence of “any challenging evidence.” United States ex rel. Susi Contracting Co. v. Zara Contracting Co., 146 F. 2d 606, 611 (C.A. 2, 1944); see, also, United States ex rel. Arc & Gas Welder Associates, Inc. v. Blount, 182 F. Supp. 648, 665 (D. Md.), aff'd, 285 F. 2d 863 *360 (C.A. 4, 1960), cert. denied, 366 U.S. 919 (1961); United States ex rel. Wander v. Brotherton, 106 F. Supp. 353, 354-55 (S.D.N.Y., 1952). But if the defendant is able to show that the costs incurred by the contractor were excessive (as a result, for example, of inefficiency or extravagance), the amount of recovery is commensurately reduced. Cf. Barrett Co. v. United States, 273 U.S. 227, 235 (1927); United States v. Behan, 110 U.S. 838, 345-46 (1884).[29]
The record before us is inadequate to determine whether Acme’s costs were, in fact, excessive. Plaintiff’s expenses appear to be inordinately high even if one takes into account its lack of experience in this manufacturing line and the prospective advantage to the Government of broadening the base of procurement. The contract ceiling price, for instance, was $384.95 per unit, but plaintiff’s actual cost in manufacturing the first 446 rifles was $1,179.29, and its cost of production during the last six months of the contract was $690.21. See findings 7, 52(a), (c). Although it is conceivable that these expenditures accurately reflect the value of Acme’s services, the present record does not provide enough information for a sufficiently accurate answer. In particular, it would seem important to compare Acme’s costs with those of other manufacturers of the same rifles during that period, taking into consideration that Acme should be permitted greater reimbursement than established manufacturers because of its inexperience and the anticipated benefits of its entry as a competitor. Since this issue was not squarely presented at the original trial, the defendant had *361 no real opportunity to prove that plaintiff’s costs were inflated ; it should be permitted to do so now. We are therefore remanding the case to the Trial Commissioner under Rule 47 (c) for a separate determination of liability.
To the extent that Acme’s actual costs are used in making this determination, the Commissioner should consider that the amounts which plaintiff paid its subcontractors latently included reimbursements for kickbacks paid to various members of the Tucker organization. See findings 18-25. Although the defendant has not attempted to prove that any of the subcontract prices were inordinately high, the kickbacks involved were hardly ordinary business expenses incurred in manufacturing 75 mm. rifles. If Acme’s total costs are to measure the value of its services, they must be reduced by any kickbacks actually paid to the Tucker organization by plaintiff’s subcontractors. Nor should Acme be reimbursed for the amounts it paid to Tucker; for the reasons given in the companion case, we conclude that his employment violated the covenant against contingent fees. See Acme Process Equipment Co. v. United States, No. 538-59, ante, p. 251, decided this day.[30] Tucker’s salaries cannot be considered reasonable expenses which enhanced the value of Acme’s services to the Government. Neither the contingent fee payments nor the kickbacks may be included in the computation of Acme’s restitutionary recovery.[31]
B. GOVERNMENT-FURNISHED MACHINERY
Plaintiff urges that a determination of the reasonable value of its contract performance must take into account costs incurred as a result of defective government-furnished *362 machinery. By supplying deficient equipment, it is alleged, the defendant forced Acme to render additional services, which had market value and are compensable under the theory of restitutive recovery. The purportedly defective machinery was, however, furnished under a separate facilities contract, not the main contract. That agreement explicitly disclaimed liability “for damages or loss of profit by reason of any delay in delivery or failure to deliver any or all of the items set forth * * *, or for delivery of such items not in satisfactory operating condition or not of a suitable typeP (Emphasis added.) The contract also stipulated, “In the event [government-furnished] items are not in fit operating condition, the Contractor shall repair, restore, or rehabilitate such equipment so as to make it serviceable or fit for use (cost connected with such repairs, restoration, or rehabilitation shall not be reimbursed to the Contractor).” If the provisions concerning government property had been included in the main contract, such a disclaimer or limitation of liability for breach of warranty would possibly have to be disregarded under plaintiff’s theory, which fixes the measure of recovery by the value of the services performed, rather than by the terms of the breached contract providing or restricting compensation. But the facilities contract was separate and was not materially breached; its clauses limiting liability remain in effect.[32] We must therefore determine whether the plaintiff is correct that the disclaimer clause is less-than-absolute and does not bar recovery for increased costs resulting from defective government machinery.
Plaintiff would have us read this disavowal of liability as applicable only to ordinary repairs made following delivery of the equipment. Because the disclaimer refers to Acme’s obligation to repair the machinery in case of “delivery of such items not in operating condition,” Acme infers that the cost of extraordinary repairs incurred in the course of performance was to be borne by the defendant. Aside from the practical difficulty of separating “normal” and “extraordinary” expenses, there is a more basic objection. The *363 terms of the disclaimer are broad, and refer to Acme’s duty to repair items “not in operating condition,” without imposing any limitation as to the time when the equipment becomes inoperable or the amount of work required to fix it. There is no reason to qualify or limit the general sweep of the contract words.
On the other hand, along with the disclaimer, the facilities agreement also specified that, if the equipment supplied by the Government required repair as a result of defects present at the time of delivery, the “Contracting Officer, upon written request of the Contractor, may equitably adjust the price, the time of performance, and' other terms and conditions of the affected supply contract (s). * * * Any failure by the parties hereto to agree upon such equitable adjustment shall be determined in accordance with the article of the related supply contract (s) entitled ‘Disputes’.” See finding 35. We do not interpret these provisions as inconsistent with the explicit disavowal of liability. Instead, they specify the only form in which relief can be obtained for injuries resulting from substandard machinery furnished by the defendant; unless the contractor makes timely written request for an equitable adjustment, he must, according to the disclaimer, bear all costs of resulting delays and repairs. See, generally, Goodwin, Government-Furnished Property, Government Contracts Monograph No. 6, p. 17 (1963); Paul, United States Government Contracts and Subcontracts 267 et seq. (1964) ,[33]
During the course of contract performance, Acme made at least two written requests for reimbursement of costs incurred as a result of defects in equipment supplied by the defendant. See finding 39(b)(2), (6). About one week after cancellation, on August 26, 1954, the plaintiff filed a claim with the Philadelphia Ordnance District, asking to be repaid for all parts which it purchased to make the de *364 fendant’s machinery workable. Finding 44(a). This August 1954 request is challenged by the defendant as untimely. . Considering all the circumstances, we cannot agree. The machinery was supplied to plaintiff throughout 1953; although some performed reasonably well, other pieces required constant tinkering and broke down repeatedly, disrupting the smooth flow of production. See findings 39 (b), 43(c). At least as late as May 1954, flaws in the government machinery were still being encountered (see finding 39(b) (11)), and, if past experience is the guide, such difficulties were probably prevalent until the suspension of contract performance a little over a month later. Had plaintiff been required to ask for an equitable adjustment each time a minor defect was discovered, the result would have been a continuous flow of such requests to the contracting officer. The time and effort expended by both parties in effecting numerous equitable adjustments would have been excessive. Instead, Acme apprised the defendant of the various difficulties at approximately the time they were encountered, but, with several minor exceptions, it in effect waited until after the abrupt termination of the contract to make a single request for compensation. This was undoubtedly the most efficient manner of obtaining relief. Plaintiff’s cumulative demand for reimbursement in August 1954, as well as the two requests made prior to annulment of the contract, were timely.
Plaintiff’s letters sought reimbursement for repair costs, without specifically invoking the equitable adjustment provision of the facilities contract or the Disputes article of the supply contract. ' But the letters were easily understandable, and the failure to delineate the precise clauses permitting recovery should not stand as a bar. Cf. Specialty Assembling & Packing Co. v. United States, 156 Ct. Cl. 252, 254-55, 298 F. 2d 794, 796 (1962). To the extent that the trial commissioner finds that these timely claims for reimbursement reflect actual costs incurred by the contractor because of defective government equipment — rather than its own inexperience or inefficiency — the plaintiff is entitled to an equitable adjustment as provided in the facilities contract. ■ This equitable adjustment should be added to the *365 determination of the value of the rest of plaintiff’s performance.[34]
in. MQTJIDATED DAMAGES
Throughout the contract plaintiff was behind in its deliveries. The original schedule was substantially revised in supplemental agreements executed in August 1953 and January 1954. Despite these time extensions, plaintiff was still late in deliveries at the time of the suspension of its contract in July 1954, and was assessed liquidated damages pursuant to the contract clause. On that basis, $53,715.19 was withheld from payments otherwise due. Claiming that the liquidated damages provision was erroneously invoked, Acme asserts that it is entitled to reimbursement of the entire amount.
There is a question whether plaintiff is barred from making this claim because it did not request a decision of the contracting officer on the cause of its tardy deliveries. In Contract 1213, the clause dealing with liquidated damages contains a paragraph excusing the contractor from paying liquidated damages when the delay arises out of causes beyond his control and without his fault or negligence. It says that in such cases, subject to the Disputes clause, “the Contracting Officer shall ascertain the facts and extent of the delay and shall extend the time for performance when in his judgment the findings of fact justify an extension.” The Disputes clause says simply that “any dispute concerning a question of fact arising under this contract which is not disposed of by agreement shall be decided by the Contracting Officer * * [35] It cannot be said that these provisions, taken together, required the contractor to make a specific request to the contracting officer for a determination of the reasons for the delays. So long as the con- *366 traeting officer was put on notice that the plaintiff wanted to avoid the levy of liquidated damages, the minimum demands of the contract would be met.
This is precisely the effect of a letter sent on May 20,1954, by plaintiff to the Comptroller General via Philadelphia Ordnance District. The contracting officer refused to forward the letter as requested, because he felt that the appeal was addressed to equitable rather than legal considerations and would not be cognizable by the Comptroller General. After being told of the contracting officer’s action, Acme wrote another letter to him on June 21, 1954, explicitly reaffirming the prior request and “asking relief from our Liquidated Damages Clause at the District level” (emphasis added). This notification was quite different from the “mere ambiguous requests for adjustments or possible negotiations” which were deemed insufficient in Specialty Assembling & Packing Co. v. United States, supra, 156 Ct. Cl. at 255, 298 F. 2d at 796. Acme’s letters put the defendant on notice both as to the relief requested and the contract clause on which the request was based; furthermore, in its June 21st letter, plaintiff invited a ruling by the contracting officer. It is clear that plaintiff was in effect asking for an equitable adjustment; the need for a degree of precision, as suggested in Specialty Assembling, was met. When the defendant suspended all production on July 22, 1954, and completely canceled the contract a month later, the contracting officer had taken no action on Acme’s demand for remission of liquidated damages; the annulment of the agreement destroyed the administrative appeal mechanism created by the contract. Since Acme properly sought to invoke its administrative remedies as long as they were available, the Government’s defense of failure to exhaust must be rej ected.
Having surmounted this procedural defense, plaintiff is entitled to recover on its claim for remission of liquidated damages, because the delays on which the assessment was based were caused by the Government as well as by Acme. On the one hand, the plaintiff’s difficulties in operating the government machinery were partially attributable to the inexperience and incompetence of its own personnel. On the other, defects in some of the equipment furnished by the de *367 fendant resulted in repeated failures and breakdowns. While some of the machines performed reasonably well if properly operated, the smooth flow of production was rendered impossible when other machines essential to a sequence of operations were in disrepair. See finding 43. “[W]here delays are caused by both parties to the contract the court will not attempt to apportion them, but will simply hold that the provisions of the contract with reference to liquidated damages will be annulled.” Schmoll v. United States, 91 Ct. Cl. 1, 28 (1940). See, also, United States v. United Eng'r & Contracting Co., 234 U.S. 236, 242 (1914); Vogt Bros. Mfg. Co. v. United States, 160 Ct. Cl. 687, 709 (1963); Commerce Int'l Co. v. United States, 167 Ct. Cl. 529, 543, 338 F. 2d 81, 90 (1964). That result is fair. It does not deprive the Government of an opportunity to prove and recover its actual damages caused by the contractor’s delay;[36] instead, the defendant merely loses its right to insist on an artificial measure of damages agreed on by the parties for the situation in which the contractor alone is responsible for the delay.[37]
IV. SUBCONTRACTORS’ RIGHT TO RELIEF
Along with its own claim, Acme has brought suit on behalf of a number of firms to which it sublet portions of the prime contract. The three major subcontract claims are those of All Metals Industries, Manalapan Machine Works, and Foley Machine Company. Each of these subcontractors obtained orders from Acme through the payment of kickbacks to Harry K. Tucker, Jr.[38] See findings 18-23. At the time the kickbacks were given, All Metals knew of Tucker’s double agency, and the other two subcontractors *368 either knew or should have known of it. On the other hand, Acme was unaware of Tucker’s duplicity.
When a contract is obtained by a person secretly acting as a dual agent, and one party knew or should have known of the double employment, only the innocent party has the option of either affirming- or avoiding the agreement.[39] Af-firmance is not effective as ratification until after the innocent party obtains full knowledge of the material facts concerning the fraudulent procurement. See Restatement, Agency 2d, §§ 91, 313. In the present case, it was not until well after cancellation of its prune contract that Acme, the innocent party, learned of the kickback arrangements. See Acme Process Equipment Co. v. United States, Ct. Cl., No. 538-59, ante, p. 276, decided this day, fn. 20. Prior to that time, it did not have the requisite knowledge to effect ratification.
When its prime contract was canceled by the Government, Acme responded by immediately requesting all its subcontractors to halt performance. From that time forward, the plaintiff had nothing to gain by ratification of its voidable subcontracts. Yet long after conclusion of performance, Acme has nonetheless chosen to “ratify” these agreements. The reason is not difficult to discern: Only if Acme is liable to the subcontractors, may Acme recover from the defendant in their behalf. See J. L. Simmons Co. v. United States, 158 Ct. Cl. 393, 304 F. 2d 886 (1962). Acme was apparently willing to affirm the agreements on the theory that the Government would probably bear any resulting liability.[40] As is pointed out in the discussion of All Metals’ claim in the companion case, No. 538-59, this form of after-the-fact ratification camiot be accepted since it violates the rule that *369 “affirmance is * * * inoperative as ratification * * * as against persons who in the meantime have acquired interests with which it would be unjust to interfere.” 2 Williston, Contracts § 278A n.l (3d ed. 1959) .[41] See, also, Restatement, Agency 2d, § 101 (c). Had Acme acted reasonably, avoiding these subcontracts after it found out about the improper double agency, the Government would not be liable. This freedom from liability is an “interest with which it would be unjust to interfere.” Acme’s attempt to destroy that interest by post-cancellation ratification of the moribund subcontracts is unavailing.
It is still necessary to determine whether the Government would be liable to All Metals, Manalapan, and Foley, if Acme had in fact avoided these subcontracts, as we have held it was bound to do. Before a contract may be rescinded because of its fraudulent procurement by one of the parties, to prevent unjust enrichment, the defrauded party is generally required to return the goods it received under the contract, or their reasonable value. See Restatement, Restitution §§ 65, 66. Since these three subcontractors would have been entitled to the reasonable value of the goods they actually delivered, the defendant should in turn be liable to that extent.[42] Cf. Crocker v. United States, 240 U.S. 74, 81-82 (1916). In the future proceeding before the Commissioner, if plaintiff is able to prove that the value of the items delivered by any of the three subcontractors exceeded the total amount it was paid, then recovery on behalf of that subcontractor will be permitted — unless the “Severin’’ doctrine is a bar (see footnote 41, supra).
With respect to the claims of the remaining subcontractors, there has thus far been inadequate proof of damages. Al *370 though the defendant audited the accounting records of each one, such verification is no substitute for actual evidence of injury. See River Constr. Corp. v. United States, 159 Ct. Cl. 254, 271 (1962). When this question arose during the trial, plaintiff’s counsel acknowledged that further proof was required, explaining that, although the other subcontractors had been invited to submit more detailed claims, they had failed to so so. Tr. 1396-97. These claims being unproved, they cannot be accepted at the present time. Plaintiff, however, may present further proof, if it can, in the proceedings under Rule 47 (c).
V. INTEREST
The last matter is the plaintiff’s demand for interest from January 1, 1955, on those parts of its overall claim for damages represented by • (1) the improper assessment of liquidated damages by the defendant, (2) the withholding of amounts due under the price redetermination provision of the contract, and (3) the failure to pay the equitable adjustment requested in August 1954 for repairs of government-furnished machinery. These amounts, the plaintiff says, were retained by the defendant without any color of right and thus come within the circle of the Fifth Amendment’s guarantee that property shall not be taken for public use without payment of just compensation. This type of demand is not novel in suits on government contracts; nor is its steadfast repudiation by the courts. See, e.g., United States v. N.Y. Rayon Importing Co., 329 U.S. 654, 658-59 (1947); United States v. North American Transp. & Trading Co., 253 U.S. 330, 335-36 (1920); Komatsu Mfg. Co. v. United States, 132 Ct. Cl. 314, 131 F. Supp. 949 (1955) ; Ramsey v. United States, 121 Ct. Cl. 426, 430-33, 101 F. Supp. 353, 355-57 (1951), cert. denied, 343 U.S. 977 (1952).
Plaintiff concedes that, under the case law, unless the Government acted in 'bad faith when it withheld the funds in dispute, there could be no violation of the Fifth Amendment, and recovery of interest on the basis of the contract would be prohibited by 28 U.S.C. § 2516(a), permitting this court to allow interest on a claim “only under a contract or Act of Congress expressly providing for payment thereof.” *371 To show bad faith, the plaintiff stresses a determination by the Department of Justice in December 1954 that it would bring no civil or criminal action against Acme. But, plainly, this was not tantamount to a finding of bad faith on the part of the Army; a difference of opinion is not proof of malice. The plaintiff also alleges that, at the time of cancellation, the Government did not have proof that plaintiff was guilty of fraudulent acts which would justify annulment; that the Government knew that its proposed action might force plaintiff into bankruptcy; and that the real cause of the cancellation was the defendant’s decision to discontinue production of 75 mm. recoilless rifles because they were obsolete. At the trial of this case, an Ordnance attorney who advised that Contract 1213 be rescinded testified that, at the time, he deemed this action appropriate because he thought plaintiff had violated the covenant against contingent fees, as well as the anti-kickback and false claims statutes. Tr. 1024-25. Assessing the credibility of this witness and the others who testified as to the matter, the Trial Commissioner concluded that the defendant canceled the contract for two equally potent reasons: the termination of military requirements for the 75 mm. rifles and the contractual irregularities thought to be present. Finding 50 (a). The circumstantial evidence submitted by plaintiff to overcome the presumption of correctness attaching to the Commissioner’s finding is wholly inadequate for that purpose. Cf. Commerce Int’l Co. v. United States, 167 Ct. Cl. 529, 537, 338 F. 2d 81, 86 (1964); Davis v. United States, 164 Ct. Cl. 612, 616-17 (1964). We must therefore turn aside Acme’s argument that the Government acted in bad faith.
Our conclusion is sustained by an examination of the specific claims which, according to plaintiff, were rejected in bad faith. The Government withheld liquidated damages, thinking that the contract gave it the right to take such action. The court’s determination that liquidated damages were not properly assessable in no way negates the existence of a bona fide dispute involving difficult legal issues. Similarly, s,o far as can be ascertained, the defendant had almost concluded at the time of the contract annulment that the plaintiff would be entitled to the ceiling price under the redetermination clause. *372 But it withheld this amount, along with other entitlements, because of an honest belief that plaintiff’s conduct merited forfeiture. Although the defendant erred in believing that it could annul Acme’s contract for violation of such provisions as the covenant against contingent fees, it cannot be charged with bad faith. Finally, the Government’s failure to allow an equitable adjustment for expenses incurred in repairing machinery furnished under the facilities contract is attributable to its view that the disclaimer provision was absolute. In none of these instances was the defendant’s action without some color of right. Even though a court may determine eleven years later that the Government’s premises were faulty, that does not alter the bona fide character of its original actions under the contract or convert the erroneous cancellation of the contract into a taking.[43]
VI. SUMMARY
The case is remanded to the Trial Commissioner for a determination, under Buie 47(c), of the defendant’s liability to Acme, based on (a) the reasonable value of its performance under Contract 1213; and (b) an equitable adjustment for the amounts expended under the facilities contract for repair of defective government machinery, for which timely requests were filed. The total thus arrived at should be reduced by defendant’s undisputed counterclaim for $15,898 (see finding 60), and by $2,000, based on plaintiff’s violation of the False Claims Act. Plaintiff has permission, in proceedings under Buie 47(c), to present further proof on the claims on behalf of all subcontractors other than All Metals, Foley, and Manalapan; in the absence of sufficient proof, those *373 claims will be dismissed. The claims on behalf of All Metals, Foley, and ManaJapan are remanded to the Commissioner for a determination under Hule 47 (c) of the extent of liability for delivered items, if there is any such liability.
FINDINGS OP FACT
The court, having considered the evidence, the report of Trial Commissioner C. Murray Bernhardt, and the briefs and argument of counsel, makes findings of fact as follows:
1. Plaintiff's corporate identity and control. Acme Process Equipment Company (formerly Acme Coppersmithing and Machine Company) is a Pennsylvania corporation located at Oreland, Pennsylvania. At relevant times all of its voting stock was owned jointly by its president and vice president, Joshua Epstein and Samuel Fisher, respectively, who also had controlling interest in the National Molasses Company, a separate corporation. They and their children and relations (including sons Irving and Jack Epstein) owned all of the non-voting stock of plaintiff company and served as its officers.
2. Acme’s line of business. Until the latter part of 1952 Acme’s business consisted principally in the manufacture of processing tanks, boilers, containers, etc., for the distillery, brewery and sugar industries. In 1952 it became interested in obtaining Government contracts in order to offset unevenness in its commercial business, but had no one on the company payroll with background and experience in the field of Government procurement.
PROCUREMENT OF CONTRACT 1213 — CONTINGENT FEE PROBLEM
3. Entry of Norris and Tucker, Jr. Unknown to plaintiff, the Government had put under surveillance the activities of a group known as Harry K. Tucker Associates, comprising Harry K. Tucker, Sr., and his son, Harry K. Tucker, Jr., in connection with suspected statutory violations in their contingent fee arrangements for services rendered contractors in procuring Government supply contracts. (Hereafter, use of the name “Tucker” shall denote Tucker, Jr., unless the contrary is indicated.) James S. Norris, who had been general manager of an eventually defunct machine shop, met *374 Tucker in September 1952 and they decided to pool their talents in a company which would render “sales and engineering” assistance to clients of Tucker. In late September or early October 1952 Norris met for the first time with Sidney Cohen, Secretary-Treasurer of the plaintiff company, to ascertain plaintiff’s interest in bidding on the manufacture of some apparatus. In this meeting Cohen was asked if he would be interested in engaging a salesman to secure commercial and Government production contracts. In consequence Tucker visited Cohen several times and there were negotiations for his services and those of Norris. It was decided at the instigation of Norris and Tucker that Acme would set up a separate division to handle Government contracts in the metals field, that Norris would manage the operation, and Tucker would contribute his “know-how” in procuring and administering Government contracts and in expediting subcontract operations. Plaintiff’s officers had not known Tucker prior to these events; however, plaintiff failed to ascertain who Tucker’s other clients were or to ask them about the quality of his services.
4. Informal hiring of Norris and Tucker. At this stage the plaintiff informally agreed to hire Tucker and Norris. Tucker was to be paid 3 percent commission — to be divided equally between Tucker and Norris — on all business he procured, with a minimum salary guarantee against which his commissions would be applied. Tucker and Norris were to manage the plaintiff’s proposed new division. Norris began work at the Acme plant in Oreland, initially ,on an unpaid test basis, and his first duties were to estimate the bids, etc., in response to invitations which Tucker would procure for the plaintiff.
5. Tucker's employment contract. Plaintiff entered into a one-year employment contract with Tucker, dated October 13, 1952, whereby he and/or his “organization” agreed to serve as a “bona fide sales agent” on a parttime basis and be paid initially a weekly minimum salary of $150 which, starting 45 days after the initial delivery date in contracts procured by him for Acme, would be increased to equal the sum of (1) 5 percent of weekly gross sales up to $10,000 generated by him and (2) 3 percent of weekly gross sales in excess of *375 $10,000. Minimum salaries paid prior to any sales being made were to be deducted later from the excesses of bis commissions over bis minimum weekly guarantee. Tbe net effect of tbe arrangement was that the guaranteed weekly salary was an advance against commissions, and Acme could cancel tbe contract if commissions did not cover tbe minimum salary guarantee. The contract defined Tucker’s services to include solicitation of invitations from both commercial firms and tbe Government. Tucker represented in tbe contract that be had no special connections of any kind with any Government departments. He agreed to assist in preparing price breakdowns and in planning of shop production methods, as well as in tbe collection of invoices if requested, in obtaining contract financing, and in locating materials, although tbe contract stated explicitly that it could not be canceled for failure to perform any of these duties not involving solicitation. Tbe contract specifically provided that Tucker represented and would continue to represent other persons and firms having dissimilar lines of business. Norris and Tucker also entered into an agreement with each other that Tucker would pay Norris 50 percent of any money to be paid Tucker by his clients for procuring work for them from Acme.
6. Tucker's early services. After the hiring of Tucker plaintiff experienced a pronounced increase in inquiries, bid proposals and bid invitations from both commercial and Government sources, thus increasing Cohen’s confidence in his judgment in hiring Tucker. Tucker’s services the first few months included investigations to determine prior bid prices, solicitation of bid invitations, securing quotations from subcontractors, locating applicable specifications, and liaison work with the Philadelphia Ordnance District (hereafter POD).
7. Plaintiff's bid. On October 17,1952, Tucker submitted to plaintiff information concerning the subject contract to be awarded by the Army Ordnance Corps for 2,322 75 mm. recoilless rifles, M-20. Tucker assisted in the preparation of plaintiff’s bid estimate. Acting on Tucker’s advice that a bid of $350 per rifle would probably insure an award as low bidder, Acme submitted its bid (signed by Norris) to POD on October 23,1952, at a unit target price of $337.31 per rifle *376 (later corrected to $337.23), subject to upward or downward price revision, with, a ceiling price of $365.41 (later corrected to $384.95). Deliveries were proposed starting in March 1953 and finishing January 1954. Two other bidders in that district submitted bids at unit prices of $484.05 and $930.16, respectively. Two other bidders from outside the district, submitted bids at unit prices of $423 and $684, respectively, one of them (Firestone) being an experienced manufacturer of the 75 mm. rifle which was then producing them at a contract unit price of $452.60. Plaintiff was thus considered to be the low bidder, although its bid on accessories under the invitation was not as low as one of the other bidders.
8. Representations as to contingent fees.
(a) In its original bid dated October 23, 1952, for Contract 1213 Acme, imder the certification of James S. Norris as General Manager of the Defense Work Department, answered in the negative that part of the form requiring the contractor to represent whether it has or has not (boxes were supplied against each of the alternatives for inserting a mark to denote the correct fact) “employed or retained a company or person (other than a full time employee) to solicit or secure this contract, and agrees to furnish information relating thereto as requested by the Contracting Officer.” Under a revised proposal of December 10,1952, also signed by Norris, it was instead represented that Acme “has * * * employed or retained a company or person (other than a full-time employee) , to solicit or secure this contract and agrees to furnish information relating thereto as requested by the Contracting Officer.” However, under date of December 18,1952, Joshua Epstein, president of Acme, executed a Government form entitled “Contractor’s Statement of Contingent or Other Fees”, in which he reverted to the company’s position on October 23 by filling in one of the two alternative boxes to indicate that Acme “has not employed or retained a company or person (other than a full-time employee) to solicit or secure this proposed Contract No.-and agrees to furnish information relating thereto as requested by the Contracting Officer.”
(b) Within a roughly contemporaneous period (November 4, 1952 to January 5, 1953), plaintiff submitted bids on three other Army Ordnance contract invitations to the Eock *377 Island Arsenal, and in these bids it disclosed the fact that it had retained someone other than a full-time employee working solely for the plaintiff. On or about December 12,1952, plaintiff furnished the Rock Island Arsenal with a form 119 (Contractor’s Statement of Contingent or Other Fees), to which was attached a copy of its October 13, 1952 employment contract with Tucker; the submitted contract did not, however, disclose the fee-splitting arrangement made by Tucker and Norris. Rock Island Arsenal was thus on notice of the Tucker employment on a part-time basis. There is no evidence that POD had any more than imputed knowledge of it, since it administered the contract to which the form 119 related (see next paragraph). The disclosure provided the Office of the Chief of Ordnance in Washington with its first indication that Acme had an employment relation with Tucker whose 5 percent activities had excited official interest for some time past.
(c) One of the plaintiff’s three bids referred to in the preceding paragraph ripened into the award to Acme on January 7, 1953, of Contract No. DA-11-070-ORD-8580 (hereafter referred to as Contract 8580), which was executed by the Rock Island Arsenal but was administered by POD. Contract 8580 is the subject of another pending action by the plaintiff in this court in Court of Claims No. 538-59. It bears the plaintiff’s statement that it “has employed or retained a company or person (other than a full-time employee) (working solely for the bidder) to solicit or secure this contract, and agrees to furnish information relating thereto as requested by the Contracting Officer.”
(d) Prior to award of the contract in suit to plaintiff, Army Ordnance headquarters had information relative to the contingent fee activities of the Tucker father and son team, but to what extent this information was in the possession of POD personnel who were negotiating with plaintiff is not known. Certain POD personnel apparently had some information concerning Tucker, Sr., because they advised plaintiff of its possible mistake in employing the son of a man suspected of so-called “five-percenter” activities, but plaintiff had no other factual basis for imputing the father’s delinquencies to the son and so ignored the advice. At *378 the request of one of the POD negotiators the plaintiff submitted a certification, dated December 18, 1952, that it “has not employed or retained a company or person (other than a full-time employee) to solicit or secure this proposed contract * *
(e) Under date of May 8,1953, in response to defendant’s request for a proposal for an additional quantity under the contract in suit, the plaintiff signed a warranty that it “has not” retained anyone, etc.
(f) On May 18,1953, Acme advised POD by letter as follows:
In answer to the question that has arisen about the status of our Mr. Harry K. Tucker, Jr. please be advised that as of January 1953 Mr. Tucker has gone on a full time basis with this company, acting in the capacity of Sales Manager.
The original part-time salary employment contract with Mr. Tucker was cancelled, and any commissions or percentages due him under this original agreement were also cancelled. He is not now, or has in the past collected any commissions on any prime contract or sub-contract, or commercial work that he has obtained for us in the past or in the future.
We will appreciate your notifying Eock Island Arsenal and withdrawing a Form W119 which was filled out by Acme showing that Mr. Tucker was being paid a commission on the three contracts we now have with Eock Island Arsenal.
Although this letter states that Tucker was employed on a full-time basis in January 1953, the contract providing for his full-time employment was executed on March 18, 1953, effective as of March 2, 1953 (see finding 9(b)).
(g)There is no evidence that Tucker used any corrupt or improper influence in obtaining Contract 1213 for the plaintiff.
9. Modification of Tucleer's contract.
(a) With the award of the contract in suit to Acme on January 27, 1953, the demands on Tucker’s time increased. From some time in February 1953 Tucker devoted the major part of his time to administration of Contracts 1213 and 8580 for plaintiff, including the procurement ,of subcontracts, ex *379 pediting of parts and supplies, and liaison with POD. In the meantime he also solicited new business for Acme and assisted in the preparation of bids on this new business. What proportion of his time ostensibly devoted to the interests of Acme was actually ¡occupied in his reprehensible secret deals with subcontractors as described in findings 22 through 24, infra, is not known.
(b) Commencing the week ending March 7, 1953, Acme increased its weekly payment to Tucker to $300. By an agreement of March 18, 1953, effective March 2, superseding all prior agreements, Acme hired Tucker and Norris on a full-time salary basis at $300 each per week. Each was to receive in addition 25 percent of the annual net profits of the Lansdale operation and, after Acme had recouped its Lansdale investment “all assets created by the Lansdale plant * * * will be owned by the partnership, or Acme and Norris-Tucker.” The purpose of this agreement was to provide incentive to Tucker and Norris to build up this new department of Acme’s business. Tucker’s salary was reduced to $250 per week on October 11, 1953. Throughout his employment by Acme, Tucker was compensated on the basis of his weekly guarantee, whether or not it was denominated as an advance against commissions, and deductions were duly made from each such payment for social security and withholding taxes.
10. Negotiations. Acme’s bid of October 23,1952 (finding 7, supra) did not contemplate that the Government would furnish any financing or Government-owned production machines. On December 3, 1952, POD requested plaintiff to file a revised bid containing complete cost breakdowns and a list of proposed subcontractors, which was done December 12. The revised bid proposed a two-month overall postponement of the delivery schedule. Meetings between POD personnel and Acme representatives (most frequently Norris and Tucker) were held from December 11, 1952 onward to discuss various aspects of the contract, including price, which POD felt to be quite low in comparison with other bids, but reasonable and attainable nevertheless in the light of the delivery schedule, subcontracting plans, and other factors *380 then, known to POD. Moreover, POD was influenced in favor of Acme because it would then be the only small business concern in the country manufacturing the recoilless rifle, and could possibly develop into an additional source of supply for the 20 mm. gun. POD was concerned, however, over plaintiff’s ability to produce an item foreign to its experience and at an admittedly low price, and offered Acme an opportunity to withdraw its bid, which plaintiff refused.
11. Request for Government machinery. Acme had planned to subcontract the rifling phase of the proposed contract. When the rifling subcontractor withdrew its quotation Acme advised defendant, on January 13, 1953, that if it could obtain the necessary rifling and honing equipment either from Army Ordnance sources or elsewhere it would undertake to perform the rifling phase of the contract itself. At this time Acme also advised the defendant that it would manufacture the vent-assembly component in its own shop rather than subcontract it as planned, and gave information as to certain subcontracts which had been let, including one for the chamber assembly which had been tentatively subcontracted to All Metals Industries, Inc. Acme was then making arrangements to obtain the equipment and machinery necessary to perform those parts of the contract which it did not plan to subcontract. On January 20, 1953, Acme requested the use of two government-owned rifling machines, two lathes and two honing machines, which it estimated would cost $15,000 and take about ten weeks to repair and •install. Acme assured POD that no V-loan would be necessary for contract financing because it had other access to funds, and requested a small increase in the ceiling price. On January 23,1953, the Board of Awards at POD, contrary to the recommendation of POD negotiators, rejected Acme’s bid because the delivery schedule calling for initial deliveries in May 1953 was too optimistic.
12. Availability of Government machinery. Following the rejection of Acme’s bid by the Board of Awards a series of meetings were held at POD attended by representatives of POD, Acme and All Metals. POD announced the availability to Acme of government-owned machinery requested by Acme capable of producing in excess of Acme’s delivery *381 schedule if properly set up and tooled. It was recommended by the Philadelphia Begional Office representative of POD that the contract be awarded to Acme.
CONTRACT AWARD AND MODIFICATIONS
13. Description. Under date of January 27, 1953, negotiated Contract No. DA — 36-03NOBD-1213 (B) (hereafter referred to sometimes as Contract 1213) was awarded to plaintiff by POD, requiring plaintiff to manufacture and deliver 2,322 75 mm. recoilless rifles, M-20, at a unit target price of $337.23 (total $783,048.06), plus 24 sets of accessories, tools and equipment at a target price of $3,787 per set (total $90,888), all subject to limited price revision upward upon delivery of 30 percent of the rifles. The original contract provided for deliveries as follows:
_ Item 1: Item S: Month Required: Rifles Sets
May_ 74 1
June_ 233 2
July-234 2
August — 233 2
September 233 2
October_ 234 2
November 233 2
December 233 2
January _ 234 3
February 233 3
March — 148 3
Total 2,322 24
Subsequent modifications to the contract up to May 7, 1954 resulted in various adjustments of quantities and prices, the total quantity finally required being 2,751 recoilless rifles, plus tools, accessories and parts at a total contract target price of $1,043,918.72. The modifications included changes in certain delivery schedules, provision for use of specific government equipment and machinery, agreements adjusting prices on items not meeting specification requirements, and the addition of spare parts to the procurement. Where these modifications are relevant to the consideration of particular developments in contract performance they will be referred to specifically at the appropriate parts of these findings.
*382 14. Deliveries, scheduled v. actuad. The delivery schedules required by the contract as revised by supplements thereto, and the actual deliveries by the plaintiff, are shown in the following schedule:

15. Contract provisions. The contract contained the standard clauses for Changes, Assignment of Claims, Default, Covenant Against Contingent Fees, Termination for Convenience of the Government, and Disputes. In addition it contained the following provisions:
4. facilities : In the performance of this contract the Contractor shall have the right to use the facilities listed in the FACILITIES CONTRACT between the parties numbered DA-36-034-ORD-1214F, subject to *383 the terms thereof; and the unit prices of this supply contract are based on such use.
*****
10. liquidated damages: % of 1% of the contract price of undelivered units for each day’s delay after the date or dates specified for deliveries hereunder.
The following paragraphs shall be added to General Provision No. 11, DEFAULT, of Standard Form 32, and Paragraph (f) contained therein is hereby deleted:
(f) If the Contractor fails to deliver the supplies or perform the services within the time specified in this contract, or any extension thereof, the actual damage to the Government for the delay will be impossible to determine, and therefore in lieu thereof the Contractor shall pay to the Government as fixed, agreed, and liquidated damages for each calendar day of delay the amount set forth elsewhere in this contract; provided that the Government may terminate this contract in whole or in part as provided in paragraph (a) of this clause, and in that event the Contractor shall be liable, in addition to the excess costs provided in paragraph (c) above, for liquidated damages accruing until such time as the Government may reasonably provide for the procurement of similar supplies or services. The Contractor shall not be charged with liquidated damages when the delay arises out of causes beyond the control and without the fault or negligence of the Contractor, as defined in paragraph (b) above, and in such event, subject to the clause of this contract entitled “Disputes,” the Contracting Officer shall ascertain the facts and extent of the delay and shall extend the time for performance when in his judgment the findings of fact justify an extension.
(g) The rights and remedies of the Government provided in this clause shall not be exclusive and are m addition to any other rights and remedies provided by law or under this contract.
* * # H: ❖
12. oveRtime : No overtime work in excess of the six (6) day, eight (8) hour week shall be performed in this contract by employees of the Contractor without prior approval of the Contracting Officer except for such overtime as is necessitated by disaster, emergency or to complete heat cycles.
13. special tooliNg: The unit price for Item 1 includes therein $14.00 as the estimated cost of special tooling.
*384 20. COVENANT against contingent eees: The Contractor warrants that n,o person or selling agency has been employed or retained to solicit or secure this contract upon an agreement or understanding for a commission, percentage, brokerage, or contingent fee, excepting bona fide employees or b,ona fide established commercial or selling agencies maintained by the Contractor for the purpose of securing business. For breach or violation of this warranty the Government shall have the right to annul this contract without liability or in its discretion to deduct from the contract price or consideration the full amount of such commission, percentage, brokerage, or contingent fee.
JÍ¡ íj¡
GENERAL PROVISIONS
(Supply Contract)
# Hi * #
31. gratuities (O.P.I. [Interim] 64-51)
(a) The Government may, by written notice to the Contractor, terminate the right of the Contractor to proceed under this contract if it is found, after notice and hearing, by the Secretary or his duly authorized representative, that gratuities (in the form of entertainment, gifts, or otherwise) were offered or given by the Contractor, or any agent or representative of the Contractor, to any officer or employee of the Government with a view toward securing a contract or securing favorable treatment with respect to the awarding or amending, or the making of any determinations with respect to the performing, of such contract; provided, that the existence of the facts upon which the Secretary or his duly authorized representative makes such findings shall be in issue and may be reviewed in any competent court.
(b) In the event this contract is terminated as provided in paragraph (a) hereof, the Government shall be entitled (i) to pursue the same remedies against the Contractor as it could pursue in the event of a breach of the contract by the Contractor, and (ii) as a penalty in addition to any other damages of which it may be entitled by law, to exemplary damages in an amount (as determined by the Secretary or Ms duly authorized representative) which shall be not less than 3 nor more than 10 times the costs incurred by the Contractor in providing any such gratuities to any such officer or employee.
*385 (c) The rights and remedies of the Government provided in this clause shall not be exclusive and are in addition to any other rights and remedies provided by law or under this contract.
•J» »!• »í» H* ¥
85. GoveRNMeNt-euRNIshed propekty (ASPE 13-502)
(a) The Government shall deliver to the Contractor, for use in connection with and under the terms of this contract, the property which the schedule or the specifications state the Government will furnish (hereinafter referred to as “Government-Furnished property”). The delivery or performance dates for the supplies or services to be furnished by the Contractor under this contract are based upon the expectation that Government-Furnished property of a type suitable for use will be delivered to the Contractor at the times stated in the schedule or if not so stated in sufficient time to enable the Contractor to meet such delivery or performance dates. In the event that Government-Furnished property is not delivered to the Contractor by such time or times, the Contracting Officer shall, if requested by the Contractor, make a determination of the delay occasioned the Contractor thereby, and shall_ grant to the contractor a reasonable extension of time in respect of such delivery of performance dates. The Government shall not be liable to the Contractor for damages or loss of profit by reason of any delay in delivery of or failure to deliver any or all of the Government-Furnished property, except that in case of such delay or failure, upon the written request of the Contractor, an equitable adjustment shall be made in the delivery or performance dates, or prices, or both, and in any other contractual provision affected thereby, in accordance with the procedures provided for in the clause of this contract entitled “Changes”.
*****
36. Special tooliNG (ASPE 13-504)
*****
37. Price Redetermination (Form IX-B).
(a) The prices stated herein may be increased or decreased in accordance with this clause. In no event shall the revised price exceed 115% of the Unit Price, as amended, of item 1 plus 110% of the Unit Price, as amended, of item 2
(b) Times for negotiation.
*386 (1) Upon completion of delivery of 30% percent of item 1 to be furnished under this contract or upon expenditure of - percent of the total contract target amount, whichever shall occur last, the parties shall negotiate to revise the prices of all items theretofore and thereafter to be delivered. Within 30 days after the completion of delivery or expenditure of funds referred to above, the Contractor shall furnish to the Contracting Officer the statements and data referred to in paragraph (c) of this clause. * * *.
THE LANSDALE PLANT
16. Locating Lansdale facility. Norris and Tucker had recommended to plaintiff that its home plant at Oreland would be unsuitable for performance of Contract 1213, and advised that a separate plant should be established to handle Government contracts. Sidney Cohen of plaintiff company located a factory at Lansdale, Pennsylvania, which had been used as a hosiery mill, one-quarter of which was still occupied for that purpose. Plaintiff made arrangements to lease the available portion of the Lansdale plant for operation as its proposed Defense Works Division. Norris was placed in charge of operations as general manager of production, and as such was authorized to submit bids, sign Government contracts, award subcontracts, and hire and fire personnel. Tucker was put in charge of sales, Government contracts, and expediting and coordinating subcontractors. On January 8,1953, Norris wrote to POD furnishing a layout of the Lansdale facility, describing its personnel and equipment, and stating in part as follows:
As further explained to Mr. Karam and Mr. Osch-wald, Acme has already invested many thousands of dollars in setting up an additional organization, specifically _ familiar with engineering, manufacturing and expediting of National Defense items, including the investment of many thousands of dollars in the new building at Lansdale, Pennsylvania, along with the necessary equipment, placing itself in a position to immediately perform on this contract, when awarded. Of note is that Acme is an established manufacturing concern, which is extending its facilities and capacity to include defense type manufacturing, and we feel the broadening of our facility not only is valuable to us, but also to our National needs.
*387 17. Lease of Lansdale plant. On January 23,1953, Acme leased that portion of the Lansdale plant which was not occupied by the existing tenant and was given the right, inter alia, “* * * to install steel plates on the floor for the purpose of properly supporting any of its machinery * *
SUBCONTRACT TO ALL METALS
18. Services contract with Tucher. All Metals Industries, Inc., was established in July 1951 at Latrobe, Pennsylvania, as a small machine shop. Its stock was owned equally by John Hopkins, its president, Edward G. Oppenheimer, its vice president, and by Leonard Morris. In the spring of 1952 All Metals learned collaterally that Tucker was for hire to solicit commercial and Government contracts. He was interviewed and his references checked. On October 1, 1952, All Metals entered into a written contract with Tucker for his services and agreed to pay him 5 percent of weekly gross sales up to $10,000 to customers procured by him, plus 3 percent above $10,000, with a minimum guaranteed weekly salary of $100 to be charged against commissions. The contract defined Tucker’s services to include the solicitation of invitations to 'bid on commercial and Government contracts, preparation of price estimates on such invitations, rendering of advice as to production methods, collection of bills when requested, assistance in obtaining financing for performance of contracts which he might secure, and in locating materials. It provided for cancellation in the event of violation of contingent-fee provisions. All Metals eventually paid a total of $2,200 to Tucker under this contract.
19. Procurement of Acme subcontract. There is no record of Tucker’s concrete accomplishments for All Metals in the form of business obtained through him until he informed All Metals of the possibility of securing purchase orders from Acme under Contracts 1213 and 8580. All Metals participated in some of the negotiation conferences between Acme and POD, which led to the award of Contract 1213 to Acme on January 27,1953. On the evening of that day Norris and Tucker met with Oppenheimer and Hopkins of All Metals and Norris gave All Metals verbal assurance of giving it a subcontract to manufacture chamber and vent assemblies, *388 which were components in the guns which Acme was to manufacture under Contract 1213. The fact is disputed, but it is reasonable to conclude that at least as of January 27, 1953, Oppenheimer of All Metals knew that Tucker was Acme’s agent, although the officials of Acme other than the conspirators were unaware that Tucker was serving simultaneously as agent for All Metals in procuring the subcontract. The only Acme personnel who were aware of Tucker’s double agency were Norris, Jack Epstein (see finding 1, supra), Philip Chagnon, and, of course, Tucker himself. By Acme purchase order No. 35986, dated February 2,1953, All Metals was issued a subcontract for the production of 2,322 chambers and vent assemblies at unit prices of $71.29 (target) and $81.64 (ceiling) for the chambers, and $51.66 (target) and $58.93 (ceiling) for the vent assemblies. The subcontract contained the following clauses:
CONTINGENT fees : Seller warrants that he has not employed any person to solicit or secure this contract upon any agreement for a commission, percentage, brokerage, or contingent fee. Breach of this warranty shall give Buyer the right to annul this contract, or, in its discretion, to deduct from the contract price or prices the amount of such commission, percentage, brokerage, or contingent fees. This warranty shall not apply to commissions payable by Seller upon contracts or sales secured or made through bona fide established commercial or selling agencies maintained by Seller for the purpose of securing business.
cancellation : (b) Buyer also reserves the right at any time whenever the prime contract is cancelled to cancel this order, or any part thereof, by written notice to Seller, even though Seller is not in default hereunder, and this order is subject to all the terms and conditions of the usual standard form of provisions of clauses providing for the termination of supply contracts for the convenience of the Government, and to all the terms and conditions of any prime contract to which this order relates. Thereupon Seller shall, unless the notice otherwise specifies, discontinue all work and the placing of orders hereunder and shall cancel all existing orders and subcontracts. Upon such cancellation settlement of any amounts due the Seller shall be in accordance with such equitable settlement of any approved and allowed by the Government as being reimbursable to the Buyer *389 tinder the prime contract. Buyer shall be under no liability for the payment of such settlement until it receives from the Government approval and allowance of Seller’s claim in respect of such settlement.
The subcontract price included latently the sales commission due Tucker from All Metals.
20. The “shakedown”. On or about February 17, 1953, Hopkins and Oppenheimer of All Metals were advised by Tucker and Jack Epstein (then superintendent of Acme’s Oreland plant and son of its president, Joshua Epstein), that All Metals’ purchase order 35986 from Acme would be canceled unless All Metals paid Jack Epstein $25,000 in cash. Jack Epstein falsely represented himself to be a vice president of Acme and Oppenheimer assumed erroneously that he had the power to cancel the subcontract and that Joshua Epstein was implicated, neither of which assumptions was true. Oppenheimer assumed that it was an “income tax dodge” of some kind. On the protest of Hopkins and Oppenheimer that All Metals was not financially able to meet this demand, Tucker and Jack Epstein suggested that, as an alternative, All Metals should let a contract for $23,500 to Gunn Engineering Company for “engineering services”, while Acme’s subcontract to All Metals would be increased commensurately. This alternative proposition had been cleared by Tucker and Jack Epstein with Norris beforehand. Gunn Engineering Company was a dummy corporation which had been organized on or about February 16, 1953, and was owned by Tucker, Norris and Jack Epstein, without the specific knowledge of Acme’s officers until around the time of the cancellation of Acme’s Contract 1213 in August 1954. All Metals accepted the alternative proposal under economic duress, and on February 18, 1953, All Metals issued a purchase order to Gunn Engineering Company for “Consulting Engineering Services and Tool Design as Per Verbal Agreement” for a price not to exceed $23,500 payable in installments. On the same day Acme issued purchase order 36108 to All Metals for chambers and vent assemblies which superseded the earlier purchase order of February 2 and increased the vent assembly prices by $10 per unit to cover *390 the amount extorted from All Metals as related above. Through May 5, 1953, a total of $12,000 was paid by All Metals to Gunn Engineering Company by check. Needless to say, Gunn Engineering Company rendered no services whatsoever to All Metals.
21. Effort to expimge consequences of Owrm purchase order.
(a) Following the May 5, 1953 installment paid by All Metals to Gunn, Tucker instructed All Metals to discontinue further payments, which All Metals did. In June 1953 Tucker told Oppenheimer that Norris was under official investigation and that he wanted to clear up the situation and cancel certain transactions that had been entered into. Principally Tucker wanted to erase the effect of the “shakedown” transaction narrated in finding 20, supra, and to create an appearance that he had not been All Metals’ paid agent dui*-ing the shakedown period.
(b) To accomplish this, on or about June 25,1953, Tucker gave All Metals a letter predated February 10, 1953 terminating his services contract with All Metals as of that date. Having previously in March 1953, for obscure reasons, assigned this services contract to one Philip Chagnon, who immediately reassigned it to Gunn, on June 25 by means of a “Pelease and Acknowledgement” backdated to March 20, 1953, Tucker canceled and voided these assignments. Oppenheimer then canceled by letter All Metals’ purchase order of February 18,1953 to Gunn. In furtherance of the fiction, Oppenheimer drafted a letter which he wanted Acme to send to All Metals, and sent this to Tucker’s residence with a covering letter. Under date of June 30, 1953, this letter on Acme’s letterhead (composed as stated by Oppenheimer) was sent by Norris to All Metals. It purported to reduce retroactively by $11.50 per unit the price in Acme’s second purchase order (No. 36108) to All Metals, which, as has been described, had increased the first purchase order by $10 as part of the “shakedown”. Since by this time All Metals had already delivered and billed Acme for one shipment (four units) under the second purchase order at the inflated price, the letter of June 30,1953 from Acme provided that a credit memorandum would be issued to Acme for $202.71, $41.04 *391 of which, represented the inflationary element in the invoice for the first shipment. Also, on June 30, 1953, a supplement was issued by Norris to Acme purchase order 36108 reducing the unit price of vent assemblies by $11.50, and halving the quantity of vent assemblies. On August 15, 1953, Acme paid the June 3 All Metals’ invoice after deducting the credit, and thereafter all invoices submitted by All Metals to Acme for completed shipments were paid at the corrected prices. All Metals corrected its books of account to reflect these price readjustments. As of June 30, 1953, its books carried as an uncharged expense the $12,000 which it had paid to Gunn up to May 5, and it was not charged in the books to the Acme subcontract for chambers and vent assemblies. All Metals’ accountant testified that the $12,000 was not included as a contract cost by All Metals directly or indirectly in either its original cost submission for termination purposes to the Army or in the damage schedule filed in the instant proceeding for audit under former Eule 28.
(c) The defendant concedes that by its revision of the second purchase order from Acme, All Metals reduced its price to less than the price in the first purchase order, but contends that the method of computation employed by Oppenheimer and Tucker in arriving at the amount of the reduction left in the ultimate cost figures the $12,000 which All Metals had paid to Gunn, so that its final price to Acme and its claim to the Government necessarily included a kick-back element in violation of the statute. Thus, the method of computation was as follows:
The sum as yet unpaid by All Metals to Gunn under the bogus purchase order was $11,220 (i.e., $23,220 less $12,000 already paid). This $11,220 was added to $15,487.74 (the 5 percent commission due Tucker for procuring the purchase order from Acme), and the resultant total of $26,707.74 was deducted from the price in the second purchase order No. 36108, thus providing a basis for a new unit price by dividing the number of units into the reduced total.
(d) The facts from which the parties reach opposite contentions are correct as stated. If we refer to the successive purchase orders from Acme to All Metals as the first, second and revised in the order of their issuance, it appears that *392 the prices charged by All Metals in the first and second purchase orders included latently Tucker’s commission, but the revised purchase order did not. The amounts paid to Gunn by All Metals were buried in the cost structure of the second and revised purchase orders but not in the first one. Since there is no evidence that All Metals made any effort to recover the $12,000 extorted from it by Gunn, it is concluded that, in its final cost structure on which its ultimate revised price to Acme was based, All Metals included the $12,000 paid to Gunn in exchange for a waiver by Tucker of the $15,487.74, which was technically owed him[1] for commissions and which had been indirectly included in All Metals’ cost structure underlying its initial price to Acme.
TUCKER’S DUPLICITOUS AGENCY EOR OTHER SUBCONTRACTORS
22. Manalapan.
(a) On November 10,1952, Tucker entered into an agreement with Jaime Kohan, trading as Manalapan Machine & Welding Works, whereby for a minimum six-month period Tucker was to be employed on a non-exclusive basis as sales representative to secure contracts for Manalapan to perform at a minimum weekly salary of $100 which was to be applied against commissions earned on business brought in. Tucker took Kohan to see Norris at the Acme plant to look over some blueprints for a potential subcontract. After some negotiations and the rejection by Acme of an initial price which was too high, Manalapan was given a series of purchase orders by Acme relating to the latter’s Contract 1213 during the period from February 1953 to July 1953. Only a portion of Manalapan’s various quotations were accepted. Some of the parts it furnished to Acme were unsatisfactory and required reworking. Manalapan’s prices to Acme included latently amounts paid by Manalapan to Tucker under the employment agreement described above. Pursuant to the employment agreement Manalapan paid Tucker $428.50 from November 21, 1952 to December 29, 1952 (which was prior to Manalapan’s purchase orders from Acme) and *393 $1,350 from February 16, 1953 to May 15, 1953 (which, was during the performance by Manalapan of its purchase orders from Acme). Tucker shared these payments with Norris pursuant to their agreement. Not all of the work which. Manalapan received from plaintiff was the result of Tucker’s efforts, for after the discontinuance of Tucker’s agency for Manalapan it received requests from Acme for quotations.
(b) There is some confusion between Jaime Kohan, trading as Manalapan Machine & Welding Works, and a corporation by the name of Manalapan Machine Works, Inc., organized January 2, 1953. Jaime Kohan had no financial interest in this corporation but eventually served as its superintendent. His son was a principal in the corporation. The corporation received and performed some of Acme’s purchase orders until November 1953, when it discontinued due to lack of funds. Other purchase orders were received and performed in the name of the individual proprietorship. Thereafter, at Acme’s request and with the consent of the Manalapan Machine Works, Inc., Jaime Kohan, trading as Manalapan Machine & Welding Works, continued the work under the corporation’s purchase orders until they were canceled. Acme treated both of the Manalapan companies interchangeably as a single legal entity. The corporation did not file a claim with the defendant, but the individual proprietorship did. The payments to Tucker described above were made by the individual proprietorship.
(c) Jaime Kohan of Manalapan knew or should have known that Tucker was an employee or agent of Acme at the time of their relations described above. The officers of Acme (as distinct from Norris, Tucker, Jack Epstein and Chagnon) did not know until after cancellation of Contract 1213 that Tucker was a paid agent for Manalapan.
23. Foley Machine Company. Foley Machine Company had been doing business for several years with Tucker, Sr., the father of Tucker, Jr. Norris and Tucker, Jr., had formed the Neptune Manufacturing Company, Inc. Foley knew that Neptune was Tucker’s company. On January 24, 1953, Foley contracted on a contingent basis with Neptune for the latter’s services in securing subcontracts from Acme, *394 agreeing to pay it 5 percent of tlie gross amount of all orders or business which Neptune might get for Foley from Acme, with a weekly drawing account of $75 to be applied against commissions. Thereafter, Foley met with Tucker at the A cm pi plant to review the prints under the 1213 contract. At that time Foley knew or should have known that Tucker was an employee or agent of Acme. On February 10, 1953, Acme issued a purchase order to Foley under its Contract 1213. Foley sent two checks to Neptune for $75 each, dated February 12 and 19, 1953. By a document dated February 27,1953, and signed by Tucker, the contingent fee agreement of January 24 between Neptune and Foley was canceled. The two checks referred to above, which had not been deposited by Neptune, were returned to Foley. Defendant contends that Acme included the contingent fees paid to Neptune by Foley in its schedule of costs filed in this court pursuant to former Eule 28, that the contingent fee which Foley had agreed to pay Neptune constituted an improper and illegal cost and expense incurred or paid by plaintiff and/or Foley, and that it constituted an illegal kickback under 41 U.S.C. 51. Undoubtedly, the price charged by Foley to Acme in the purchase order included latently an amount sufficient to pay the contingent fee. The officers of Acme (as distinct from Norris, Tucker, Jack Epstein and Chagnon) did not know until after cancellation of Contract 1213 that Tucker and Norris were paid agents for Foley through the medium of Neptune.
24. Nicholson Products Company. In June 1952 Nicholson Products Company entered into an agreement with Tucker, Sr., hiring him at a minimum salary of $200 per week for his services in procuring customers. The agreement provided for an eventual increase in compensation to equal 5 percent of weekly gross sales up to $20,000 and 3 percent over that from all new business for which Tucker, Sr., was responsible. Through arrangements made by Tucker, Sr., Nicholson’s president visited Norris at Acme to obtain details of a subprocurement. Nicholson then obtained some subcontracts from Acme under Contract 1213 and paid commissions to Tucker, Sr., on such subcontracts. *395 There is no evidence that any responsible officers of Acme were aware of this matter.
25. Johnson and Kunz. After Norris was hired by Acme as general manager of the Lansdale plant he hired as his assistant at $150 per week one Philip Chagnon, who had been associated in previous business relations with Norris since 1944. Chagnon performed some expediting work but his duties for Acme were principally clerical in nature. He entered into a private agreement with the firm of Johnson and Kunz to be paid a commission on any business he obtained for the latter. At Chagnon’s recommendation Norris awarded a subcontract to Johnson and Kunz under Acme’s Contract 1213. Johnson and Kunz paid commissions of $900 to Chagnon by checks made out to a mythical Robert Skill-man, Chagnon’s pseudonym. The checks were endorsed and cashed by Chagnon. No other Acme employee was aware of Chagnon’s private commission arrangement. He used a pseudonym as a cover because he understood that the Federal Bureau of Investigation had commenced an investigation of certain aspects of Acme’s performance under Contract 1213.
DEPARTURE OP THE CONSPIRATORS
26. Norris. From May to July 1953 Norris used several Acme employees to perform work on his farm, charging the labor cost of $895.52 and travel expenses of $150 against Contract 1213 on Acme’s books. This matter was brought to the attention of Joshua Epstein, Sidney Cohen and Jack Epstein of Acme by an FBI agent who had investigated it. They disclaimed prior knowledge of it. Jack Epstein recommended that the labor costs should be charged against Norris’ account and thus credited to Contract 1213 to remove the charge, but this was not accomplished. On September 4,1953, Norris was discharged with the following letter from Joshua Epstein:
We are obliged to advise you that your services with this company are terminated immediately because of:
A. Your improper conduct and unauthorized expenditures, involving contracts with agencies of the United States Government, which resulted in your being investigated by the Federal Bureau of Investigation;
*396 B. Your voluntary abandonment of your duties, without excuse or permission;
C. Other reasons well known to you, not necessary to relate in detail.
We are making formal demand for reimbursement of all unauthorized withdrawals, or improper charges for salaries, moneys, value of materials or otherwise.
On September 11, 1953, Acme wrote to POD requesting the correction of the latter’s records showing Norris’ elimination as General Manager and his replacement by Jack Epstein as plant superintendent.
27. Tucher. Effective October 17,1953, Acme reduced its weekly payment to Tucker to $250, and effective the week ending November 11,1953, Tucker’s services with Acme were terminated for reasons which are not specified in the record.
28. Ohagnon. At the end of November 1953 Chagnon left Acme’s employ.
29. Epstein. On November 23, 1953, Jack Epstein executed a false affidavit that at no time had he received any commission, etc., from any Acme subcontractor or supplier in connection with Government contracts. On August 28, 1954, he resigned from Acme.
30. Knowledge of Joshua Epstein. POD had advised Joshua Epstein on several occasions prior to the removal of Norris and Tucker that Tucker, Sr., was known to be a five-percenter in Government contract circles and that it was risky to hire his son, Tucker, Jr. Joshua Epstein did not consider this advice to be worthy of reliance, and as late as June 1955 asserted that he had found Norris and Tucker to be willing and competent workers and that their hiring had 'been justified. From the circumstances related in findings 26 through 29, supra, relative to the removal of the conspirators from Acme’s payroll, particularly the inferences contained in the letter discharging Norris (finding 26, supra) and the contents of Jack Epstein’s affidavit (finding 29, supra), it is reasonable to conclude that during the late summer and fall of 1953 some information had come to Joshua Epstein’s attention leading him to suspect that the conspirators (including his son) had engaged in some improper activities. Eather than expose the culprits he induced their removal for suspected cause. Joshua Epstein was not called *397 as a witness in the trial of the instant case. Jack Epstein’s delayed resignation is understandable in view of the relationship which existed.
31. Prosecution of conspirators. Tucker, Norris and Jack Epstein were indicted for violation of the Anti-Kickback Law (41 U.S.C. 51, 52, 54). On April 13,1956, after presentation of the Government’s case, the defendant’s motion for acquittal was granted (see finding 54(j), infra). The court, inter alia, said:
* * * I may say that I have been shocked at the sordid picture that has been exhibited here in this case. I have never seen such an exhibition of disloyalty to an employer as has been exhibited in the actions of these three men.
* * * the picture of a scheme set up, not only to increase the cost to the employer, but also to increase the cost to the United States, for a few paltry dollars, shows complete larceny in the hearts of these three defendants. They thought they were doing something crooked, and that is clear from the actions they took in effectuating this scheme. The scheme was despicable and morally reprehensible, but unfortunately within the narrow letter of the law.
This statute, as I see it, does not cover the contract in this case. I am intellectually certain that this is not the type of contract that is covered by the Act of March 8, 1946, being Title 41, Section 51, of the Act. There is nothing that I have seen in any of the regulations or in the congressional history which would indicate to me that there was any intention on the part of Congress to cover this particular type of contract. It may well be that Congress thought that in this type of contract the employer would be the one that would protect the interests of the United States, but no employer can protect himself against treacherous employees who are determined to commit morally reprehensible acts and who, for the sake of a few paltry dollars, set up the type of vicious scheme that has been set up in this case, which resulted in increased cost both to the employer and to the United States.
Therefore, it seems to me that the proper remedy in this case is that if Congress so feels, it should expand the provisions of Title 41 to cover just this sort of machination on the part of trusted employees; and I am ordering that my remarks here be transcribed, filed of record, and that the United States Attorney be furnished two copies *398 so that if he wishes he may transmit a copy of my remarks to the Attorney General of the United States, to the end that Congress may if it so desires amend this Act to include as a crime the vicious and immoral type of conduct that has been exhibited in this case.
This case clearly showed that the employer was victimized, and I would say indirectly the United States was also, but the defendants were narrowly within the law. I don’t know what type of action the employer may take against these employees, but I do say that I have nothing but contempt for their actions. Unfortunately, they are without the purview of this particular statute.
ALLEGED IMPROPRIETIES INVOLVING GOVERNMENT EMPLOYEES
32. Hochstuhl.
(a) After Contract 1213 was awarded to Acme, Charles G. Hochstuhl of POD was assigned to administer it, along with a number of other contracts, under the immediate supervision of Harry Oschwald. In this capacity Hochstuhl journeyed to Ohio in March 1953 in the company of Acme officials to show them existing gun-manufacturing facilities. On his return to POD he submitted a voucher for his per diem and other trip expenses, and was paid the same. Adolph Gromada of Acme had paid $12.50 for Hochstuhl’s hotel room charges on the trip, and this expense was charged by Acme against the contract in suit. On another occasion Acme charged against the contract hotel and meal charges for visitors, apparently Government employees, from Water-vliet Arsenal. Hochstuhl’s duties at POD in connection with Contract 1213 included recommending changes in the delivery schedule, for review by Oschwald.
(b) Hochstuhl was removed from his position with POD effective August 4, 1953 “* * * for making material false statements and exaggerations on your application standard Form 57”, relating to some prior private employment. During his notice period he looked for other employment and was employed by Acme in August 1953 immediately after the termination of his employment at POD. POD advised Acme at the time, in Hochstuhl’s words, that he “would be limited for a period of two years after being separated from the Government, which would restrict [him] in not negoti *399 ating any prices or any legal matters, any technical involvements of the contract, as a contractor’s representative to any individml Government employee.” If POD’s advice to Acme was in writing it is not in the record.
During the first few weeks of his employment by Acme he helped Norris as an expediter of subcontracted components. After Norris was discharged in September 1953 and replaced by Jack Epstein as superintendent of the Lansdale plant, Hochstuhl was appointed as Epstein’s assistant. As such he was given a variety of assignments, all of them relating in one form or another to paperwork. He helped to establish a control system for subcontracted work, correlated many details relating to Acme’s several Government contracts, maintained quality control records, prepared letters to Ordnance from Acme for signature by others, correlated plant inspections by inspectors for Acme and the Government, handled various matters with reference to the records concerning Government-furnished machines and tools, and helped with preparation of requests for change orders. He did not make personal contacts with Government representatives in connection with Acme’s Government contracts.
In the fall of 1953 he came across a number of vouchers and other cost records in Acme’s files which related to repairs made by Acme to Government-owned machines supplied under the Facilities Contract 1214. On his own volition and in the interest of keeping adequate cost records should need arise for them, he undertook to segregate and allocate the cost records to individual machines, and thereafter as additional repairs were made to the machines he kept a running record of them as to each machine. There is no suggestion that this record in its inception was made for the purpose of a claim by Acme, since as of the fall of 1953 there was no prospect of the contract cancellation in July 1954. Under date of January 1954 he prepared a chart which depicted certain facts pertaining to Government-furnished machines, such as when they were ordered and received, the periods they were out of operation or not functioning properly and the reasons, and the nature and cost of repairs.
In September 1954 at the direction of his superiors, Hochstuhl prepared an up-to-date record of Acme’s expendi *400 tures in repairing the various Government-owned machines. This record was based on the records he had compiled a year earlier and had kept current in the meantime. The cost record was attached to the letter from Acme (signed by Mr. Cohen, its secretary-treasurer) to POD on September 7, 1954, in which plaintiff refused to return the machines to the Government unless POD gave assurance that Acme would be reimbursed for its cost of repairs. These facts are set forth in finding 53, infra. Other than as described there is no evidence from which it could possibly be inferred that Hoch-stuhl prosecuted a claim against the Government as Acme’s agent.
33. Lee. Acme was experiencing difficulty in getting into production with the machines and tooling furnished by the Government. At Acme’s request Watervliet Arsenal ordered Harold J. Lee, a machinist lead foreman at the Arsenal, to report to plaintiff’s Lansdale plant for the purpose of assisting plaintiff in its technical problems. Under his official orders Lee worked at plaintiff’s plant from his arrival on April 20 until April 24,1953, at Government expense. Plaintiff requested the Arsenal to loan Lee’s services for an additional week at Government expense, but this was refused. Instead, Lee was given official permission to remain at the plant, advising plaintiff in an absent-without-pay status from April 27 to May 1,1953. During this latter period he worked 96 hours and was paid by the plaintiff $470 plus his hotel expenses, at the rate of $5 per hour compared to his Government salary rate of $2.60 per hour. The amount paid by Acme to Lee were charged against Contract 1213. Plaintiff was pleased with Lee’s services and commended him to Watervliet Arsenal. Upon his return Lee filed with the Arsenal a trip report. There is no evidence of any improper conduct on the part of plaintiff with reference to Lee. Lee’s observations of the plaintiff’s operations and the nature of his services are described in finding 39(b) (1), infra.
CAXTSES OE PLAINTIEP’S productioN delays
34. Prefatory statement. The plaintiff contends that the defective condition of certain items of machinery furnished by the defendant under a so-called Facilities Contract, some *401 of which machines were also used by its subcontractor, All Metals, was responsible for its inability to adhere to the original and subsequent delivery schedules under Contract 1213. Acme also asserts that the defective machinery caused not only the incurrence of unreimbursed costs of machinery repairs in excess of those anticipated, but also the delays which led to the assessment of liquidated damages for delinquency in deliveries. Plaintiff seeks to recover these costs and to have remitted the liquidated damages which have been withheld. The defendant contends that the machinery it furnished plaintiff was not defective but was usable, that plaintiff’s difficulties in its use were attributable to improper installation and operating incompetence, that plaintiff’s actual cost of repairs and installation was well within its original estimate, that $44,358.58 of the amount spent by plaintiff for special tooling was included in its bid price (as amended by Supplemental Agreement No. 6) and the balance was plaintiff’s responsibility under the terms of the Facilities Contract, and that the part of plaintiff’s delays not attributable to its own deficiencies was attributable to the failure of All Metals to adhere to subcontract delivery schedules.
35. Facilities Contract. Clause 4 of Contract 1213 provided that plaintiff would have the right to use certain Government-owned machinery enumerated in the so-called Facilities Contract (No. DA-36-034^ORD-1214F) entered into between the parties simultaneously with Contract 1213, although not fully executed until February 27,1953. The Facilities Contract contained the following selected provisions:
Titee II
GOVERNMENT FURNISHED FACILITIES
ARTICLE H-A. DELIVERY.
1. The Government shall furnish to the Contractor the facilities described in Schedule “B”, attached hereto and expressly made a part hereof, for use in the performance of certain supply contracts, identified in Article IV-A. The Government shall deliver, or has already delivered, such Schedule “B” facilities at the time or times stated in such Schedule or if not so stated in sufficient time to enable the Contractor to perform the affected supply contract (s). If any such facilities are *402 not delivered to the Contractor by such time or times, or are delivered in such condition as to require repair or rejection pursuant to the provisions of Paragraphs 2 and 3 of this Article, the appropriate Contracting Officer, upon written request of the Contractor, may equitably adjust the price, the time of performance, and other terms and conditions of the affected supply contract (s). In no event shall the Government be liable to the Contractor for damages or loss of profit by reason of any delay in delivery or failure to deliver any or all of the items set forth in Schedule “B”, or for delivery of such items not in satisfactory operating condition or not of a suitable type. Any failure by the parties hereto to agree upon such equitable adjustment shall be determined in accordance with the article of the related supply contract (s) entitled “Disputes”.
2. In the event Schedule “B” items are not in fit operating condition, the Contractor shall repair, restore, or rehabilitate such equipment so as to make it serviceable or fit for use (cost connected with such repairs, restoration, or rehabilitation shall not be reimbursed to the Contractor).
3. The Contractor reserves the right to reject any Schedule “B” facilities which are not of a suitable tj^pe or not in fit operating condition, or are not reasonably capable of being restored, repaired, or rehabilitated so as to make them serviceable.
ARTICLE II — B. INSTALLATION.
The facilities under this Title shall be installed by the Contractor in its plant or plants or, if approved in writing by the Contracting Officer, for temporary use in the plants of first tier subcontractors. All such facilities installed in plants of first tier subcontractors will be operated and maintained in the same manner as the facilities located in the Contractor’s own plant or plants and the conditions of this contract shall apply to such facilities. It is the responsibility of the Contractor to see that all provisions contained in the contract for the protection of the Government’s interests in said facilities will be incorporated in the agreement under which such facilities are so placed.
ARTICLE H-C. TITLE.
Title to all property furnished by the Government shall remain in the Government. Title to the property furnished by the Government shall not be affected by the incorporation or attachment thereof to any property not owned by the Government, nor shall such Govern- *403 meat property, or any part thereof, be or become a fixture or lose its identity as personalty by reason of affixation to any realty.
Title III
COST OE THE WORK AND PAYMENT THEREEOR
ARTICLE HI-A. REIMBURSEMENT EOR CONTRACTOR’S EXPENDITURES.
1. For the performance of this contract, the Government shall pay to the Contractor the costs and expenditures determined to be allowable in accordance with Section XV, Armed Services Procurement Regulation, as in effect on the date of this contract (such section being hereby incorporated and made a part of this contract by reference) for the following:
a. Cost of facilities procured from sources other than his own manufacture:
(1) The net invoice price ther of.
(2) The cost of transportation to the Contractor’s plant or other place of installation of said facilities, provided, however, that no reimbursement shall be owing to the Contractor hereunder when the invoice price described in subparagraph (1) has included the cost of transportation.
(3) Allocable overhead and general and administrative expenses.
(4) Any Federal, State or Local taxes arising from the acquisition for or delivery of such facilities to the Government.
b. Facilities manufactured by the Contractor: (other than those items included in subparagraph (c) below) :
The costs incurred by the Contractor in manufacturing facilities hereunder as determined in accordance with Section XV of the Armed Services Procurement Regulation.
c. Standard or commercial items manufactured by the Contractor in accordance with provisions of Article I-A-5.
2. Costs and expenditures for the following will not be reimbursable hereunder:
a. Installation of facilities furnished by the Government (Schedule “B” facilities).
b. Installation of facilities acquired or manufactured hereunder (Schedule “A” facilities).
c. Plant rearrangement, rehabilitation and incidental construction necessary for the installation of facilities.
*404 SCHEDULE “b”
2 — #4 Rifling Machines 2 — Boring Lathes 2 — Honing Machines 2 — Boring Bars 14'6" each
1 — Boring Bar 18'8" to be modified for the rifling machine
1 — Honing Bar & head complete
2 — Rough Reamers complete 2 — Finish Reamers complete 1 — Set of Babbitts
1 — Set Broach Rifle Cutters 1 — Rifling Plead
Plus Manufacturing Aids available from Watervliet Arsenal.
All items of Schedule “B” shall be furnished f.o.b. Watervliet Arsenal, and Contractor shall bear the cost of freight, installation and repairs without reimbursement by the Government.
By letter dated January 27, 1953, Acme (per Norris and Chagnon) advised POD that the contractor would bear the expense of transporting, installing and repairing the two rifling machines, two boring lathes, and two honing machines listed in Schedule “B” of the Facilities Contract.
36. Description of machines furnished. The defendant furnished the plaintiff with a total of 19 machine tools, six of them under the 'basic Facilities Contract, and the balance under supplements 1, 2 and 3 thereto, issued in May 1953, and in January and April 1954. The following schedule describes each of the machines by name, gives its Government tag number for identification purposes, provides where known the date of manufacture of each machine and its cost when new, the date received by the plaintiff, and the condition of each machine.[2] [See schedule on page 93.]
Items numbered 1 through 11 in the foregoing schedule were authorized by Contract 1214 and Supplement 1 thereto, and as to them the plaintiff was contractually obligated to bear the cost of freight, installation and repairs without reimbursement from defendant. The remaining items 12 through 16 in the schedule were authorized by Supplements 2 and 3

*405

*406 to Contract 1214, and as to them the plaintiff was contractually obligated to bear the cost of freight to its plant without reimbursement from defendant. As consideration for use of defendant’s machines listed in the above schedule (except Items 1 through 6 for which there was no charge), the plaintiff agreed to a reduction of its Contract 1213 price by $18,602.55.
37. How to make a gun barrel. The plaintiff subcontracted the manufacture of the principal components of the rifle, except for the barrel which it manufactured in its plant at Lansdale. The plaintiff’s manufacturing process for the production of rifle barrels consisted in general of the following sequence of operations:
(a) A seamless tube or forging furnished to plaintiff by the defendant was brought to a rough finish of the prescribed inside diameter of the barrel on a horizontal boring lathe, sometimes referred to as a reamer. The tube was placed on the lathe and secured firmly. A cutting tool of appropriate size was placed tightly on the head of a boring bar. The machine then pushed the boring bar with the cutting tool at its head through the gun tube and as it rotated the cutting tool removed the metal evenly from the inside diameter of the tube until the desired dimensions were obtained.
(b) The tube would then be cut on a lathe to form the outside dimensions, including the taper of the barrel.
(c) The tube or barrel would then be placed on a honing machine for honing the interior of the barrel to the dimensions and smooth finish required, the honing being performed by a series of honing stones being passed through the tube on the end of a ram.
(d) Following this the rifling grooves were cut in the interior of the barrel by means of a rifling machine or broach. The barrel was placed on the machine and secured firmly. The appropriate size cutter blade was placed on the head of a rifling bar and fastened securely in place. To obtain the desired rifling the machine then pushed the rifling bar with the cutter at its head through the barrel in a spiral motion imparted by means of a key riding in a curved groove around the rifling bar. The machine then withdrew the bar from the barrel and the next larger size cutter was placed on the *407 bar and the operation was repeated. The process continued with a larger size cutter blade being used on the head of the bar on each successive pass until the rifling or grooves inside the barrel were sufficiently deep and accurate to meet specifications.
(e) Finally, the breach end of the barrel was threaded on a thread miller and the barrel was paced off to the required length.
38. Installation of machinery.
(a) The schedule in finding 36, supra, shows that most of the machines furnished plaintiff by the defendant arrived at the Lansdale plant at various dates from February 13 to June 9, 1953. They were large and heavy, ranging in length ■up to 35 feet and in weight up to 40,000 pounds. For proper operation such machines must be absolutely level and be solidly fixed to foundations to prevent misalignment, vibration and movement. The building housing the Lansdale plant had formerly been a hosiery mill. It had a concrete floor, the thickness of which was disputed by the witnesses, whose estimates varied from three to five and one-half niches. An older section of the floor in the back of the plant where the large boring lathes were installed was repaired by plaintiff, but the remainder of the floor area was more recently constructed of reinforced concrete. The previous occupant had installed and operated knitting machines on the concrete floor. Knitting machines are not as heavy as the machines loaned by defendant to plaintiff to make gun barrels.
(b) There is a wide discrepancy in the testimony of the witnesses as to the adequacy of the plaintiff’s installation of the machines in question, some of the testimony being diametrically contradictory. In general the plaintiff’s witnesses testified that the legs of the two boring lathes were solidly based in specially excavated and poured concrete foundations four feet square and four feet deep, that the other machines were bolted to steel plates laid on top of the newer part of the concrete floor and were anchored to the floor by one inch round bars driven three feet deep into the floor and grouted in, and that, although one of the rifling machines vibrated at first, that was quickly corrected and thereafter none of the installed machines broke through the concrete *408 of moved when in operation. On the other hand, several witnesses produced by defendant had been employed by plaintiff at the Lansdale plant for various periods in 1953 and 1954 and conveyed a radically different impression. They testified collectively that improper bedding of the machines caused them to vibrate in operation and to go out of alignment so that the high tolerances required in the end product could not be consistently achieved; that the honing machine delivered in October 1953 was the only machine which was properly installed at the outset and none of the other machines delivered earlier was properly installed; that they caused the concrete to crack because of vibration; that Gromada (plaintiff’s plant engineer, deceased at time of trial) refused to heed advice to reset the machines because of cost; and that one of the machines had to be shored up with wedges to make it level.
(c) In weighing conflicting evidence on this point due consideration must be given to the fact that none of the official reports of plant operations made by defendant’s personnel (so far as is contained in an otherwise voluminous record) make reference to inadequate installation as contributing to plaintiff’s problems in operation of Government-furnished machines. Moreover, if it were to have been a serious factor at the time it is reasonable to believe that the plaintiff would naturally have taken immediate steps to correct the error early in the period of performance rather than permit it to go uncorrected and to plague all subsequent operations, for neither the cost nor the time in reinstallation would have been such as to warrant placing the entire contract in jeopardy by not correcting defects in installation. It is therefore concluded as a matter of fact that improper installation of machinery played a relatively unimportant role in plaintiff’s production problems.
39. Condition of government-furnished. machines.
(a) Historical records. Watervliet Arsenal, which supplied the machines to the defendant under the Facilities Contract, maintained a so-called “historical record” on each item of Government-owned machinery in its possession. The historical record described each particular machine in detail, *409 listed its accessories, recited its successive uses, and reported its condition by means of a code as shown in the schedule included in finding 36. The historical record was not an entirely reliable reflection of the condition of the equipment, for not only did it have some gaps in the sequence of uses, but also the condition reported by code was based on visual inspection in most cases instead of on operating experience, whereas certain types of defects would become apparent only in the course of operation. The historical record also did not relate the experience which previous users had with the machine. Watervliet Arsenal did not test the machines to determine their operability prior to delivering them to plaintiff. When the Government supplies a contractor with a Government-owned machine tool under a Facilities Contract, it certifies only that the machine is capable of performing a certain function as indicated in the historical record, and does not certify that the machine is equipped with all the special tooling and accessories needed to manufacture a variety of weapons. The terms “special tooling” and “accessories” are different, but the difference is difficult to define and the terms are often used interchangeably with reference to particular devices used as adjuncts to the basic machine.
(b) O ontemporcmeom writings relative to condition. Throughout the period of contract performance the plaintiff frequently complained to the defendant that the Government-furnished machines were defective, and on numerous occasions the defendant sent inspectors and other technical personnel to investigate the complaints and to render assistance to plaintiff. Some of the complaints and reports of inspectors throw contemporaneous light on the condition of the machines and are quoted herein in pertinent part or are paraphrased.
(1) Under date of May 4, 1953, Harold J. Lee, machine shop foreman at Watervliet Arsenal, prepared the following report of his visit to the Lansdale plant from April 20 through May 1, 1953:
facts:
On arrival I found that the contractor lacked a considerable amount of necessary small tooling. I pointed out what was lacking to the Shop Superintendent and they proceeded to either make or procure what was *410 needed. For example, they had no keys with which to key their broach head to the bar or key the adapters. They had no bore sizer, and had no plugs for turning.
They were using a follow rest in lieu of a guide rest for starting reamers and it was proving unsatisfactory so I suggested this be changed. They replaced the follow rest with the proper bushing guide support and made new bushings. I also found a great deal of variation in the sizes their reamers were made to. This condition was corrected along with suggestions I made in regard to the method of holding the carbide tips. I found after all the conditions were corrected that the first reamer had insufficient stock removal so I suggested elimination of the first reamer. This proved quite satisfactory. The bores came straight and the reamers held size plus the fact that it cut the boring time in half, and eliminated the maintenance on one reamer. When I left they were boring at the rate of approximately nine tubes per nine hour shift; one shift per day.
On the hone they were having trouble with sufficient stock removal. This was corrected by reversing the stones every five passes. Ordnance inspection was not satisfied with the finish being produced, and I had them change the coolant from Houghton honing oil to 60% Union base and 40% kerosene. I also recommended three hundred and twenty (320) grit stones manufactured by either Norton or Bay State. They also have difficulty inasmuch as the honing head is designed for hydraulic expansion and the machine did not have the hydraulic attachment. However, this equipment arrived at the plant the day I left. They also have no satisfactory method of measuring sizes in the machine. They have a short gauge that checks the bore size for about 12 inches on each end, but they need something faster and that will give a more complete check.
[Nora: Mr. Lee testified that the lack of a hydraulic attachment did not affect the function of the machine but did lessen its efficiency.]
The second day after my arrival I suggested that they have their rifling bar checked for twist. Mr. Gromada assured me that it had been checked; however I questioned this, so they finally agreed to check it again. I instructed them in the proper procedure and I found that the twist was one turn in 25 cal. instead of the prescribed one turn in 22. After considerable checking they found that the proper bar being cut at Firestone would not be ready until 10 May. Watervliet Arsenal was contacted and arrangements made to borrow a bar from Watervliet. This bar was shipped to Lansdale *411 and the machine was set tip. I recommend changes in their holding fixtures as I felt that the method they were using was insufficient. After a few minor corrections in the machine, and setting up a method of sharpening and stoning the cutters the machine operated satisfactorily. I had Mr. Snyder have a set of plugs made up to turn the tubes between centers, and instructed them in the operation of the Lees Bradner Thread Mill machining. However, the proper hob cutters are not yet available. They will be there around 10 May. They had some difficulty finish turning due to a lack of a steady rest. They overhauled the one they had and made a roller rest which worked quite well.
Mr. Gromada was quite concerned over the fact that he thought that when the lug was shrunk on the Chamber the threads would collapse and the components wouldn’t go together. I recommended that they use at least half of their tolerance on their threads. They did this and the first two tubes assembled satisfactorily.
The one great deficiency in their set up was the lack of engine lathes, which I am informed is being taken care of. Two Boye and Emmes lathes are en route from Pontiac, Michigan, and should take care of this.
CONCLUSIONS AND RECOMMENDATIONS:
When I left they had about seventy tubes through the boring lathe and about half of these were through the honing operation. They have installed a method of checking runout with a center spot so should have no trouble there. Once they get the necessary engine lathes they should have no trouble meeting their schedules.
Ordnance inspection seemed very inexperienced in regard to inspecting bores. They couldn’t seem to make up their minds on finish, etc. Due to the indecision that was prevalent I would recommend that a visit by one of the inspectors from this installation would be a big help.
The manufacturer has adopted this Arsenal’s method of manufacturing on the tube, and it would be a good idea, in my opinion, for the district to use our method of inspection.
(2) On June 8,1958, plaintiff wrote the following letter to POD requesting an allowance for overtime expended as a result of trying to adhere to delivery schedules with defective Government-furnished equipment which delayed operations:
Inasmuch as subject contract was bid in October 1952 and award was held up until the latter part of January *412 1953, due to conditions beyond our control, it was necessary for Acme to secure six (6) pieces of Government-owned equipment on a loan basis, along with five (5) pieces of leased equipment. All this equipment, with the exception of two lathes which were new, had been in storage over a long period, and the true condition of said equipment could not be determined prior to receiving same in our Lansdale plant, installing and actually operating the equipment.
It was not until the middle of March that the true facts pertaining to the condition of the equipment became known. At this point many hours of straight time as well as overtime had to be worked in order to put this equipment in first class working condition.
A great deal of time was lost in waiting for special parts. In fact we are still awaiting some parts . . . operating the machines at approximately 30% of their efficiency in the meantime. For instance the Lees Brad-ner thread miller is still out of operation due to the lead screw being worn beyond repair, and we are presently chasing the threads on the rifle barrel on a lathe. The quality of the thread being done in this manner is very good; however, the time required is approximately five times longer than if the thread was nobbed with the Lees Bradner thread miller.
Similar conditions existed on the two Smalley thread millers which we leased from the Government and in turn loaned to our vendor, All Metals Industries, who is manufacturing the Chamber and Yent assembly for us.
Once these particular machines were in working condition we had already spent many hours overtime, and it was necessary to continue this overtime work in order to comply with the specified delivery schedule. It is a fact that we have been unable to adhere exactly to said delivery schedule, but we feel certain that by working this overtime all deliveries will be up to date within thirty (30) days from date.
Thereforej we feel justified in requesting payment or allowances m our renegotiation of costs for 4,826% hours of overtime at a total cost of $11,601.40, which was incurred between February 1, 1953 and May 17, 1953. We further feel that we will use approximately 50% of the above hours and monies in order to meet June and July deliveries, and hereby request an allowance for same.
(3) On June 18, 1953, plaintiff wrote the following letter to POD requesting an extension of delivery schedules due *413 to defects in Government-furnished machines enumerated in some detail:
Pursuant to Article II-A, page 6 of facilities contract 1214F, and in accordance therewith, we are. requesting the release accorded us under said provisions. Various machines supplied to us on the original award and later machines which we have procured on a rental basis were not in fit operating condition, or were delayed at point of origin for a long period of time due to clearance papers and packaging procedures controlled by Government agencies.
The following is a list of machines that required a large amount of repair, or were delayed beyond the delivery time stated by us when our present delivery schedule was agreed upon in the office of Philadelphia Ordnance District during the week of 19 January 1953. These machines are directly responsible for our inability to deliver seventy-four (74) guns in May, and a setback on our June schedule of 233 guns.
Rifling Machine — 12G American — Govt. Tag WV-8938.
Requisitioned February 2 and received March 10. Has not been used to date as we are still waiting for parts that have been on order since receiving machine. We expect this machine will be ready to operate within two weeks. The rifling bar that came with this machine had to be sent to Firestone for cutting proper groove from 25 cal. to 22 cal., and to date has not been received from them.
Honing Machkie — Barnes Model 60 — Govt. Tag WV-8580
Requisitioned February 3 and received February 18. Certain parts on the supporting table were missing and due to a long delivery given by the manufacturer for these parts, said parts were made in our shop. The machine was finally put in operation about the middle of April. The motor that came with this machine apparently had come from another machine and would not fit in its proper place. Several days were lost in making a table attachment to the machine for this motor.
Bormg Lathe — No. / LeBlond — Govt. Tag WV-8990
Requisitioned February 2 and received February 18. The steady rests and chucks of this machine were made for a 12" barrel. Therefore, we had to bush them down to fit the 75/MM barrel which involved over thirty days of machining and fitting as well as grinding. Tms ma *414 chine had only one steady rest with it, and in order properly to bore the barrels, two steady rests are necessary. Inasmuch as we could not locate another steady rest, we proceeded to build our own steady rest, which involved considerable time. This boring laths was put in operation about the middle of April.
Boring Lathe — No. 4 LeBlond — Govt. To,g WV-899£
Requisitioned February 2 and received February 18. This was in same condition as above boring lathe (WV-3990) and still is not in operation due to our having to make two steady rests for this machine. We expect to have it operating within the next two weeks.
Thread Millers — Smalley General — Govt. Tags WV~ 8171 and WV-£1£0
Requisitioned February 6 and received March 3 by our subcontractor All Metals Industries Inc., who are machining and threading the chamber and vent assembly for us. These m achines had to be completely overhauled, and only recently were put in operation. Here again the lead screw had to be completely rebushed which involved the making of several parts due to the long delivery quoted by the manufacturer of said parts.
Boye <& Emmes Lathes — Govt. Tags WY-££58894 and WY-££58895
Requisitioned March 31 and received May 18. These lathes were new and in good condition, and have been operating in our plant since May 20. These two lathes are helping us to pick up a back log on the O.D. turning of the barrel and the final machining of the O.D. on the barrel. Not having these machines sooner has hurt our delivery considerably at the present time, but within the next two weeks they will help to remove any bottlenecks on this operation.
Thread Miller — Lees Bradner — Govt. Tag WY-941847
Requisitioned February 10 and received February 18. We have had considerable trouble with the lead screw and hob on this machine,, and through extensive repairs and completely overhauling the lead screw bushing and mounts, plus replacing the hob, we were just able to put this machine in operation on June 11. A replacement lead screw from the manufacturer was subject to six months delivery.
Rifling Machine — No. 4 Lehlond — Govt. Tag G1-5A-2
Requisitioned February 2 and received March 3. Steady rests had to be rebushed from 8" down to 4*4". *415 Boring bar was sent to Firestone for changing the groove from 25 cal. to 22 cal. A bar was loaned from Watervliet Arsenal to put this machine in operation, and the original bar received on machine was returned to us from Firestone on June 5. We are now ready to apply this bar which involves a major change.
Other tooling such as jigs, fixtures and manufacturing gages requisitioned on February 11 and received from Watervliet Arsenal on March 4 could not be used. Inasmuch as we had anticipated using some of this tooling after it finally arrived, we then had to replace same which took considerable time. This is one of the reasons why we were unable to make our proper delivery. This is true especially on the two parts i.e. chamber and vent assembly, which All Metals Industries is machining for us, since not one piece of the Watervliet tooling could be used on their machines. These two particular parts are the ones that have held up our delivery.
Request was made on February 2 to Philadelphia Ordnance District for approval to use molds located at various subcontractors’ plants to produce component parts. These subcontractors were currently producing these items for Firestone. Cleveland Ordnance District and Pittsburgh Ordnance District had to give approval since these involved their prime contracts, and final clearance was arranged on March 17.
Therefore, because of the conditions above and beyond the control of Acme Coppersmithing and Machine Company, we are respectfully submitting our revised forecast delivery schedule as follows:
June ’53_ 30
July _ 125
August- 233
September_ 233
October_ 233
November_ 233
December_ 233
January ’54_ 233
February_ 233
March _ 233
April _ 233
May - 70
Total_2,322
This will enable us to complete our contract within the original completion period. If monthly forecasts can be exceeded, we request the authority to do so.
We would appreciate any consideration to the above request, and thank your offices for all past cooperation.
(4) On October 21,1953, plaintiff wrote to POD requesting further extension of the delivery schedules, assigning the following reasons for delay:
*416 Tbe following production machinery is furnished by the Government:
MACHINE DESCRIPTION DOLLARS EXPENDED NET RESULTS
LeBlond Broaching Machine Govt. Tag G16A-2 Ser. 4BM8. 3,049.12 Unserviceable.
#120 American Broaching Machine Govt. Tag WV3938 Ser. 3628. 4,697.36 Unserviceable.
Barnes #10 Horizontal Honing Machine Govt. Tag WV8530 Ser. 2896. 2,973.72 Unserviceable.
Lees Bradner Thread Miller-Model HT Govt. Tag WV7020 Ser. 966. 877.76 Unserviceable.
This equipment was carefully examined before it was placed in the line, and it was only during production that these hidden faults became apparent. After a total expenditure of $11,497.95 these machines are still unserviceable.
Mr. Roy Hepburn, after a detailed investigation of the above equipment, has certified that the machines are unserviceable, and are responsible in large part for Acme’s inability to meet the contract delivery schedule, and has recommended replacement.
Acme Coppersmithing and Machine Company, if the above machines were serviceable, is ready to meet the contract delivery schedule, but owing to the fact that Mr. Hepburn is replacing the unserviceable machines, the month of December will have to be zero (0) in order to allow sufficient time to remove the unserviceable equipment and install replacement machines; also, there is a strong possibility that the tooling on the present machines may have to be altered to make them applicable to the new machines. In order to meet the requested delivery schedule, it will be necessary to have the replacement machines in the line by December 1,1953.
(5) In a letter dated November 9,1958 to POD the plaintiff stated in part as follows:
As a result of a survey made by Machine Tool Section your District, two (2) machines supplied to us under Schedule “B” of above contract were found unserviceable, and we were advised that replacements of these machines would be made as soon as possible. Machines in question are:
LeBlond Boring Lathe — Ser. 4GSR-151 — Govt. Tag WV3990 — Value $30,300.80.
Lees Bradner Thread Miller — Ser. HT-966 — Govt. Tag WV7020 — Value $9,051.44.
*417 We request immediate arrangments be made for replacement of above machines as soon as possible.
(6) On November 9, 1953, the plaintiff wrote again to POD describing the condition of a honing machine recently received and requesting the defendant to supply certain items required for effective use of the machine, as follows:
Tour attention is invited to the Barnes #3 Horizontal Honing Machine, Govt. Tag 11342-741, Ser. No. 8869, which we received from Pontiac Motors, Pontiac, Michigan on September 21, 1953 through Schedule “B” Facilities.
As you well know, this machine was procured by the Government for a 57/MM operation and was short a honing bar and head attachment for this type operation. Since it has been supplied to us for our 75/MM Kecoilless Rifles, the guide trough bushing and oil trough are adapted for a 1%" bar; our operation calls for a 2i/2" bar.
Through investigating the possibility of getting this machine complete with its required components to effectively use this in our present production, we were verbally advised by Mr. R. Hepburn, Machine Tool Section, Philadelphia Ordnance District, that the items required to effectively use this machine in ourproduction line would be supplied and paid for by the Government upon our submitting a quotation as to their cost. The following are parts we require:
1 10' Honing Bar with 3" diam. Honing Plead to hone 60" Tube.
2 Sets Stone Holders for above head.
1 Head Coupling Guide Trough Bushing Oil Trough
We were advised by the Micromatic people that the delivery on above items would take approximately twelve (12) weeks to complete at a cost of approximately $2,200. They will officially confirm this by formal quotation which should be received by us the latter part of this week. Copy of same will be forwarded to your office promptly.
(7) On February 23, 1954, plaintiff wrote the following letter to POD:
This will confirm several conversations we have had with you relative to the trouble we are having on the *418 two broaching machines. As yon realize, the broaching machines in our production set-up control the quantity of guns that can be shipped in any given month.
We have had very high rejections on gun tubes not holding their concentricity requirements, and we have found this fault lies within the mechanisms of these machines. We are extremely worried as to whether or not we will be able to meet our delivery schedule for March, and are wasting no time in thoroughly inspecting and adjusting the above machines. As soon as the fault is known, and if corrective steps can be taken, we shall notify your office.
These machines practically have been shut down for the entire month of February, and we can assure you that no time has been lost in trying to get these machines in operation. We have requested Ordnance Inspection to aid us in taking corrective steps.
(8) On March 1,1954, plaintiff wrote the following letter to POD:
On the following dates our company requested either Messrs. Hepburn or McMenamin of Machine Tool Section P.O.D., to visit our plant and advise us the proper setting up of the two rifling machines, namely, LeBlond, Ser. No. 4RM8, Govt. Tag G15A-2 and American 12G, Ser. No. 3628, Govt. Tag WV8938 since we are having extreme difficulty in holding our rifling of tubes to the tolerance required by the print and Ordnance gages. The dates are: October 21, November 23, November 24, November 25, December 4, December 24 and February 10, 1954.
During each visit your Machine Tool Section has made certain recommendations on the adjustment, repair or replacement of parts on these machines, and in every case we have followed their instructions to the letter.
In addition to the above we requested the American Broach & Mach. Co. of Ann Arbor, Michigan, to send Mr. G. A. Deming to assist us in the setting up of the hydraulic system on the American broaching machine. Mr. Deming corrected the functioning of the hydraulic system enough to put us in operation. But, it was impossible to eliminate the erratic forward motion of the rifling bar due to leaks in the main cylinder and pressure control valves. To rectify this would require factory repairs.
During the latter part of January ’54 your Inspection Branch was supplied a new concentricity gage to check *419 rifling and the i.d. of the gun tubes. It was at this time that we realized we were faced with the rejection of a large quantity of tubes due to the use of this gage;
Please note that up to this time the gage originally put into service by Ordnance was functioning satisfactorily, meaning that our rifling machines were producing acceptable tubes on the original gage being used by Ordnance Inspection.
We have now reached a point where we feel we have exhausted all sources of know-how in rectifying the faults in these machines furnished by the Government. These machines are in proper alignment and level, but still there is some fault causing rejected tubes. We would greatly appreciate your office sending a man from Watervliet Arsenal to our plant who will be able to service these machines put them in efficient running condition or take the necessary action to eliminate our present difficulties.
Please note that we have lost complete production for the entire month of February, and if this condition exists any longer, our shipments for the next two months will be greatly endangered.
We feel that our procedure in manufacturing the 75 m/m Recoilless Rifle is accurate, and sound shop practice is now in full force and effect. In the interest of meeting our delivery schedules which we have firmly established over the last two months, we are asking for your immediate cooperation.
(9) On March 29, 1954, plaintiff wrote the following letter to POD:
We wish to offer our sincerest thanks and appreciation for the splendid cooperation and assistance rendered by the Philadelphia Regional Office, through Mr. Edward Dougherty, P.O.D. and Mr. Roy Hepburn and Watervliet Arsenal personnel in having a Mr. Earl G. Heiner of said Arsenal visit our plant on the 12th and 13th of March 1954.
As a result of these visits, recommendations were made to replace the one Mechanical Broaching Machine with a more serviceable one, and also the use of cutter heads presently being used by Watervliet Arsenal in the rifling of seamless tubing. It was also pointed out by Mr. Heiner, that the rifling bar on the Hydraulic Broaching machine will have to be repaired by re-grooving the slot in the rifling bar. Arrangements are being made to ship this bar to Watervliet Arsenal for machining, after the unserviceable rifling machine *420 is replaced, so that our production on rifling gun tubes is not endangered.
(10) On April 16, 1954, James F. McMenamin (presumably an expert sent by POD to plaintiff’s plant) wrote to plaintiff as follows:
Tour letter of April 8, 1954 received requesting a written report of my findings on your rifling machine in your plant on February 10,1954.
Your Mr. C. I-Iockstuhl requested Mr. E. L. Hepburn in P.O.D. office to have me to go to your plant on the above date and on my arrival in your plant I found the rifling gauge had been replaced by a new gauge with .002" tolerance — the old guage had .004" tolerance.
In order to use the new rifling gauge, the tube when set-up in the rifling machine had to be in line within a .003" of a thousand in order for the new gauge to pass through the bore of the tube after rifling.
The following suggestions were made:
Make two (2) tube support brackets lining the brackets on the machine with the cutter bar support bracket. Spot turn the tube diameter on the engine lathe to suit the bore in the tube support brackets.
I requested the P.O.D. to give .003" tolerance on the rifling gauge, or increase the bore diameter in the tube .001" thousand. It was requested that the P.O.D. have the tubes stress relieved after the rough turn and rough bore operations.
I also noted that after parkerizing three or four tubes out of 12 at 180 degrees the gauge would not pass through the bore. These tubes were returned to the Honeing Machine to be rehoned.
Mr. Ilaplan, P.O.D. Head Inspector at your plant was of the opinion your shop could produce these tubes with the present equipment by relining the machine. He asked for a week or two in order to line up the adjustable steady rest with the rifling bar and tool guide support bracket.
(11) On May 23,1954, All Metals wrote the following letter to plaintiff:
We refer to your phone request of April 27 pertaining to our furnishing information as to the operating condition of the Smalley-General thread millers which we received under lease arrangement from Watervliet Arsenal.
*421 In view of the fact that these machines were equipped with 440 volt motors which could not be reconnected for 220 volt service, it was necessary for us to delay installation until we could have 440 volt service installation made. This new service installation has just been completed within the last few days and we have the machines wired and ready for operation.
One of the machines, Arsenal number Bill, serial number 455, has been tried in operation and has proved to be satisfactory. The second machine, Arsenal number 2120, serial number 384, is completely wired and is in process of being set up for trial. As soon as trial runs have been made, we will report to you the operating condition of this machine.
With reference to both of the above machines, a considerable amount of work was necessary, both electrical and mechanical, to put them into operating condition. Apparently when these two machines were removed from operation and prepared for government storage, the person or persons doing the preparation were somewhat overzealous in application of the preservative material. For example, a good portion of the electric switch gears on both of the items had to be removed and replaced due to the fact that covers had been removed from switch gear boxes and preservatives sprayed on all electrical contactors and equipment. Most of the electric wiring connections had been removed by the expedient method of jerking them completely loose from their moorings. Much of the inter-connecting wiring was either so impregnated with preservative material, or damaged to the extent that it had to be replaced.
As you can see from the foregoing, we have spent considerable time and expense in preparing these machines for operation in our plant, but we feel that the major portion of this work has now been completed and the machines will satisfactorily serve the purpose for which they are intended.
There are certain parts missing from the machines, such as hand wheels and handles, for which we will improvise replacements so that we may get the machines in operation at the earliest possible date. A complete inventory of electrical and mechanical parts, necessary for the operation of these machines which were not shipped to us, will be forwarded to you at a later date. We will also advise what electrical equipment it was found necessary to replace. Apparently all of the necessary change gears have been provided with the machines to permit them to produce the chamber and vent assembly parts.
*422 40. Other indicia of condition of machines.
(a) Boring Lathe No. 3990. Under the Facilities Contract the Government was obligated to furnish plaintiff the subject machine, together with a rough reamer and a boring bar 14' 6" long. On or about February 17,1953, the machine was delivered to plaintiff. The last use of the machine preceding its use by plaintiff, so far as disclosed by the historical record accompanying the machine, was in 1943, and at that time it was inventoried with certain related equipment and controls, including a boring bar 4' long. At some subsequent undisclosed time, but prior to dime 30, 1955, the Government furnished plaintiff with a 17' 1" boring bar. As of April 7, 1954, the machine was in plaintiff’s possession in 0-2 condition, together with enumerated controls and accessories. There is no way of ascertaining the condition of the machine as of February 17, 1953. From February 17, 1953, through November 1953 plaintiff expended $1,902.02 on the machine, including $430.67 for repairs, $323.60 for installation expenses, and $1,147.75 for special tooling, the last item being so listed in the special tooling inventory dated July 15,1958, attached to plaintiff’s termination type claim. Included in the special tooling category of plaintiff’s expenditures is $377.85 for a chuck, since the one furnished by the Government with the machine was not of the correct size. There is no record of an expenditure for fabrication or modification of steady rests for the machine, as plaintiff reported to defendant by letter dated June 18, 1953, but the historical record indicates that only one steady rest was provided with the machine instead of two as required, so it is concluded that plaintiff had to fabricate at least one steady rest at an undisclosed cost, and the other steady rest required modification.
By letter of November 9, 1953, plaintiff reported that the Government had found this machine to be unserviceable, but there is no other record of such determination. It is considered unlikely, however, since between that date and the inspection finding of April 7,1954, that the machine was then in 0-2 condition, plaintiff spent only $52.88 in repairs on it.
The installation expense of $323.60 includes $237.60 for the services of four men for three days to correct the bed of the *423 machine at some undisclosed later date. This corroborates defendant’s contention that the machine was defectively installed in the first instance.
Other references to the condition of the machine are to be found in the written communications reprinted in paragraphs (1), (3) and (6) of finding 39(b), supra.
Several conclusions are reached from the foregoing facts, viz: the defendant’s failure to supply with the machine a boring bar of the size required by the Facilities Contract, an omission later rectified, is not claimed by plaintiff as a cause of delay. In the absence of definition in the Facilities Contract as to what is comprehended in the term “manufacturing aids available from Watervliet Arsenal”, which the defendant was to furnish, it is assumed for want of any better interpretation that the aids in the form of accessories and special tooling which were actually supplied with the machine by necessary implication should have been usable for the purpose of manufacturing 75 mm. guns. Otherwise, the quoted phrase would be meaningless. In this case the defendant supplied a chuck and steady rests of the wrong size which occasioned the plaintiff some expense and delay to correct. In contracting to pay for repairs to the machine the plaintiff must have contemplated a reasonable amount of repairs, and the repairs itemized in record do not seem unreasonable or excessive. On the other hand, the plaintiff installed the machine improperly in the first instance and considerably later had to reinstall it, thus causing problems involving delays. Moreover, much of the plaintiff’s problems with the machine arose from inefficient operation attributable to inexperienced employees, as reflected in the Lee report (finding 39(b) (1), supra). In smnmary, the defective nature of the machine, as a factor in plaintiff’s costs and delays, was substantially outweighed by the factors of improper installation and incompetent operation, both of the latter being attributable to the plaintiff.
(b) Boring Lathe No. 399®. Under the Facilities Contract the Government was obligated to furnish plaintiff the subject machine, together with a rough reamer and a boring bar 14'6" long. On or about February 16, 1953, such a machine was delivered to plaintiff. The last prior use of *424 the machine disclosed by the historical record was in 1943, at which time it was inventoried with certain related equipment and controls which did not include a boring bar. At some subsequent undisclosed time prior to June 30,1953, the Government furnished plaintiff with a boring bar 18'8y2" in length. As of April 7, 1954, the machine was in plaintiff’s possession in 0-2 condition, together with enumerated controls and accessories. There is no way of ascertaining the condition of the machine as of February 16,1953.
From February 16, 1953, to April 21, 1954, plaintiff expended $2,457.86 on the machine, including $1,031.61 for repairs, $232.75 for installation, and $1,193.50 for special tooling ($720 of which was listed as such in a special tooling inventory dated July 15, 1958, attached to plaintiff’s termination type claim). Of the expenses in the special tooling category, $423.60 is represented by the fabrication and rebuilding of two steady rests for the machine, to replace the steady rests supplied with the machine which apparently were designed to accommodate a different size gun barrel than the 75 mm.[3] Other references to the condition of the machine are found in the letter quoted in finding 39(b) (8), supra.
Study of the expenses to repair this second boring lathe lead to the conclusion that it was in somewhat worse condition than the first one and caused the plaintiff some delays. For example, the plaintiff’s expenditures for fabricating two steady rests to replace the steady rests supplied with the machine occurred in August 1953, approximately six months after the machine was delivered. Whether or not the repairs to the machine exceeded reasonable expectations is conjectural. The evidence does not satisfactorily establish that the second boring lathe was improperly installed. It is probable that the plaintiff’s lack of operating experience was fully as responsible as the condition of the machine for the difficulties and delays plaintiff had in its use.
(c) Honing Machine No. 8530. Under the Facilities Contract the Government was obligated to furnish plaintiff the subject machine, together with a complete honing bar and *425 head. On or about February 17, 1953, the machine was delivered to plaintiff. The last use of the machine preceding its use by plaintiff was in 1951, and at that time it was inventoried with related equipment and controls. Its condition was not reported as of 1951, but as of September 15, 1954, was reported as 0-2. Upon delivery the machine lacked an hydraulic head attachment designed to expand the honing stones, but this arrived about May 1, 1953. The machine could be used without the attachment, but operated less efficiently without it and tended to hone the inside of the gun barrels unevenly. On June 18, 1953, the plaintiff complained of certain parts which were missing from the machine on delivery and which plaintiff had to fabricate, thus causing an alleged delay to mid-April before the machine could be operated, but the only parts which the defendant should have supplied, but did not so far as the record corroborates, are an electric motor purchased in May 1953 and the hydraulic head mentioned above, and two steady rests which the plaintiff fabricated.
From February 17, 1953, to May 22, 1953, plaintiff expended $2,067.42 in repairs and $1,238.40 in special tooling on this machine. The special tooling expense consisted of a filter, a pump and a set of stone holders, all of which appeared in a special tooling inventory attached to plaintiff’s termination type claim dated July 15, 1958. The repair expense included $1,260 for the steady rests mentioned above, which are also classifiable as special tooling. By letter of October 21,1953, to the defendant (finding 39 (b) (4), sufra), the plaintiff referred to the fact that a Government representative had declared the machine to be unserviceable and recommended replacement. This contention is not refuted in the record. Other references to the condition of this machine are found in the letters quoted in paragraphs (1), (3) and (4) of finding 39 (b), sufra.
Determination as to whether the machine supplied by the Government met with the requirements of the Facilities Contract involves an interpretation of what the latter required, an intimate understanding of the various parts to the machine so that the record of expenditures can be interpreted, and the customary resolution of conflicting testimony, none of which lend themselves to easy solution. The defendant *426 was clearly at fault in not supplying an hydraulic head with the machine, and less clearly at fault in not supplying usable steady rests and in supplying a machine requiring excessive repairs. On the other hand, there is evidence that the plaintiff’s lack of operating experience contributed to its difficulties. It is not established that the plaintiff’s troubles were attributable to improper installation of the machine. By attaching significance to the fact that the machine was replaced after the plaintiff’s complaint in October 1953 that it was unserviceable, it is concluded on balance that the machine was defective upon delivery, that its condition was worse than plaintiff could have reasonably anticipated and occasioned it excessive expense and delay, and that plaintiff’s unfamiliarity and inexperience with the operating characteristics of the machine was also an important factor in the plaintiff’s difficulties.
(d) Honing Machine No. 7J¡,1. This was the second of the two honing machines which the defendant was obligated to supply plaintiff under the Facilities Contract. It was manufactured in 1952, used by another Government contractor, and was received by plaintiff on October 5,1953 (over seven months late for some unexplained reason), at which time it was reported conflictingly to be in N-l and 0-2 condition, a contradiction which the record does not explain. In the three months following delivery of the machine the plaintiff expended $1,419.62 on it, including $229.80 for repairs and $1,249.82 for tooling and/or accessories. $1,132.79 of the latter item was denominated as tooling in the special tooling inventory which plaintiff attached to its termination type claim dated July 15, 1958. By letters of November 9 and 17, 1953, to defendant, the plaintiff confirmed its understanding that the machine was designed for use in the manufacture of a different size gun and would require certain adaptations to use for making 75 mm. guns, which adaptations would cost the plaintiff $937.20 and would take eight weeks from the latter date to accomplish. Plaintiff requested authorization and reimbursement for the expenditure, and stated that the need for major repairs to the other honing machine was handicapping operations. There is no response in the record to these representations and they appear to be *427 roughly consistent with the record of expenditures made to the second honing machine as that record is reduced by elimination of items either ordered long prior to the arrival of the machine or not clearly identifiable as a repair, an accessory, or as special tooling. Other references to the condition of this machine are found in paragraphs (1) and (5) of finding 39 (b), sufra,.
(e) Rifling (i.e., broaching) Machine No. 3938. The defendant was obligated under the Facilities Contract to furnish the plaintiff two rifling machines, a rifling head, and one set of cutters. One of the rifling machines was received by plaintiff on March 5, 1953. The records accompanying the machine indicate that it was in R-3 condition as of August 1951 (per visual inspection) and was certified to be in 0-2 condition apparently as of September 1954, although the precise dates of these condition ratings are subject to some doubt. The top bar bracket was listed as broken, apparently as of August 1951. It was delivered to plaintiff with certain listed controls and attachments and/or accessories, none of which seem to include a rifling head or a set of cutters of the proper size. Subsequently the defendant supplied plaintiff with a steady rest fixture and a rifling bar for the machine. The tooling furnished to plaintiff was not adequate to hold the gun tube hi place in the machine and had to be reworked to adapt it to the rifling of a 75 mm. gun barrel. The rifling bar furnished plaintiff by defendant had the wrong twist and plaintiff was delayed several weeks waiting for this to be corrected at a cost of $728.34.
Plaintiff expended a total of $2,708.92 on this machine, all but $754 of which was spent during the six months following its receipt. Of the plaintiff’s total expenses, $2,478.92 was for repairs, $35 for installation, $70 for maintenance, and $125 for tooling. In addition to the above expenses, defendant paid $1,280 (reimbursed by defendant) for a centering fixture for the machine as an item of tooling, and plaintiff bought $5,263.09 worth of expendable cutters. The testimony of defendant’s witness that the machine was in good working condition as of May 1,1953 is not consistent with the fact that all but $825 of plaintiff’s expenses for the machine occurred after May 1, 1953.
*428 In summary, it would appear as to this machine that the defendant delivered it in defective condition and without the equipment required by the Facilities Contract, and that it required frequent repairs which were both costly and time-consuming. Other references to the condition of this machine are found in the letters quoted in paragraphs (1), (3), W? (7), (8), (9) and (10) of finding 39 (b), supra.
(f) Rifling (i.e., ’broaching) Machine No. 0-1-5-A-H. The second of the two rifling machines required by the Facilities Contract was received by plaintiff on February 20, 1953. Its condition was listed conflictingly in the historical record and other documents relating to the machine as 0, 0-2, and “fair”, but it is not clear whether these condition ratings apply to the time of its receipt by plaintiff, or to September 1954 when it was certified for inventory purposes, or to some other time. As guides to determine the condition of the machine at the time it was delivered to plaintiff the entries on the historical record are useless. Another handwritten entry on the historical record refers to “Scrap”, but this is equally inconclusive.
Plaintiff spent $8,034.73 on this machine, including $1,266.40 for repairs, $35 for installation, and $6,733.33 for special tooling (including $5,188.28 for expendable cutter blades, $720.05 for modification of a rifling bar supplied by defendant, and $825 for replacement of a cutter head supplied by defendant).
The plaintiff experienced trouble with both of the rifling machines furnished under the Facilities Contract. Because of the erratic thrust of the rams carrying the cutter blades and shifting of the cutter blades inside the tube the lands of the rifling would be scratched, the grooves would have tears, and there would be steps in the edges of the lands. The plaintiff made frequent complaints about the rifling machines and the defendant sent representatives on many occasions to advise and assist plaintiff in overcoming its difficulties. In March 1954 POD representatives recommended the replacement of rifling machine No. C-1-5-A-2, and repairs to the rifling bar on the other rifling machine. Other references to the condition of this machine are contained in *429 the letters quoted in paragraphs (1), (3), (4), (7), (8), (9) and (10) of finding 39(b), sufra.
(g) Lees-Bradner Thread Miller. Supplemental Agreement No. 1 of May 26, 1953 provided for the furnishing to plaintiff of the subject machine, which was received by plaintiff on February 18, 1953. It was delivered to the plaintiff without a steady rest, which was not listed among the accessories on the historical record. It is not clear from the record whether a steady rest is part of a general purpose machine such as this or is an item of special tooling, in which case it would have been the plaintiff’s duty to provide. The historical record reports the condition of the machine conflictingly as being rated both 0-3 and “fair” as of April 7, 1954, and 0-2 apparently as of September 8, 1954. The Condition Code defines 0-3 condition to be “Used-Usa'ble Without Repairs-Fair. Used property which is still in fair condition and usable without repairs; however, somewhat deteriorated with some parts (or portions) worn and should be replaced.” Plaintiff overhauled a steady rest to use with the machine and fabricated a roller rest for it. It found the lead screw to be worn beyond repair and, instead of taking several weeks to order a replacement, dismantled and repaired the worn lead screw from end to end over a three-week period. The machine was repaired and in operation by June 11,1953. On October 21, 1953, the plaintiff complained to defendant that the machine had been declared unserviceable by a Government representative, who had recommended that it be replaced. There is no record of a response to this complaint, but apparently the machine was not replaced since the historical record indicates that it was inspected and found to be in 0-3 condition as of April 7, 1954. At some time plaintiff sent this machine to All Metals for use in performing the latter’s subcontract, but it did not prove satisfactory in All Metals’ operation and was returned to plaintiff. Plaintiff testified that it spent $375.10 to repair the machine, but offered no vouchers to support these charges.
(h) Boye dk Emmes Lathes Nos. 71S and 7JJ¡,. These machines were received by plaintiff on May 11, 1953, at which time they were new and in good condition. Plaintiff spent $2,477.84 on the two machines, including $73.60 for repairs *430 and the balance for six special roll lock centering plugs which were special tooling not included in the list of attachments and/or accessories contained in the historical record. The plugs were plaintiff’s responsibility.
(i) Two Smalley General Thread Millers Nos. WV 81£0 and 3171. These machines were received by plaintiff on February 13, 1953, and transferred to All Metals on March 3, 1953, for use hi machining and threading the chamber and vent assemblies which All Metals was to manufacture for plaintiff under the subcontract. One of the machines was in 0-2 condition, apparently as of October 23, 1953, and the other was rated to be in R-2 condition at some undisclosed date. The Condition Code defines R-2 condition to be “Used-Repairs Required-Good. Used property in good condition but considerable repairs required. Estimated cost of repairs would be from 11 to 25 percent of acquisition cost.” The defendant’s acquisition cost of the machine was $7,651.32. On May 23,1953, All Metals advised plaintiff that they had performed considerable electrical and mechanical work on the machines to put them in operating condition, that certain minor parts of the machines were missing, that the principal reason for delay in placing the machines in operation was that the All Metals plant had to be rewired to accommodate the 440 volt motors of the machines, and that both machines were by May 23 ready for operation and one of them had proved to be satisfactory. There is no record of All Metals’ expenses in repairing and installing the machines, except a report in July 1954 by All Metals to POD that it had spent about $8,000 in repairing the two machines in question as well as two lathes and a milling machine which plaintiff had procured for All Metals from the defendant. But there is no other proof of these expenditures in the form of vouchers, etc.
41. Plaintiff's Inexperience. In undertaking to manufacture 75 mm. rifles the plaintiff embarked on an undertaking completely foreign to its previous production experience. Both the personnel hired for the Lansdale plant and the machinery with which to perform the contract were new and untried to the plaintiff. It is quite natural that many production errors and inefficiencies resulted, such as improper *431 installation and poor alignment of certain of tbe machines, unsuccessf ul experimentation with untried methods of fastening cutters to reamers on the boring lathes causing oversize cutting, inaccurate centering of the bushing which guided the reamer on the boring lathe through the gun tube, unfamiliarity with the technique of reversing the honing stones on the honing machine so as to improve their cutting efficiency, and unwise investment in certain expensive accessories to machines which proved not only to be useless but harmful as well to the machines and work product. Naturally most of these problems arose hi the earlier chapters of performance and were solved as personnel acquired more experience. The nature of some of the early problems are described in Mr. Lee’s report set forth in finding 39(b)(1), supra. Several of plaintiff’s former employees at the Lansdale plant were called as witnesses for the defendant to testify as to their observation of inefficiencies in the operation. Their collective views centered largely on such matters as improper installation and alignment of Government-furnished machines, and faults mostly of a minor nature which they attributed to. one Gromada, the plant engineer at Lansdale. The testimony of these employees is discounted to some extent, however, because of their own lack of background and opportunity for informed observation, or an impression of hostility towards the late Gromada. Moreover, it is easy to overemphasize the effect of isolated mistakes on the overall pattern and thus to give such instances undue weight. No doubt many of the plaintiff’s problems arose from its inexperience, but to attribute all of them to that cause would be to ignore the effect of the inadequate Government-furnished machines which compounded plaintiff’s difficulties.
42. Delivery failures by plaintiff’s subcontractors.
(a) All Metals became delinquent in deliveries of vent assemblies to the plaintiff. Because of this arrangements were made to divert to plaintiff 140 vent assemblies being manufactured by another company for the Rock Island Ordnance Depot, 40 of them being shipped to plaintiff on May 22,1958, and another 100 on July 22,1953. On July 17,1953, plaintiff advised POD that All Metals was “progressing nicely” on the subcontract for chambers and vent assemblies. *432 Plaintiff was assisting All Metals in getting under way in its subcontract, and All Metals was objecting to the pressures being applied on it to expedite deliveries. At the same time plaintiff complained to POD that a Government inspector, by complimenting All Metals on its progress, was actually interfering with the plaintiff’s efforts to stimulate All Metals to produce more rapidly, apparently on the theory that flattery promotes complacency rather than effort. By the end of July 1953 All Metals had invoiced plaintiff for only 18 vent assemblies, eight of which were subsequently rejected by plaintiff.
(b) On August 11, 1953, POD directed plaintiff to suspend further operations on the machine finishing of vent assemblies pending revision of drawings. This stop order was in force until rescinded on September 2,1953, when POD notified plaintiff that it had decided not to make a change after all. All Metals was delayed another three weeks in September 1953 due to the failure of its steel supplier to deliver steel which complied with specification requirements. These were prime, but not sole, factors in All Metals’ failure to meet its delivery schedule in August and September 1953, although Supplemental Agreement No. 7 to the prime contract referred to the stop order as having “drastically reduced Contractor’s ability to make deliveries in August and in September 1953.” In order to compensate for All Metals’ failure, the plaintiff ordered 140 vent assemblies from the Lycoming-Spencer Division of Avco Manufacturing Corporation. These were charged to plaintiff at higher prices than All Metals’ subcontract price and were shipped to plaintiff on October 22, 1953, with the understanding that plaintiff would return them in kind out of subsequent deliveries from All Metals, although there is no record of this having been done. The work stoppages on vent assemblies at All Metals in August and September 1953 due to the causes given above precluded deliveries of completed rifles by plaintiff to defendant in September 1953, and during that period plaintiff was accumulating completed gun barrels so that in October it was able to ship 137 completed rifles to defendant, using vent assemblies procured from Avco as aforesaid. Plaintiff’s subcontractor Manalapan discontinued *433 its operations in November 1953 for lack of funds, thus compounding plaintiff’s problems.
(c) By December 5, 1953, All Metals was in such serious financial difficulties that it was unable to meet its payroll, and proposed a new delivery schedule for chambers and vent assembles at a higher price, plus a prompt payment by plaintiff of $10,000 to meet an immediate payroll in order to finish and ship about 70 chambers and 100 vent assembles then in the final stages. By then All Metals had invoiced plaintiff for a total of 261 chambers and vents. It is evident that All Metals’ financial condition steadily worsened during the early months of 1954, and it was not only in trouble with its bank, but had a sizeable claim under a subcontract given it by Avco for vent assemblies under a prime contract which the Government threatened on January 18, 1954 to default, and which was in February 1954 terminated for convenience of the Government. In March 1954 All Metals was shut down for lack of cash to meet payrolls and material costs, and plaintiff was unable to pay $35,000 then owing to All Metals.
(d) In an effort to rescue All Metals and expedite deliveries, in early April 1954 the plaintiff agreed to an increase in the subcontract price and to pay All Metals $35,000 plus another $9,000 later, while All Metals promised to deliver 200 chambers and 200 vent assembles (minimum 100 of each) per month starting in May. Apparently the vents actually delivered by All Metals to plaintiff in the past were not uniformly up to specifications, for on March 31,1954, All Metals credited plaintiff for 85 rejected vents. All Metals delivered only 18 vent assemblies in April and 578 thereafter, of which an undisclosed quantity were accepted subject to a deviation request since they failed to comply with specifications. On April 28,1954, the plaintiff advised POD that its failure to meet the April 1954 delivery schedule for guns was due to All Metals’ failure to deliver chambers in March and April, which in turn was attributed to All Metals’ financial difficulties. No reference to defective Government-furnished machines is assigned in this last-mentioned letter as a cause.
(e) All Metals attributes its difficulties to the Government’s stop order and defective machines furnished by the Government through the plaintiff. While these may have *434 been minor contributing factors, its chief difficulties were inexperience, lack of “know-how”, poor management and supervision, and inadequate financing.
43. Conclusions.
(a) Under the terms of the Facilities Contract, if the Government-furnished machines were delivered either late or not in fit operating condition, the plaintiff’s only recourses were either to reject them or to request an equitable price adjustment in Contract 1213. The Facilities Contract precluded plaintiff from being reimbursed directly for the costs of repair, rehabilitation or restoration of the machines, or from recovering damages for their delay in delivery or delivery in unsatisfactory operating condition. It was thus incumbent on the plaintiff to estimate in advance as accurately as possible what it would cost to install and repair the machines, as well as the cost of special tooling. The difference between a repair and an item of special tooling is not always easily discernible. In general, an item of special tooling is a device which is used in conjunction with a basic machine in order to adapt it to the manufacture of a particular end product, as distinct from a component of the basic machine without which the machine will not operate satisfactorily for any purpose.
(b) Of $82,264 which defendant has verified was expended by plaintiff for dies, jigs, fixtures and special tools, the defendant concedes that $37,358.58 was properly chargeable to contract performance, because the contract provided the payment of this sum as the cost of special tooling which was to become the property of the Government. Originally the plaintiff had included $38,514 in its contract price for special tooling (estimated at $14 per rifle), which was to remain its property, but in order to provide plaintiff with badly needed working capital the Government agreed to subtract $37,358.58 from the rifle price and set up special tooling as a separate item to be paid for, with the proviso it was to become the property of the Government. Of the $44,905.42 admittedly expended over and above the $37,358.58 which the Government concedes is properly chargeable, it cannot be determined with any precision what part was spent for installation and repairs of Government-furnished machines *435 (the plaintiff says $27,750.48), what part was spent for special tooling in excess of that contemplated, and what part was the cost of plaintiff’s inefficiency and inexperience. From the record as a whole it is reasonable to conclude that the $82,264 was expended as follows:
$12,000 — repairs and installation
60,264 — special tooling
10,000 — lost through inefficiency
(c) From the facts presented in findings 34 through 42, and other facts in the record, it is concluded as follows:
Collectively, the condition of the machines furnished by the Government to the plaintiff did not measure up to what the plaintiff might reasonably have anticipated under the promise of the Facilities Contract to furnish machines in fit operating condition, even though the parties contemplated machines which would need repairs, special tooling and accessories to be provided at the plaintiff’s expense to perform Contract 1213. Knowing that the plaintiff had had no previous experience in this particular type of operation, it would seem incumbent on the Government to have furnished it machines which, while they might require initial repairs of a normal nature to place into operation, would not require the constant tinkering and involve the repeated failures and breakdowns which were experienced with some of the machines, even leading to the replacement of certain ones at a later time. The fact that some of the machines performed reasonably well if properly operated did not permit a smooth flow of production if other machines essential to a sequence of operations broke down. The defects in the machines in many cases were not such as could be detected upon visual examination alone at the time of delivery, for the machines had to be installed and placed into operation before certain types of defects became apparent. Thus, it was not always possible for the plaintiff to invoke its right or perform its duty under the Facilities Contract to reject defective machines upon delivery, although its complaints as to certain machines at later dates resulted in replacements. There is some support in tins conclusion as to the overall condition of the machines in the continuous assistance and advice which the Government rendered to the plaintiff throughout the *436 contract, in the generous modifications which, the Government made to the plaintiff’s delivery schedule, and in the apparent willingness to replace some of the machines. Reliance is also placed on the recorded complaints from the plaintiff set forth in finding 39(b), supra, the contents of which are not refuted or responded to by contemporaneous communications from the Government. It is true that the troubles which the plaintiff experienced in the operation of the machines were compounded by certain inadequacies in their installation (finding 38, supra), and to a larger extent by the demonstrated inexperience and incompetence displayed by plaintiff’s personnel in the installation and operation of such machines for the production of gun barrels (finding, 41 supra). Moreover, All Metals’ failure to deliver subcontracted components (finding 42, supra) was at least of equal significance in the delays which plaintiff experienced and, of course, they are imputed to the plaintiff. To some extent the delays coexisted, so that even if the plaintiff had experienced no delays from defective machines, it would have been delayed by the failures of its subcontractors. There is no way to assess accurately the comparative effect of the various delay factors in terms of time or cost, but it is reasonable to conclude from the weight of the evidence that the defendant caused one-third of them and the balance was caused by plaintiff either directly or by imputation.
44. Plaintiff’s requests for reimbursement for machine repair costs.
(a) Section 1 of Article II-A of the Facilities Contract (see finding 35, supra) authorized the contracting officer to make an equitable adjustment of the price and time of performance of the affected supply contract if the Government-furnished facilities were not delivered timely or in suitable condition and if the contractor requested such an adjustment in writing. Prior to cancellation of Contract 1213, the plaintiff wrote to POD at least twice requesting reimbursement in one form or another (outright payment or renegotiation cost allowances) for specified costs allegedly in connection with putting the Government-furnished machines in working condition. See the letters reprinted in subpara-graphs (2) and (6) of finding 39(b), supra. On August 26, *437 1954, plaintiff asked POD for reimbursement for all parts which, plaintiff had purchased to make the machines workable, and on September 7, 1954, plaintiff supplied POD with schedules itemizing the cost of parts purchased for the machines and requesting “assurance that the monies represented herein will be paid to us.” The total amount claimed was $28,646.41.[4] POD replied that it would take these requests under consideration and would advise plaintiff of a decision. After being prodded by the plaintiff for a decision, on October 28,1954, POD advised plaintiff that “should future developments absolve your company of any wrongdoing and this District be authorized to effect a settlement with your company that we will at that time give full consideration to your claim for said expenditures along with any other termination claims you may allege as being brought about as a result of the cancellation of your contract.” The defendant contends that plaintiff at no time during the period of contract performance requested an equitable adjustment in the contract price because of problems with Government-furnished machines, a contention which is accurate only if the written efforts for reimbursement made by plaintiff as related above are not construed to be equivalent to a formal request for an equitable adjustment. It is found, however, that the letters referred to above did amount in fact to a request for an equitable adjustment.
CONSEQUENCES OE PLAINTIFF’S PRODUCTION DELAYS
45. Time Extensions.
(a) The composite schedule in finding 14, supra, reflects the original delivery schedule for rifles and accessories as amended by Supplements 3, 7 and 9 to the contract, against the actual deliveries, which when analyzed demonstrates that against the revised requirements the plaintiff was delinquent in deliveries during all but the first two of the 15 production months from April 1953 to July 22,1954, when the contract was canceled,[5] and that the delinquencies ranged from 8 to *438 237 rifles and stood at 118 rifles at the time of cancellation, viz:

The details of the time extensions granted and the need and requests therefor are presented in the succeeding paragraphs of this finding.
(b) Prior to award of the contract the plaintiff estimated that it would take about ten weeks to install the machine tools to be furnished by the Government and would commence production about March 15,1953, so that it could meet the initial delivery requirement of 74 rifles in May and 233 each month thereafter to completion. Due to the causes already described the plaintiff had delivered only 324 rifles by the end of June 1953.
(c) On June 18,1953, the plaintiff submitted for approval to POD a revised delivery schedule (see finding 39(b) (8), supra), which postponed initial deliveries to June and which would “enable us to complete our contract within the original completion period.” The request attributed plaintiff’s lack of deliveries to the Government’s failure to furnish machines in sufficient time and in proper condition, and plaintiff said that it would request no further extensions because it had by then sufficient Government-furnished machinery on hand to perform. On the same day POD approved the revised schedules and on August 11,1953, the parties entered into Supplemental Agreement No. 3, antedated January 27, 1953, under which the quantities in the original contract were increased by 429 rifles and some spare parts and the *439 delivery schedule was revised to conform to the schedule which the parties had agreed to on J une 18, 1953. Supplemental Agreement No. 3 read in part as follows:
wheeeas, the parties have agreed to increase the quantity of Rifles (Item 1) to be delivered by 429 units and to add Spare Parts for same; and
whereas, the price for the Spare Parts shall be subject to Price Redetermination (Form IY) after complete delivery of same; and
whereas, the Contracting Officer has found and determined that the Contractor is entitled to a change in the delivery schedule applicable to the original contract item because the Government-owned facilities were delivered to the Contractor; and
whereas, the Contracting Officer has found and determined that due to late deliveries of Government facilities under Contract No. DA-36-034-ORD-1214 and the need for excessive repairs thereto, the Contractor is entitled to a change in the delivery schedule on subject Supply Contract;
One effect of this time extension was to relieve plaintiff of liability for non-delivery of 275 rifles by the end of June 1953 as per requirements of the original contract.
(d) On September 1,1953 (All Metals’ production of vent assemblies had been stopped since August 11 by a stop order from POD pending a proposed change in finishing specifications) the plaintiff submitted to POD a proposed further postponement of the delivery schedule for rifles, which was withdrawn on October 16 when plaintiff substituted another schedule further postponing early deliveries but accelerating the completion date, citing as reason the failure of vent assembly deliveries from All Metals due to a stop order and steel supply problems. On October 21, 1953, plaintiff again submitted to POD another proposed revision of the delivery schedule which was the same as that proposed on October 16 but eliminating from the latter deliveries for December 1953, citing as reason the unserviceable condition of certain machines furnished by the Government (see finding 39(b) (4), supra,).
(e) By the end of November 1953 plaintiff was in arrears of delivering 703 out of 1,087 rifles required by the revised *440 delivery schedule agreed to on June 18, 1953, and incorporated in Supplemental Agreement No. 3. It delivered 100 rifles in November and 82 in December 1953. Plaintiff was rightly concerned about the prospect of being charged penalties for non-delivery under the liquidated damages provision of the contract and was proposing that the clause be deleted. Instead, POD on December II, 1953, advised plaintiff that such a proposal would require action by higher authority, and that in the meantime it contemplated reducing the delivery schedule requirements to 100 rifles per month at no increased cost to the Government. Said POD: “This should be a delivery schedule which you can make and if you do make it the penalty clause will not take effect. As you can see, this then would have the same effect as removal of the penalty clause.” As will be seen in the next paragraph of this finding, Supplemental Agreement No. 7 to the contract which was the ultimate form of the next official time extension did not have the effect of waiving late deliveries of rifles required to be delivered prior to August 1953 under Supplemental Agreement No. 3.
(f) Supplemental Agreement No. 7, dated January 27, 1954, further revised the delivery schedule. Its effect was to require the delivery of 481 rifles by the end of November 1953 (by which time plaintiff had delivered 384 rifles), and 100 per month thereafter, thus relieving plaintiff of liability for 1,105 rifles which, by the end of January 1954, were in default under the revised schedule in Supplemental Agreement No. 3.[6] The reasons assigned by Supplemental Agreement No. 7 for the modification of delivery requirements were as follows:
wheReas, the Contractor was directed by the Government on 11 August 1953 to suspend the finish machining operation of breech lock vent openings pending revision to Drawing C7229964; and
*441 wheReas, said stop order bas since been revoked; and
whereas, said stop order drastically reduced Contractor’s ability to make deliveries in August and in September 1953; and
whereas, the deliveries required of the Contractor for the months of October and November 1953 were cut to 133 per month by a Government directive from Water-vliet Arsenal; and
whereas, the Government has further ordered that beginning with December 1953 the minimum monthly deliveries shall be at 100 units till completion of contract; and
whereas, the parties have agreed that the delivery schedule in the contract shall be revised to reflect the above at no change in contract price.
(g) Prior to cancellation of Contract 1213, the defendant considered the possibility of a termination for default, but concluded that “the delinquent delivery of items could be considered excusable or corrected by the contractor within a ten-day period.”
46. Liquidated Damages.
(a) On December 16, 1953, the plaintiff requested POD to eliminate from Contract 1213 the Liquidated Damages provision, quoted in finding 15, sufra. On December 17, 1953, POD advised plaintiff that its request was beyond POD authority and required action by higher headquarters, where its approval would be unlikely. As an alternative POD mentioned the possibility of a substantial modification of the delivery requirements which, if plaintiff would meet the changed schedule, “would have the same effect as removal of the penalty clause [i.e., liquidated damages clause].” This modification was later adopted in the form of Supplemental Agreement No. 7 of January 27, 1954, described in finding 45 (e) and (f), sufra.
(b) Supplemental Agreement No. 7 was the last modification of the delivery requirements for rifles prior to the suspension of Contract 1213 on July 22, 1954. During the performance period the plaintiff delivered a total of 1,163 rifles. Late deliveries by plaintiff under the delivery schedule as ultimately revised by Supplemental Agreement No. 7 resulted in an assessment of liquidated damages of $55,568.25 on Item 1 (rifles) and $747.83 on Item 2 (accessories), or a *442 total assessment for liquidated damages of $56,316.08. Liquidated damages deducted from the payments made to plaintiff for delivered items totaled $53,115.19, of which $1,700.34 represents an erroneous overcharge. Becomputation of the liquidated damages schedule indicates another overassessment of $286.53 for which the Government has not given the plaintiff credit.[7] Liquidated damages applicable to items delivered by plaintiff but for which no payments have been made by the Government total $4,301.23.
(c) On May 20, 1954, the plaintiff addressed a letter to the Comptroller General through POD which may be fairly construed not only as a complaint over the presence in the contract of a liquidated damages clause but also as a request that it be relieved of the assessment of liquidated damages either by forgiveness or by deletion of the clause. Plaintiff’s contention therein that the inclusion of the clause in the contract was contrary to the preaward oral agreements is not supported by evidence. The letter contains no reference to the effect of Supplemental Agreement No. 7 as a mitigant of liquidated damages. There is also a puzzling inference that the reduction of the monthly delivery schedule to 100 without a 5 percent increase in unit prices for the stretched-out deliveries was an imposition on the plaintiff, although the reduction in delivery requirements actually conferred a substantial benefit on plaintiff by forgiving most of its past delinquencies and corresponded more realistically to the average of plaintiff’s erratic production record to that time. On May 28, 1954, POD accepted plaintiff’s letter of May 20 as an appeal for relief from liquidated damages but held it in abeyance instead of processing it to the Comptroller General, advising plaintiff that the appeal was addressed to equitable rather than legal considerations and thus would not be cognizable by the Comptroller General. On June 21, 1954, plaintiff advised POD that, if it could not be relieved of liquidated damages by the Ordnance District, then it *443 wished its earlier request for such relief to be forwarded to the Comptroller General. There is no record of the plaintiff’s letter of May 20, 1954 ever having been forwarded to the Comptroller General by POD. Beyond the documents referred to or quoted from in this report, there is no record that the plaintiff at any time after January 25, 1954 filed with the contracting officer a specific request for a decision by the latter of the causes of plaintiff’s delay in deliveries either under the liquidated damages or the disputes clauses of Contract 1213.
CONTENTIONS AS TO CAUSES OE CONTRACT CANCELLATION
47. Cancellation. On July 22,1954, POD directed plaintiff to suspend all production under Contract 1213, emphasizing that the order was not “to be construed as a termination of this contract either for convenience of the Government or for default.” On August 18,1954, POD notified plaintiff that Contract 1213 was canceled for unspecified “statutory violations”, and that since these alleged violations and their effect on the Government’s rights under the contract were under study by the Army and the Department of Justice any future payments would be “handled in accordance with procedures for handling claims of a doubtful nature arising under such contracts.” In essence, the plaintiff contends that the defendant’s prime but unadmitted motivation in canceling the contract was the discontinuance of military requirements for the 75 mm. rifle as an obsolete and superseded weapon, and that POD’s excuse of “alleged statutory violations” was a convenient pretext to avoid the high costs prospectively attending a termination for convenience of the Government. The status of requirements for the rifle as well as the status of defendant’s knowledge of statutory violations as they existed on July 22,1954, thus become pertinent subjects of inquiry in order to determine their causal relationship to the cancellation.
48. Need for 75 mm. rifles. On June 16, 1954, the office of the Chief of Army Field Forces questioned the effectiveness of the 75 mm. rifle and requested permission from the Assistant Chief of Staff, G-3, to eliminate it from the Army weapons system. On June 17, 1954, G-3 approved the re *444 quest submitted by the Chief of the Army Field Forces. Between then and July 6, 1954, an officer from the office of the Assistant Chief of Staff, G-4, requested Lt. Colonel Martin Baines to estimate the cost to terminate production of the 75 mm. rifle, then being produced only by plaintiff. This was the first knowledge by the Ordnance Corps that the Army staff level was considering the elimination of the 75 mm. rifle. On July 6 or 7, 1954, the Ordnance Corps received a directive from G-4, dated July 2, to take steps to terminate production of the 75 mm. rifle. The Ordnance Corps did not agree with this decision and General Medaris authorized Lt. Colonel Baines to endeavor to obtain a reversal. The Ordnance Corps’ reasons for not wanting to terminate production of the weapon were two-fold: the high cost of termination (estimated at $300,000), and the belief that the BAT 106 rifle, which was to supersede the 75 mm. rifle, was not sufficiently advanced in production to warrant phasing out the 75 mm. rifle. Because plaintiff had an outstanding V-loan, it was necessary to obtain financial coordination with the Chief of Finance before deciding upon termination for convenience. Accordingly, a financial coordination conference was held on July 15,1954, and on July 16, 1954, the Ordnance Corps requested G-4 if it should still proceed with the prior directive of July 2,1954, to terminate pi'ocurement of the 75 mm. rifle. Meanwhile, Lt. Colonel Baines, with General Medaris’ knowledge, had held a series of verbal discussions with G-4 to persuade the retention of the 75 mm. rifle in the weapons system. By communication dated July 21, 1954, G-4 reaffirmed the decision to cancel production of the 75 mm. rifle, and thus ended the Ordnance Corps’ efforts to retain the weapon. The final decision by G-4 to deny the Ordnance appeal and to terminate production on the 75 mm. rifle was thus reached after General Medaris’ decision on July 13, 1954 to cancel Contract 1213 because of plaintiff’s activities that were suspected of fraud.
49. Precancellation intelligence of contract irregularities. Between April and July 1954 the Federal Bureau of Investigation received, investigated and reported information relating to the Gunn Engineering Company (findings 20 and 21, supra), and the kick-back activities of certain of the *445 plaintiff’s subcontractors as described in findings 18 through 25. This information became known to the Ordnance Corps and was discussed between General John B. Medaris, then Assistant Chief of Ordnance and Chief of its Industrial Division, and Albert C. Lazure, General Counsel of the Ordnance Corps. Mr. Lazure had previously learned in December 1953 that plaintiff had hired Tucker, Jr., for he had seen the copy of Tucker’s employment agreement filed by plaintiff with the Eock Island Arsenal in connection with plaintiff’s Ordnance Contract 8580 (see finding 8(b), supra). This background information, plus the data from the FBI investigation, was augmented by additional information resulting from an investigation in progress by the General Accounting Office into the general contingent fee activities of the Tucker father and son associates.[8] General Medaris and Mr. Lazure had received reports collectively concerning the payment of gratuities by plaintiff to Government employees, the charging of personal expenses to the contract, the plaintiff’s excessive requirements for technical assistance from Watervliet Arsenal, and plaintiff’s inability to operate Government-furnished machines which Ordnance considered to be adequate in qualified hands. They had formed the impression that the situation had begun to “smell bad” and had the “flavor of contractual irregularities”. These matters were the subject of a conference held on or about July 12, 1954, between General Medaris, Lt. Colonel Eaines and Mr. Lazure, at which the latter advised that from a legal standpoint the plaintiff’s contract could be canceled for its activities in violation of statutes relating to contingent fees, kickbacks, false claims and conspiracy, as well as common law fraud. As a preliminary to cancellation the following teletype message was sent by Ordnance to Watervliet Arsenal on July 13, 1954:
Ee Contract DA-36-034-OBD-1213E. Information received by this office indicates possibility of contract *446 irregularities concerning certain individuals associated with Acme Coppersmithing. In view thereof contractor should be notified immediately that Government will not accept any additional rifles produced by Acme. Inspection and acceptance of items manufactured by this contractor should stop immediately. Detailed instructions will be forwarded your arsenal outlining the method to be followed in cancelling this contract. Under no circumstances will this contract be terminated for either convenience or default.
On July 21, 1954, the following teletype message was sent by Ordnance to Watervliet Arsenal:
* * * Take immediate action to effect work stoppage pursuant to referenced TT. Detailed instructions will be forwarded your arsenal outlining the method to be followed in cancelling the contract. Under no circumstances will contract be terminated for either convenience or default.
The actual suspension itself occurred on July 22, 1954, as described in finding 41, supra.
50. Conclusion as to cause for cancellation.
(a) It is reasonable to conclude that as of July 22, 1954, there existed simultaneously two reasons of equal validity in the view of the Army to cancel Contract 1213: the termination of military requirements for the 75 mm. rifle, and the suspicion of plaintiff’s fraud, with particular emphasis on the Gunn Engineering Company situation, as related in findings 20 through 25, supra. Either one of these reasons would have resulted in cancellation in absence of the other, but each was arrived at independently. Whether right or wrong, the election by the Army to cancel the contract for alleged statutory violations instead of terminating it for convenience of the Government was not controlled by considerations of termination costs, but rather by the Army’s interest in promoting morality in public procurement. The time sequence of events described in findings 48 and 49 bears out this conclusion. There was a calculated risk in the Army’s election to cancel for cause, for if the grounds proved to be invalid the Government would then face the risk of ultimately paying damages for breach of contract, a cost conceivably greater than the allowances provided under the *447 normal termination for convenience formula. And if the grounds were ultimately valid so that the plaintiff would forfeit any recovery, the plaintiff’s resultant financial predicament would jeopardize the security of its V-loan underwritten by the Government, and accordingly cause the Government a prospective loss.[9] It is, of course, obvious that, had it not been for the termination of the Army’s requirements for the 75 mm. rifle, the defendant might have elected to take over the contract and complete it, but it is not clear that this would have benefited plaintiff.
(b) All Metals was suspended from the Army list of eligible bidders as a result of its “implication in the fraudulent situations”, but plaintiff was not. Plaintiff’s counsel was advised in January 1956 by POD that it was not considered to be in disrepute in Government circles. The criminal indictment against Tucker, Norris and Epstein for conspiracy alleged in pertinent part as follows:
5. It was the plan and purpose of the said conspiracy that James Samuel Norris and Harry King Tucker, Jr., defendants, would utilize, take advantage of, and trade on their positions as employees of Acme to approach persons who sought subcontracts and orders from Acme for supplies, materials, equipment and services to be used by Acme in the performance of the above mentioned prime contract, and to solicit fees, commissions, gratuities and compensations from such persons as an inducement for the aid of the defendents in obtaining and procuring the award of such subcontracts and orders.
PRICE REDETERMINATION
51. Contract -provisions. Provisions of Contract 1213 relevant to price redetermination provided ultimately that, after completion of delivery of 30 percent of the rifles, the prices of rifles and spare parts could be increased retrospectively and prospectively to a ceiling of 115 percent of contract target price, and the prices of accessories, tools and equipment which plaintiff was to manufacture could be increased to a ceiling of 110 percent of contract target price. The redetermined prices were to be reached after negotiations based upon sub *448 mission of data by plaintiff, all as prescribed in the relevant contract provisions. The data was to be submitted by plaintiff within 30 days after 30 percent of the rifles had been delivered. The target and ceiling prices (as revised) are as shown in the following schedule:

52. Submission of allegedly false claims via yrice redeter-mimation.
(a) On July 23, 1953, by which time plaintiff had delivered only two rifles out of 2,751, POD requested plaintiff to submit cost data for price redetermination purposes. Plaintiff promised to provide the data by November 27,1953. Not having received it, POD renewed its request on December 4, 1953, in response to which the plaintiff wrote that it would furnish the data in March 1954 by which time it expected to have completed the 30 percent of deliveries prerequisite to price redetermination proceedings. On April 29, 1954, plaintiff submitted statements reflecting its cost of performance of $1,179.29 per rifle through December 31, 1953,[10] and its estimated cost to complete of $453.31 per rifle, compared to the contract ceiling price of $362.90. The costs submitted by plaintiff include all of its unanticipated costs such as those for delay.
(b) The schedules accompanying plaintiff’s submission of cost data on April 29, 1954 contained without specific designation certain cost items which the defendant contends were false claims for expenditures not properly chargeable to performance of Contract 1213, viz:
(1) Subcontract costs of All Metals, Manalapan, Nicholson Products Company and Eoley Machine Company which included a 5 percent allowance for the services rendered *449 the subcontractors by Tucker and/or Norris in procuring the subcontracts from plaintiff, as related in findings 18 through 25, supra.
(2) The $12,000 inflation in All Metals’ subcontract price to plaintiff involving the Grunn Engineering Company, as related in findings 20 and 21, supra.
(3) The $470 plus hotel expenses paid by plaintiff to Mr. Lee, an employee of Watervliet Arsenal, for his services, as related in finding 33, supra.
(4) The $1,045.52 charged by Norris against Contract 1213 for services rendered by plaintiff’s employees on Norris’ farm, as related in finding 26, supra.
(5) Minor hotel, meal and entertainment charges for Government employees, including Hochstuhl, as related in finding 32, supra.
(6) Payments of salaries and/or commissions to Tucker by plaintiff.
The cost data was submitted for purposes of price redeter-mination, and the contract ceiling price was vastly less than the plaintiff’s actual costs per unit even with the exclusion of the costs which defendant contends were not properly chargeable to the contract. Moreover, by letter of July 16, 1954 (six days prior to contract cancellation), the plaintiff’s accountant advised POD of the reason why he could not certify the costs submitted on April 29,1954, and that he had not corrected certain errors that he knew plaintiff had made in charging costs to the contract because the errors would be relatively small and, even if eliminated, would leave plaintiff with costs greatly in excess of the contract ceiling price. The Army Audit Agency audited the plaintiff’s cost submission but its report is not in evidence.
(c) On July 16,1954, the plaintiff’s accountant submitted to POD plaintiff’s cost data on rifles for the period January 1, 1954 to June 30, 1954, showing a cost per gun of $690.21 even after elimination of certain direct costs, cost of tools and dies, and miscellaneous expenses. Plaintiff’s accountant again said that he could not certify the costs as being entirely accurate because he was not present at the taking of physical inventories, but felt that the costs submitted were essentially correct. The per unit cost was so greatly in *450 excess of the contract price that the Army Audit Agency felt it was not necessary to audit the plaintiff’s costs for this later period. On July 16, 1954, the plaintiff certified that it had negotiated a repricing settlement agreement with the defendant’s representatives whereby the contract price of rifles was increased to the contract ceiling price of $362.90 each, subject to approval of the contracting officer, which approval was never forthcoming because the contract was canceled in the meantime. However, on July 28, 1954 (six days after contract suspension), the defendant’s Board of Awards approved the increase of rifle prices to the contract ceiling price, basing its decision on the recommendation and reasons of the defendant’s Price Analyst who had reported that the ceiling price was less than that of any other producer of the item.[11]
(d) Under date of April 11, 1955, Army Ordnance advised GAO that because of the price redetermination possibility which apparently was still alive, the Army was reserving $54,894.22, which was in addition to $21,411.64 being held for possible use in payment for items delivered prior to cancellation, in the event plaintiff’s claim was not subject to forfeiture. At this time Army Ordnance had been given interim advice by the Department of Justice that no civil or criminal cause of action lay against plaintiff, and Ordnance was seeking the advice of GAO as to whether the cancellation for cause action of July-August 1954 could be converted into a termination for convenience of the Government, thus indicating a prevailing uncertainty on the part of Army Ordnance as to the legal sufficiency of the grounds upon which the contract had been canceled for cause.
RETURN OP GOVERNMENT PROPERTY
53. (a) Plaintiff’s refusals to return property. On August 25, 1954, POD notified plaintiff that it intended to remove all government machine tools and equipment in plaintiff’s possession under Facilities Contract 1214, and requested permission to send a packaging contractor to the Lansdale plant to prepare the property for shipment. On August 26 *451 plaintiff instructed its subcontractors not to release any machinery or tools to the Government and notified POE as follows:
* * * The matter which you suggest in your letter is not quite as simple as the two paragraphs you have written. First, before withdrawing any Ordnance owned machine tools and equipment now in our possession, we wish to be reimbursed for all parts that were purchased personally to make the machines workable under both contract numbers. We have a complete list of all gears, tables and extra necessary fixtures for each and every machine. It would be foolhardy to pack these machines and strip them of the necessary working parts, which was done by the Government previously when we took in the Ordnance owned machine tools and equipment.
After the evaluation has been established and OK’d for payment, we do not see any need for sending in an Ordnance Packaging Contractor for the purpose of removing the Government equipment, since we are definitely capable of doing same.
On September 7,1954, plaintiff wrote the following to POD:
Enclosed please find two copies of parts that were purchased for the various machines rented to us by the Government.
As pointed out to you in a previous letter, the parts contained herein were the necessary pieces of equipment required to make the machines functional and were missing upon receipt of the various machinery shipped us. As explained to you over the telephone, the monies shown on the individual sheets were the actual out-of-pocket expenditures on our part. Before shipping the apparatus, as per your instructions, we would appreciate assurance that the monies represented herein will be paid to us.
Findings 36, 39 and 40, sup-ra, describe the machines and the repairs and additions made to them by plaintiff. POD promised to take plaintiff’s request for reimbursement under consideration and renewed its request for permission to enter plaintiff’s plant and prepare the machines and other Government property for shipment. Plaintiff expressed its willingness to comply with POD’s request if given suitable assurances of reimbursement, to which POD responded on October 28, 1954 that since cancellation of the contract it *452 lacked authority to pay or promise to pay, but that “should future developments absolve your company of any wrongdoing” the claim for reimbursement would be considered along with plaintiff’s other termination claims.
On November 5 plaintiff briefly granted permission for POD to remove the machines, but before this could be done the plaintiff reimposed the prohibition on November 10 because of a purported lack of cooperation on the part of the defendant in entertaining plaintiff’s claims. In effect plaintiff wanted a quid fro quo, and believed that “the only way any consideration will be given this company is if we adopt the same measures the Government is adopting with us.”
(b) Plaintiff authorizes removal. The Government prepared to file suit to recover its machines and tools, and on February 2, 1955, the plaintiff voluntarily capitulated by authorizing the Government to remove its equipment, requesting “a reciprocal spirit of cooperation on the part of the Army” in the form of money because of plaintiff’s threatened bankruptcy and its “desperate need of immediate assistance.” Arrangements were made to remove the property commencing February 10, 1955, and on February 1 POD advised plaintiff as follows:
Previous inspection of Machine Tools at your plant has indicated that the majority were equipped with contractor owned accessories and tooling, such as special heads, guides, bearings, motor controls, gages, etc. Since the Government cannot be responsible for this property after removal of equipment, it is recommended that it be removed prior to plant clearance date.
On February 9, 1955, POD advised plaintiff as follows:
This will confirm telephone conversation today concerning removal of contractor-owned accessories and tooling from Government-owned machine tools. Since you have indicated that you will be unable to remove this Contractor-owned equipment prior to plant clearance date, it is agreed that E. A. Gallagher and Sons will undertake this task. It is understood, however, that since the Government is relieving your Company of this work, any property damage incident to this removal will be at Contractor’s risk and that the Government and/or E. A. Gallagher and Sons will be relieved of any liability.
*453 (c) Removal from All Metals accomplished. Arrangements were also made in January and February 1955 to remove Government property from the premises occupied by Manalapan and All Metals, and a removal was accomplished from All Metals’ plant without delay.
(d) 0ou/nter claim for unretumed property. After the Government had regained possession of its machines and certain special tooling which had become Government property by virtue of contract provisions (Clause 36 of General Provisions, and Supplemental Agreement No. 6), there remained unreturned some additional tooling as to which plaintiff admits liability in the amount of $6,205.55, which is the subject of a counterclaim by the defendant. In view of the plaintiff’s admission of liability it is not essential to mention that the additional tooling was apparently at the time on the premises occupied by Manalapan (which Manalapan denied) and became the subject of a protracted but fruitless exchange of correspondence between the parties from February 1, 1956 to July 12, 1956, in an effort to recapture the tooling or its value.
(e) Counterclaim for scrap. The plaintiff also concedes liability for the defendant’s counterclaim in the amount of $1,117.94, representing the scrap value of gun tubes furnished plaintiff by defendant, and in plaintiff’s possession at time of contract cancellation.
POST-CANCELLATION ADMINISTRATIVE PROCEDURES (OTHER THAN PRICE REDETERMINATION)
54. Recital.
(a) On November 15, 1954, Mr. Lazure, General Counsel of the Ordnance Corps, advised the Army Judge Advocate General of the circumstances which induced cancellation of Contract 1213, and then stated as follows:
4. Subsequent to the cancellation, Acme presented a plan for payment in order that a V-loan obtained by the Company could be liquidated by approximately $85,000. In this regard, this office, consistent with the practice of securing advice from your office and the Department of Justice in matters concerning fraud or suspicion of fraud, requested advice on the possibility of making payments to liquidate the V-loan balance. Reference b. advises that the Department of Justice has *454 considered the matter and determined that no objection would be raised provided there is a prior execution by Acme of an agreement that acceptance of the proposed plan of payment would be without prejudice to any rights of the Government arising out of this case.
5. This office has considered the entire matter concerning payments to Acme Coppersmithing under Contract Ord-1213K, and has determined that it would be consistent with the original decisions of this office concerning cancellation of this contract and decisions of the Comptroller General as indicated above to recommend no further payments to this Company until such time as the matter under consideration by the Department of Justice has been concluded.
(b) Plaintiff’s representatives repeatedly requested Mr. Lazure to expedite action on the release of contract funds. By December 15,1954, the Department of Justice had advised the Army Judge Advocate General that, although it had not completed its study, it believed that the only civil fraud action that would lie against plaintiff would be the possible withholding of $15,000 under the Anti-Kickback Act, and it had concluded that no criminal prosecution of Acme (as distinct from other firms and individuals) would be warranted. On December 15, 1954, Mr. Lazure gave a status report to General Medaris which closed with the following recommendation:
* * * Inasmuch as the Department of Justice has made certain determinations with respect to Acme and it now appears that action will not be entertained against the Company, it is suggested that prior to closing this case by the Ordnance Corps, in light of the decision of the Department of Justice, the Ordnance Inspector General be requested to make a complete review of this matter. In the past the Ordnance Inspector General has conducted considerable investigations concerning this matter at the Philadelphia Ordnance Di,strict. A complete review of the situation by the Inspector General will provide a basis whereby the Ordnance Corps may in all fairness to the contractor and in the interest of the Government make final decisions as to the disposition of this case.
(c) On December 16, 1954, at Mr. Lazure’s recommendation, General Medaris advised plaintiff’s attorneys that plaintiff could file a claim with the General Accounting Office.
*455 (d) On March 8, 1955, General Medaris summarized the complex situation for the Army Judge Advocate General. After claiming that its position was legally sound and that plaintiff could apply to the General Accounting Office for relief, the Ordnance Corps document stated as follows:
Although it is considered questionable by this office that payment can be made under a cancelled contract, and in light of 28 U.S.C. 2514 the question of payment for items delivered prior to cancellation has been resolved in favor of the contractor by preparing vouchers for those items and submitting same through appropriate channels to the General Accounting Office for direct settlement. In addition, the record of price redetermination of items delivered prior to cancellation and recommendations thereto will be submitted to the General Accounting Office for direct settlement.
Here again, attention is invited to the forfeiture or fraudulent claim statute 28 U.S.C. 2514 * * * as indicated * * * it is the position of the Ordnance Corps that the cancellation of subject contract should stand and the contractor should be left to his legal or administrative remedy.
The memorandum also stated at another point as follows:
* * * In addition, there was a possibility that the matter could come within the purview of the Federal statute which prohibits kickbacks (41 U.S.C. 51). However, since this contract was fixed price with price rede-termination, a decision as to whether this type of contract can be construed to be a cost reimbursement contract has to be made. It is the understanding of this office that the official position of the Department of the Army is that contráete of this nature are not to be construed as cost reimbursement.
Following out the statement of intention in the foregoing document, on April 22,1955, the Army submitted to the General Accounting Office vouchers for rifles shipped by plaintiff prior to cancellation in the net amount of $18,810.75 (after deductions totaling $9,969.02 and a credit of $1,700.34 for an overassessment of liquidated damages).
(e) In a communication dated April 11, 1955, to the General Accounting Office, Mr. Lazure recited the background of the case, stated that the Department of Justice had advised *456 the Army that no civil or criminal cause of action existed against plaintiff (not so as to other firms or individuals implicated and still under investigation), mentioned that POD was reserving certain funds totaling $76,305.86 for claims including price redetermination claims if they were eventually to be allowed, and then stated as follows:
5. In connection with the cancellation of subject contract, this office at the instance of Dep Log and OJAG is preparing a draft of a submission for the signature of the Assistant Secretary of the Army to the Comptroller General requesting a determination as to whether the cancellation of this contract for cause under the common law can be converted to 'a termination for convenience of the Government in the event the matter concerning this contractor and subcontractor as well as the individuals concerned is concluded by the Department of Justice. * * *.
(f) On June 2, 1955, the Army wrote to the General Accounting Office requesting advice as to the propriety of treating the rescission or cancellation of Contract 1213 as having been terminated for convenience of the Government for the purpose of determining the rights and obligations of the parties. In this communication the Army discussed at some length the prerequisites, ramifications and legal considerations involved in termination for convenience of the Government, termination for default, and rescission or cancellation for irregularities, with particular emphasis on the latter. It is evident that at this point the confidence on the part of the Army in the correctness of its action in canceling Contract 1213 was seriously undermined by the advice of the Department of Justice that “neither civil action nor criminal prosecution against Acme or All Metals, Inc., a subcontractor, is warranted.”, although prosecution against certain employees of Acme had been recommended. The letter also mentioned that the Army had already sent to the General Accounting Office for direct settlement a voucher presented by plaintiff for $18,810.75 covering items delivered prior to contract cancellation, and a request for reimbursement of $54,394.22 for a price redetermination negotiation.
(g) As of August 29, 1955, the General Accounting Office felt that its information concerning the claim was not sufficient to render the Army the advice sought by the latter in *457 its request of June 2,1955, and it bad undertaken an investigation of its own. It is not known bow much of the information in the possession of the Army and its component organizations bad been made available to the General Accounting Office by this time. The Army was apparently considering the idea of converting the cancellation action into a termination for convenience of the Government, withholding from termination payments a sum to cover “the maximum possible adjustment due the Government under the covenant against unauthorized commissions or fees paid or agreed to be paid for securing the Government contract,” and then permitting the Armed Services Board of Contract Appeals to rule upon the withheld items on application by plaintiff.
(h) The General Accounting Office conducted a comprehensive investigation of the “five-percenter” activities of the Tucker father-and-son team covering not merely their employment by the plaintiff, but their participation in the procurement of 35 Government contracts for 19 firms starting in early 1951. On March 16, 1956, the Comptroller General furnished the Secretary of the Army an extensive report covering the Tucker activities referred to. There were many similarities and some differences in the arrangements between Tucker, Jr., and the plaintiff on the one hand, and between the Tucker group and various other companies in the Government contract field. The Comptroller General reported what seem to be parallels in the type of employment contracts the Tuckers entered into with their various clients, in the double commission deals which they procured for themselves by means of obtaining subcontracts for their clients from contractors who were also their clients, and in the common inability of the contractors they represented to perform the contracts which were purportedly procured through the services of the Tuckers. (These observations are based entirely on the report of the Comptroller General, and are of course not entitled to any more weight than hearsay is normally accorded in a judicial proceeding, for the record in the instant proceeding contains no evidence of probative value on these collateral matters.) The following relevant passages are quoted from the report in question in order to reflect the advice given by the Comptroller General to the *458 Army as to both factual and legal aspects of his views resulting from the investigation made to that time:
The Acme Coppersmithing & Machine Company’s employment of Harry K. Tucker, Jr., was not previously investigated by our Office. It now appears that there was no misrepresentation concerning such employment and that Harry K. Tucker, Jr., might have qualified as a full-time employee since he worked at the Lansdale Plant of Acme Coppersmithing & Machine Company where he was placed in charge of sales and Government contracts. Thus, it is questionable whether there was any breach of the contingent-fee covenants in the contracts of that company.
In regard to the cancellation of contract No. DA-36-034-OBD-1213 (B), the record now shows that James Samuel Norris, Harry K. Tucker, Jr., and Jack Epstein, employees of Acme Coppersmithing & Machine Company, were indicted for conspiracy to solicit fees, compensations, etc., as an inducement for award or an acknowledgment of the award of subcontracts or orders. We have ascertained that Jack Epstein, son of Acme’s president, Joshua Epstein, was associated with Tucker and Norris in the operation of the Lansdale Plant and that an agreement was executed between Tucker and Norris on the one hand and Acme on the other providing for a distribution of profits made at Lansdale Plant on the following basis: 50 percent to Acme; 25 percent to Harry K. Tucker, Jr., and 25 percent to James S. Norris. Hence, there appears to have been a closer relationship between the company and these employees than normally would be the situation where apparent violations or attempted violations of the Anti-Kickback statute, 41 U.S.C., 51-54, have been disclosed.
$ * * ‡ $
* * * The Department of Justice has apparently taken the position that Acme’s civil liability under the Anti-Kickback statute cannot be considered as amounting to more than the sum of $14,600., representing the total of the amounts paid to Gunn Engineering Company or to the employees of Acme by subcontractors under contract No. DA-36-034 — OBD-1213 (B), which is essentially a cost-reimbursable contract since it provides for price redetermination based upon increases or decreases in costs of performance.
# ^ # % í¡s
There has been no indication that the contractor delivered or intended to deliver supplies which were differ *459 ent in substance from those contracted for. Further, it appears that at the time contract No. DA-36-034M3KD-1213 (E.) was canceled, the Government was in a position to ascertain the probable extent of the damages likely to be sustained as the result of the fraudulent actions of the employees or “partners” of the Acme Coppersmithing & Machine Company, and to have protected itself against the payment of excessive charges for the supplies delivered or to be delivered under the contract.
Moreover, the Anti-Kickback Act is directed primarily against the payers and recipients of the illegal fees, commissions, etc., and the statute appears to imply that a prime contractor’s responsibility in such matters should not generally be determined on the basis of the rule adopted in various criminal cases that a corporation may be held liable for the acts of an agent within the scope of his authority. United States v. George F. Fish, Inc., 154 F. 2d 798).
*****
In the circumstances — and since our investigation has disclosed that Acme discharged James S. Norris in the early summer of 1953, and terminated Tucker’s and Epstein’s employment when it learned of the full scope of the FBI investigation of kickbacks from some of Acme’s subcontractors — -you are advised that we perceive no objection to treatment of the contract as having been terminated for the convenience of the Government. Otherwise, consistent with the principle that rescission has the effect of annihilating a contract so effectually that in contemplation of law it has never had any existence, we would appear to be required to disallow any outstanding claims of the contractor as for unliquidated damages which cannot be paid out of appropriated funds.
In the event that the contract is terminated for the convenience of the Government, we would be in a position to authorize payment on the outstanding claim of the contractor in the amount of $18,810.75, with the understanding that the amount of the kickbacks involved in the award or acknowledgment of subcontracts or orders under contract No. DA-36-034-OKD-1213(R) will be withheld by your Department in making payment on the termination claim or the amount finally determined to be due the contractor under the price redetermination article of the contract. Your further report and recommendation concerning the disposition of the above claim for $18,810.75 are requested.
*460 Although we have not completed our investigation of the activities of the Tuckers, our records will be made available for examination by representatives of your Department whenever so desired. The enclosures with your letter dated April 19, 1955, are returned herewith except for one complete set of the photostatic copies of the original papers which will be retained here for use in connection with such investigation.
(i) On April 3, 1956, the Chief of Army Ordnance was furnished a copy of the Comptroller General’s opinion of March 16, 1956, and was directed by the Deputy Chief of Staff for Logistics (DCSLOG) to “furnish the Comptroller General * * * with a report and recommendation concerning the disposition of the above mentioned claim in the amount of $18,810.75, on or before 7 May 1956.” At this point, the top echelon of the Army may have been in favor of converting the contract cancellation into a termination for convenience of the Government so that the plaintiff could file and have considered its claim for termination costs under Article 22 of the contract.
(j) In the meantime Norris, Tucker and Jack Epstein had been indicted for violation of the criminal provisions of the Anti-Kickback Act (41 U.S.O. 51, 52 and 54). At the conclusion of the prosecution’s case, on April 13,1956, the Federal District Court Judge entertained and granted a defense motion for judgment for acquittal of the defendants on the sole legal ground that the Anti-Kickback Act was not applicable to a price redetermination contract and thus the scheme of the defendants was “despicable and morally reprehensible, but unfortunately within the narrow letter of the law.” (See finding 31, supra, for more complete quotations.)
(k) The Ordnance Corps continued its review of the facts surrounding the Acme-Tucker relationship. On August 22, 1956, Mr. Lazure responded to the April 3, 1956 communication from DCSLOG (finding 54(i), supra), and sought concurrence by the latter in a proposal to refer back to the Comptroller General for reconsideration in the light of additional information the question as to whether plaintiff had not breached the contingent fee covenant of the contract. The specifics of the “certain facts and additional information” presented by Mr. Lazure leads to the conclusion that *461 it was in actuality not evidence theretofore unknown to the departments concerned, but was rather a reappraisal and argument that these known facts constituted a violation of the covenant against contingent fees. The Army Ordnance Corps through its General Counsel was unswerving in its views that cancellation of the contract was legally justified, despite some discouraging responses from other agencies of the Government which had reviewed the matter.
(l) On September 12, 1956, the Deputy Chief of Staff for Logistics instructed the Chief of Ordnance that, as had been discussed earlier at a conference on July 12,1956, if it were ascertained what actual damage had been suffered by the Government as a result of increased contract costs due to kickbacks, and if the Department of Justice would give assurance that it could successfully defend the cancellation action, the Chief of Ordnance should prepare a letter to the Comptroller General informing him of the Army’s intention to stand by the cancellation action. But if no actual damages to the Government could be shown or the Department of Justice could not give the assurance indicated, then the cancellation action was to be changed into a termination for convenience, as DCSLOG had directed on April 3, 1956. The Chief of Ordnance was given until September 30 to comply.
(m) It is not in evidence whether the Department of Justice gave the Chief of Ordnance the assurances referred to in the preceding paragraph, but on February 27, 1957, DCSLOG sent a letter to the Comptroller General reciting the reasons for his conviction that plaintiff had violated the covenant against contingent fees and presenting “additional information” to this effect, although the “additional information” was much the same as that described in paragraph (k) of this finding, supra. The letter concludes with the following paragraph:
After examination of the reports of the Ordnance Corps on this matter and the various internal reports of the Department of the Army, the Federal Bureau of Investigation and the decision of tñe court in the matter concerning the three individuals, the Department of the Army believes the action instituted by those three individuals was as responsible and authorized representa- *462 lives of tlie Acme Corporation under contracts of the United States; that such actions as corporate representatives were clearly and unequivocally in bad faith; and that there was a full intent to deceive the United States Government. The acts of these three individuals were detrimental to the interest of the United States. In view thereof, it is proposed that the cancellation of subject contract will remain in effect.
It was at this point that the Army solidified its decision to stand by the cancellation action. It felt that “the repudiation of [the contract] by the contracting officer was proper and necessary in the public interest”.
(n) On May 29, 1957, the Comptroller General responded to the Army’s letter of February 27, 1957, and reversed his previous views in the following words:
On the basis of the additional information furnished in the matter, we are of the opinion that, as suggested in your letter, the relationship between Harry K. Tucker, Jr., and the Acme Coppersmithing & Machine Company is for consideration as being within the same category as the relationship between Harry K. Tucker, Sr., and Snap-Tite, Inc., so far as there may be concerned the question as to whether there was any breach of the contingent fee covenants of the contracts awarded to those companies. Thus, it is apparent that the Acme Copper-smithing & Machine Company should be held liable for the breach of the contingent fee covenants of contracts Nos. DA-11-070-OED-8580_, 8592 and 8681.
In regard to the cancellation of contract No. DA-36-034-0ED-1213 (E), your letter sets forth that, on the basis of a complete administrative review of the matter, including consideration of the decision rendered on April 13, 1956, in the case of U.S.A. v. James Samuel Norris, Harry King Tucker, Jr., and Jack Harry Epstein, Criminal No. 18536, and the internal FBI reports, it is proposed that the cancellation of the contract will remain in effect. In view of the unusual nature of this case and of the doubt which exists as to whether, under the circumstances, the contractor is entitled to have the contract terminated for convenience of the Government, we will interpose no objection to your permitting the cancellation action to stand.
The “additional information” providing the stated basis of the Comptroller General’s change of mind as to violation of the covenant against contingent fees was his ascertainment *463 that Tucker was a parttime and not a fulltime employee of plaintiff at the time of plaintiff’s bid submission on Contract 1213 on January 5,1953. It is not clear whether the Comptroller General’s change of view was brought about more by his reconsideration of facts previously known than by consideration of new evidence offered by the Army in the form principally of the plaintiff’s letter of May 18, 1953 to POD (finding 8(f), supra).
(o) On July 26, 1957, the plaintiff filed the instant petition in the Court of Claims. On August 15, 1958, plaintiff submitted to POD a termination claim. Subcontractor All Metals had submitted its termination claim on June 18, 1958, and subcontractor Manalapan had prepared certain inventory schedules in November 1954.
55. Conclusions. On the basis of the foregoing recital the plaintiff contends that the Army Ordnance Corps was guilty of bad faith in perversely and steadfastly refusing to capitulate to plaintiff’s demands for an administrative settlement in the face of unanimous advice from the Comptroller General and the Department of Justice that there had been no violation of the statutes relied on in canceling the contract. The stubborn but permissible refusal of the Ordnance Corps, the contracting agency in the case, to follow the advice and recommendations given it from the indicated sources portrays a strength of conviction, but not bad faith. On its part the defendant complains that, through the period from cancellation to and beyond the filing of suit in July 1957, the plaintiff and its attorneys continuously sought action on the claim and had Members of Congress intercede in its behalf. Such action has no bearing on the issues now before the court.
SUBMISSION OE ALLEGEDLY FALSE CLAIMS DURING PENDENCY OP COURT PROCEEDING
56. Acme's claim. Just as the defendant contends that the plaintiff advanced false claims to the Government in the price redetermination proceedings as related in finding 52, supra, the defendant also contends that false claims were advanced by plaintiff in the course of proceedings in this *464 court, in contravention of 31 U.S.C. 231-233, and 28 U.S.C. 2514.
(a) On October 23,1958, the commissioner directed plaintiff to furnish, to the defendant under former Rule 28 (b) (2) a detailed statement showing the items included in the sums sought in the petition. On November 4, 1958, plaintiff’s counsel informed the commissioner that, “at the request of the Department of Justice, plaintiff has presented the fiscal aspects of its claim in the form of a termination claim pursuant to the Armed Services Procurement Regulations”, and that after receipt of the audit report made by the Army Audit Agency the parties would try to settle the claim.
(b) The termination claim referred to in the preceding paragraph had been submitted by plaintiff on a form entitled “Settlement Proposal (Total Cost Basis) ” under date of August 15, 1958, under a certification reading in part as follows:
(1) As to Contractor’s Own Charges. — The proposed settlement (exclusive of charges set forth im, Item, Ilf) and supporting schedules and explanations have been prepared from the books of account and records of the contractor in accordance with recognized commercial accounting practices; they include only those charges allocable to the terminated portion of this contract; they have been prepared with knowledge that they will, or may, be used directly or indirectly as the basis of settlement of a claim or claims against the United States or an agency thereof; and the charges as stated are fair and reasonable.
On April 14,1959, the Department of Justice sent to plaintiff a copy of the audit of the termination claim made by the Army Audit Agency, with the understanding that “this information is furnished you in connection with pending settlement negotiations only and, in accordance with agreement of counsel, is not to be used to prejudice any defenses which the Government has asserted or may assert in the action in the Court of Claims.” In its response to plaintiff’s Notice to Admit the defendant stated: “The termination claims filed by the parties mentioned were filed for the purpose of settlement negotiations and were not submited in accordance with Rule 28(b).” Under the circumstances it is concluded that the termination claim to which reference *465 has been, made was submitted for settlement purposes and not as a compliance with the commissioner’s direction under former Rule 28. On August 27, 1959, plaintiff responded to the audit report thus furnished, summarizing the fiscal issues and objecting to certain charges and disallowances.
(c) Whether submitted as a termination claim or in compliance with the former Rule 28 requirement of the commissioner, the defendant contends that the termination claim, dated August 15,1958, contained false claims. It is correct that the termination claim included all but $5,561.31 of those items enumerated in paragraph (b) of finding 52, supra, which lists certain objectionable items contained in plaintiff’s price redetermination application. The $5,561.31, which plaintiff had previously asserted as relevant costs in the price redetermination application, were eliminated as such in the termination claim because plaintiff could not provide supporting detail, and they were reclassified as General and Administrative expense, of which a portion was allocated against Contract 1213. The $5,561.31 in expenses reclassified to General and Administrative expense included expenses of entertaining visitors from Watervliet Arsenal, payments made to Watervliet Arsenal employee Harold Lee for services rendered (see finding 33, supra), and part of Hochstuhl’s hotel bill. In addition, there was included in General and Administrative expense the $12,450 paid by plaintiff to Tucker for salaries and/or commissions, of which a portion was allocated to Contract 1213.
(d) In determining whether the plaintiff practiced fraud in the submission of its termination claim as described in the preceding paragraphs, the consequences of the fact that it may have been submitted as part of a settlement proposal instead of a formal claim are subject to dispute by the parties. At the time the termination proposal was submitted the defendant was fully aware of all of the facts giving origin to those items of the claim which the Government contends were falsely charged to the contract. The presentation of these items by the plaintiff to the Army in the form of a termination claim or settlement proposal did not deceive nor was it intended to deceive the Army, although it was an effort to obtain payment from the Army of ex *466 penses which, the plaintiff knew or should have known were questionable in part as to being properly chargeable against the contract. The questionable expenses in the termination proposal were not charged directly against the contract, but were charged to the plaintiff’s General and Administrative expense, and in this way only a portion of the $18,011.31 of questioned expenses was allocated to the contract performance costs. Some, if not all, of the total questioned expenses would be properly included in the plaintiff’s overall General and Administrative expense as costs of doing business, even though they would not be properly chargeable against the contract as a cost of its performance.
(e) On June 16, 1961, the plaintiff filed a “Statement of claims intended to be proved pursuant to Eule 28 (b) (2) ”. It included separate schedules of damages for plaintiff and for its subcontractors, as well as the following statements:
Pursuant to Eule 28 (b) (2) plaintiff submits herewith a schedule of damages claimed by the plaintiff and in addition thereto, a schedule of damages claimed by plaintiff’s subcontractors.
In the main the plaintiff’s schedule is the same as was set forth in the settlement proposal which it furnished to the Department of Justice pursuant to the request of the Philadelphia Ordnance District except as modified where indicated. The modifications principally were acceptances of the Army Audit Agency’s determinations.
After the items in the said settlement proposal were audited, the Army Audit Agency prepared its report. A copy of the said Army Audit Eeport of the plaintiff’s settlement proposal was furnished to the plaintiff. A copy of each of the Army Auditors Eeport relative to each subcontractor was not furnished to plaintiff. For comparative purposes the plaintiff lists the determinations made by the Army Audit Agency and the amounts on the individual items which are stül in issue.
* * # * *
SUBCONTRACTORS’ CLAIMS
While the subcontractors’ claims have not been audited or examined by the plaintiff, it does not know or have reason to believe that there are any elements of overstatement in the said claims. Plaintiff has relied upon the audit of these claims by the Government to determine their accuracy and reasonableness.
*467 For purpose of the submission under Eule 28 (b) (2) all subcontractors’ claims for damages are based upon tbe items included in the various subcontractor, settlement proposals which have been submitted by each of them.
* * * *
If the defendant has any knowledge or reason to believe that any of the items of the claims set forth herein-above are not accurate as to amount, or not properly includable as an item of damage, plaintiff would welcome the opportunity of one or more pretrial conferences in which to discuss the same. This suggested procedure would narrow the issues and speed up the disposition of the subject litigation.
The plaintiff’s schedule in its former Eule 28 (b) (2) submission eliminated from its previous claim all of the questioned items contained in the termination settlement proposal described in paragraph (c) of this finding (relating to such items as entertainment expenses, payments to Mr. Lee- of Watervliet Arsenal, certain travel expenses of Tucker, Jr., and certain expenses in connection with Norris’ farm), but retained a proportionate part of the $12,450 paid to Tucker as salaries and/or commissions, and the claims of the subcontractors (under the conditions quoted above) containing in part the fees paid by the subcontractors to Tucker as related in findings 22 through 25, supra. The presentation of these items by plaintiff did not deceive nor was it intended to deceive the Army, which was fully aware of all of the facts giving origin to the items now claimed to have been falsely charged.
(f) By way of counterclaim under 31 U.S.C. 231-233 the defendant seeks an affirmative judgment for $2,000 for plaintiff’s misrepresentations in the price redetermination proceedings (finding 52, supra), plus $2,000 for misrepresentations in the termination settlement proposal (finding 56(a) through (d), supra), plus $2,000 for misrepresentations in connection with plaintiff’s schedule submitted pursuant to former Eule 28(b) (2) as related in paragraph (e) of this finding. These counterclaims under 31 U.S.C. 231-233 are in addition to the forfeiture asked for in defendant’s special plea in fraud based on violations of 28 U.S.C. 2514, but the *468 facts constituting the alleged violations are the same in. each instance.
57. Subcontractors' claims. Defendant has requested that findings be made that All Metals and Manalapan practiced fraud against the Government in the presentation of their instant claims by including in their statements of costs items not contributing to subcontract performance (i.e., fees to Tucker and/or Gunn Engineering Company) and thus inflating plaintiff’s claimed costs. The facts upon which the finding of fraud or lack of it must rest are contained elsewhere in these findings. See findings 18-22 supra.
ASSIGNMENT OP CLAIME
58. By Acme.
(a) Plaintiff was closely affiliated with the National Molasses Company, shared offices in the same building, and had interlocking corporate officers and stockholders. Plaintiff had borrowed $275,000 from National Molasses Company in 1955 on a non-interest bearing basis. On February 2, 1956, the plaintiff’s Board of Directors authorized the execution of a mortgage on plaintiff’s real property to secure $150,000 of the debt to National Molasses Company. On February 7, 1958, plaintiff’s Board of Directors authorized the execution of a second mortgage on plaintiff’s real property and a mortgage on its principal items of machinery and equipment to secure a further $125,000 of the debt to National Molasses Company.
(b) On February 29, 1960, at a time when the plaintiff’s offer to settle its claims arising out of Contract 1213 was under consideration by the defendant, the plaintiff and All Metals entered into a letter agreement whereby any payment received by plaintiff from defendant in settlement of the contract claims was to be endorsed over to the Pittsburgh National Bank for distribution to plaintiff and All Metals in proportions stipulated in the agreement. The letter agreement was conditioned on settlement of the Contract 1213 claims with the Government by April 15, 1960. The Pittsburgh National Bank, which was the assignee under an earlier assignment from All Metals for the purpose of financ *469 ing All Metals’ subcontract under Contract 1213, endorsed its agreement to the letter agreement of February 29,1960.
(c) On August 8,1960, the plaintiff executed the following “assignment” and sent it to the Pittsburgh National Bank:
Acme Process Equipment Company (formerly Acme Coppersmithing and Machine Co.), being entitled to certain proceeds and payments from the United States Government by reason of its contract No. 1213-K, and whereas the said Acme Process Equipment Company has heretofore, by letter agreement dated March 4,1960, authorized the Pittsburgh National Bank (formerly Peoples First National Bank and Trust Company), as-signee of All Metals Industries, Inc., to receive and disburse the moneys as therein provided, and it now being the intention of Acme Process Equipment Company to secure National Molasses Company, a corporation with principal place of business at Oreland Mill Boad, Ore-land, Pa., to which it is indebted, now therefore, subject to the letter agreement aforesaid referred to, Acme Process Equipment does hereby assign, set over and transfer to it, the said National Molasses Company, whatever proceeds it, the said Acme Process Equipment Company shall be entitled to as aforesaid, up to but not in excess of the sum of $275,000, and this assignment and transfer of the proceeds as aforesaid rip to $275,000, shall stand binding and unrevoked unless and until the Pittsburgh National Bank shall receive appropriate written authority to the contrary from both Acme Process Equipment Company and National Molasses Company.
The letter agreement of March 4, 1960, to which the foregoing assignment of August 8,1960 refers, is the letter agreement dated February 29, 1960, described in the preceding paragraph (b). From the circumstances under which it was made, including the references in the document itself, the terms of the resolution of plaintiff’s Board of Directors which authorized the execution of the assignment, and the fact that plaintiff had already executed another assignment of contract proceeds to the Girard Trust Corn Exchange Bank for the purpose of financing Contract 1213, it is reasonable to conclude that the assignment to National Molasses Company was not an assignment of its claim against the Government (as defendant contends), but (as plaintiff *470 contends) merely a direction to a neutral bank to distribute a share of the proceeds of an anticipated settlement to the National Molasses Company when and if the settlement materialized, which was at the time by no means certain and as a matter of fact did not materialize.[12] Thus the assignment was dependent on a contingency which did not occur. A test would be whether, in the event a judgment were ultimately awarded to plaintiff in the instant litigation, the so-called assignment to the National Molasses Company would be enforceable. The National Molasses Company has asserted no interest in the instant litigation.
(d) On November 9, 1960, the plaintiff and All Metals entered into a revised letter agreement in the form of a joint direction to Pittsburgh National Bank, which rescinded the earlier letter agreement dated February 29, 1960 and substituted other directions as to the distribution of any settlement proceeds received from the Government as a result of a revised settlement offer in a smaller amount made by plaintiff to the Government. This offer was not accepted by the Government.
59. By All Metals. On March 11, 1953, All Metals assigned the proceeds of its subcontract with plaintiff to the Peoples First National Bank & Trust Company and notified plaintiff. This banking institution changed its name to the Pittsburgh National Bank in the course of a merger, and is now the owner of the assignment. The plaintiff waived its right to make payment to other than the assignee and its right of setoff for any claims which it might have except for claims arising under the subcontract. On April 3,1954, the plaintiff advised All Metals in part as follows:
9._ You further agree that as against Peoples First National Bank & Trust Company, of Pittsburgh, Pa., to whom we have assigned our accounts receivable, including all sums due or to become due under the above mentioned purchase order, as collateral security for loans made or to be made to us by the said bank, and as an inducement to the said Peoples First National Bank & Trust Company to make a further loan or loans to us, you will not assert any defenses, set-offs, counterclaims or recoupments, of any nature or kind, arising from your *471 dealings with ns, excepting only such set-off as shall represent the rental of equipment to us for the performance of the aboye mentioned purchase order, which shall only be asserted against the amounts payable for the last deliveries under the said purchase order, and which shall not exceed $8,421.26.
The defendant has not formally pleaded as a defense that All Metals assigned its claim in violation of law and considers the issue to be irrelevant. However, the pertinent facts have been included at the plaintiff’s request.
DAMAGES
60. Acme’s costs and credits. The following schedule lists the items and amounts which Acme claims it incurred in contract performance, the amounts thereof verified by defend-

*472 ant as properly chargeable to contract performance, the amounts in issue, the credits against the costs, and post-cancellation expenses.
Acme admits the defendant’s entitlement to the following amounts by way of counterclaim: $6,206 for undelivered tools (finding 53), $674 for a duplicate payment; $2,519 for defective rifles; $4,760 for unreturned vent assemblies; and $1,739 as a disposal and scrap credit (see, in part, finding 53 (e)). The total amount of this counterclaim is $15,898.
61. All Metals* costs and credits. The f ollowing schedule lists the items and amounts which All Metals claims it incurred in subcontract performance, the amounts thereof verified as applicable by defendant as properly chargeable

*473 to subcontract performance, the amounts in issue, the credits against the costs, post-cancellation expenses, unreimbursed costs of third-tier subcontractors, and total amounts due All Metals.
62.Claims of other subcontractors: Fiscal aspects. Subsequent to the cancellation of Contract 1213 certain of Acme’s subcontractors filed claims against Acme to recover sums relating to their subcontracts which Acme had, in turn, canceled. Other than All Metals, whose claim has already been described, these other subcontractors, the claims they present here, and the extent of verification of their claims, are shown in the following schedule:

Although defendant verified these claims to the extent indicated, plaintiff did not prove at the trial the claims of Steel Heddle, Intricate, Pattern, and Nicholson.
63. Manalaparts claim. The deletion of $15,370 from the claim by Manalapan consists of $4,120 for various items which Manalapan waived, and a storage claim of $11,250. Manalapan claims to have stored a quantity of tooling owned by the Government after contract cancellation and to have maintained it in storage. The evidence fails to establish that the Government owned the tooling which Manalapan claims to have stored. During the post-cancellation period the Government made diligent efforts to get plaintiff to return Government-owned tooling thought to be in the possession of Manalapan, but Manalapan at that time denied that it had possession of the tooling. It cannot now claim storage charges for the storage of Government-owned tooling of which it previously denied possession.
64. Bight to relief. The defendant contends that, under the terms of their subcontracts with Acme, none of the sub *474 contractors bad recourse against Acme and, accordingly, no actions can be maintained in their behalf against the Government. The specific language of the subcontracts upon which the defendant bases this contention is shown below.
(a) Nicholson, Steel Reddle, Intricate, Pattern, and Foley subcontracts. In each of the subcontracts mentioned, and in all of the several purchase orders issued to Manalapan, the following language appears:
3. We reserve the right to cancel entirely or to reduce the quantity of material covered by this order.
(b) Ma/nalapan. In two of the purchase orders issued to Manalapan by Acme the following conditions appear in addition to that quoted above:
3. INVOICES. * * * Each invoice (including copies) must be certified as follows: “I certify that the above bill is correct and just; that payment therefor has not been received; that all statutory requirements as to American production and labor standards, and all conditions of purchase applicable to the transactions have been complied with. This order and the work done or articles furnished hereunder shall be subject in all respects to the prime contract and to any statute, law, rule, regulation or administrative action relating to the foregoing.” The liability of the buyer for payment of any articles delivered by the seller shall be contingent upon the buyer being reimbursed thereof by the government under the prime contract. * * *
12. cancellation: (a) Buyer reserves the right to cancel this order or any part thereof (without any liability to Seller except for the purchase price of articles previously delivered to and accepted by Buyer and the Government) if delivery is not made within the time specified or within a reasonable time in case no time is specified, or if the quantity or quality of the articles ordered is not as specified herein, except hi those cases in which such delay or default is due to causes beyond Seller’s control and without Seller’s fault or negligence, including, but not restricted to acts of God or of the public enemy, acts of the Government, fires, floods, epidemics, quarantine restrictions, strikes, freight embargoes, unusually severe weather, and delays of a subcontractor due to such causes, (b) Buyer also reserves the right at any time whenever the prime contract is *475 cancelled to cancel this order, or any part thereof, by written notice to Seller ? even though Seller is not in default hereunder, and this order is subject to all the terms and conditions of the usual standard form of provisions of clauses providing for the termination of supply contracts for the convenience of the Government, and to all the terms and conditions of any prime contract to which this order relates. Thereupon Seller shall, unless the notice otherwise specifies, discontinue all work and the placing of orders hereunder and shall cancel all existing orders and subcontracts. Upon such cancellation settlement of any amounts due the Seller shall be in accordance with such equitable settlement of any approved and allowed by the Government as being reimbursable to the Buyer under the prime contract. Buyer shall be under no liability for the payment of such settlement until it receives from the Government approval and allowance of Seller’s claim in respect of such settlement. Either before or after cancellation all rights of the Buyer herein may be assigned to the Government and thereupon all liability of the Buyer and Seller shall terminate except as to articles previously delivered to and received and accepted by the Buyer and the Government, and then only to the extent the Buyer has been reimbursed by the Government for the purchase price thereof.
It is not known to what extent the two purchase orders in question are represented in Manalapan’s claim.
(c) All Metals. The provisions quoted above in paragraph (b) in the two Manalapan purchase orders were also contained in the purchase order issued to All Metals, except that, by amendment requested by All Metals, the following proviso was added at the end of Conditions 3 and 12, entitled “Invoices” and “Cancellation”, respectively:
* * * provided, however, that in any event, where the buyer is not reimbursed by the government by reason of any matter, cause or thing not within the seller’s control, the buyer shall remain liable to the seller for the articles delivered.
(Note: The same provisions were contained in the purchase order issued by Acme to All Metals mider Contract 8580, and are reprinted in finding 19 in Acme Process Equipment Co. v. United States, Ct. Cl., No. 538-59, decided this day on pages 307-09 of the opinion accompanying that re *476 port; the legal effect of the provisions on the right of Acme to prosecute a claim, on behalf of All Metals is discussed.)
(d) All Metals assigned the proceeds of its subcontract to a bank to secure a loan of money for the performance of the subcontract. Acme accepted the Notice of Assignment from the bank and waived “its right of set-off for any claims which it might have or might hereafter have except for claims arising under the contract and/or Purchase Order referred to herein.” Following the termination for convenience of the Government of plaintiff’s Contract 8580, All Metals’ bank was unwilling to continue to finance All Metals for the performance of the contract in suit unless it received certain assurances from Acme. These assurances were forthcoming in the form of an agreement between Acme and All Metals, contained in a letter of April 3, 1954, from All Metals to Acme, which read in part as follows:
9. You further agree that as against Peoples First National Bank & Trust Company, of Pittsburgh, Pa., to whom we have assigned our accounts receivable, including all sums due or to become due under the above mentioned purchase order, as collateral security for loans made or to be made to us by the said bank, and as an inducement to the said Peoples First National Bank & Trust Company to make a further loan or loans to us, you will not assert any defenses, set-offs, counterclaims or re-coupments, of any nature or kind, arising from your dealings with us, excepting only such set-off as shall represent the rental of equipment to us for the performance of the above mentioned purchase order, which shall only be asserted against the amounts payable for the last deliveries under the said purchase order, and which shall not exceed $8,421.26.
CONCLUSION OE LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiff is entitled to recover in accordance with the foregoing opinion. The court also concludes that the defendant is entitled to recover seventeen thousand eight hundred ninety-eight dollars ($17,898), on its counterclaims. The amount of plaintiff’s ultimate recovery will be determined, purusant to the opinion, under Kule 47 (c).

 The opinions and findings of Commissioner C. Murray Bernhardt in this case and its companion, Acme Process Equipment Co. v. "United States, Ct. Cl., No. 538-59, decided this day, ante, p. 251, have been most helpful. The court has borrowed material from both opinions, although, in some respects, our results are different.

 No. 538 — 59, supra, fn. 1, involves the other contract.

 This ease, like No. 538 — 59, was tried and the Commissioner’s report filed before the decision of the Supreme Court in United States v. Carlo Bianchi & Co., 373 U.S. 709 (1963). Neither party has preserved an objection to the receipt of de novo evidence, and we therefore need not concern ourself with that problem. Stein Bros. Mfg. Co. v. United States, 162 Ct. Cl. 802, 337 F. 2d 861 (1963), and succeeding decisions in that line.

 It is impossible to ascertain whether the written contract superseded the prior informal agreement.

 In both this case and its companion, -we also reach the different question whether the Government can validly refuse to reimburse the plaintiff for payments made to Tucker.

 We take into account, in establishing what was a reasonable time for determining whether the covenant against contingent fees was violated, the fact that an evaluation of all the circumstances surrounding the arrangement is often necessary. See Acme Process Equipment Co. v. United States, Ct. Cl., No. 538-59, ante, pp. 267-71, 274-5, decided this day. But, as pointed out infra, the fourteen months which the Government waited before canceling Contract 1213 was an unreasonable delay even by lenient standards.

 There are situations in which the Government can cancel a contract notwithstanding the amount of time elapsing between discovery of the violation and termination of the contract. Such cases, however, involve more than a plain material breach of the contract, as is the case here. See United States v. Mississippi Valley Generating Co., 364 U.S. 520 (1961), in which the Supreme Court held that a government contract for the construction and operation of a power plant was unenforceable, on the ground that a federal conflict-of-interest statute, 62 Stat. 703, 18 U.S.C. § 434, had been violated in securing the contract. That penal provision “speaks in broad, absolute terms,” establishing “a rigid rule of conduct” (364 U.S. at 550, 551), and its violation may result in imprisonment for up to two years and/or the imposition of a fine not to exceed $2,000.
The only legislation with which we are now concerned is the Armed Services Procurement Act of 1947, § 4, 62 Stat. 21, 23, 10 U.S.C. § 2306(h), which is not a penal statute. It requires that a covenant against contingent fees be inserted in contracts such as plaintiff’s and states that, in the event that the covenant is breached, the Government may (i.e., in its discretion) either deduct the commission from the total contract price or annul the contract. Congress gave the defendant a choice, and did not require the voiding of the contract. The violation of the covenant against contingent fees in this case was thus not conduct that was iUegal per se, as in Mississippi Valley Generating Co. It was a contractual breach, which the defendant could, under the statute, elect to ignore. Our holding today is that, under that statute, the election to annul could not be unreasonably delayed.

 Plaintiff seeks to impute knowledge of the Tucker contract to the Ordnance District as of January 1953, but we see no basis for such an imputation.

 The May 18, 1953, notification included one incorrect statement. The letter said that Tucker had been a full-time employee since January 1953, whereas the contract under which he began working full-time was not effective until March 1953. However, this error did not conceal the existence of the contingent-fee relationship.

 As pointed out in tile opinion in tie other Acme case, No. 538-59, the facts known to defendant by the Spring of 1953 were sufficient to call for an election at that time to use the severe remedy of total cancellation, but the Government’s delay after these facts were known was not sufficient to constitute an affirmative waiver of the defendant’s conventional right to refuse to reimburse Acme for its illegal payments to Tucker. There is no inconsistency.

 Jack Epstein was the son of Joshua Epstein, president of Acme. There Is no evidence, however, that Joshua Epstein knew anything about the kickbacks which Tucker and Norris were receiving from subcontractors or the extortion scheme they carried out with his son. Nor is there persuasive evidence that any Acme employee or official other than the conspirators was aware of these illicit activities.

 Citing Carrier Corp. v. United States, 164 Ct. Cl. 666, 328 F. 2d 328 (1964), tie Government claims that the wrongdoers were given broad apparent authority by the plaintiff, and that Acme is therefore bound by their acts. Even if the premise is true, the conclusion does not follow. Imputation of an agent’s actions to his principal is precluded where the agent’s action is taken for the purpose of defrauding the principal. 3 Fletcher, Private Corporations § 826 (rev. ed. 1947) ; e.g., Maryland Casualty Co. v. Tulsa Industrial Loan & Investment Co., 83 F. 2d 14, 16-17 (C.A. 10, 1936). Since the commissions which the Tucker organization received from, subcontractors increased their charges to Acme, plaintiff was being swindled by its own agents.

 The statute, as originally enacted in 1946, provided: “[T]he payment of any fee, commission, or compensation of any kind or the granting of any gift or gratuity of any kind, either directly or indirectly, by or on behalf of a subcontractor, as hereinafter defined, (1) to any officer, partner, employee, or agent of a prime contractor holding a contract entered into by any department, agency, or establishment of the United States for the furnishing of supplies, materials, equipment or services of any kind whatsoever, on a cost-plus-a-fixed-fee or other cost reimbursable basis ; or to any such prime contractor or (2) to any officer, partner, employee, or agent of a higher tier subcontractor holding a subcontract under the prime contract, or to any such subcontractor either *342 as an inducement for tie award of a subcontract or order from the prime contractor or any subcontractor, or as an acknowledgment of a subcontract or order previously awarded, is hereby prohibited. The amount of any such fee, commission, or compensation or the cost or expense of any such gratuity or gift, whether heretofore or hereafter paid or incurred by the subcontractor, shall not be charged, either directly or indirectly, as a part of the contract price charged by the subcontractor to the prime contractor or higher tier subcontractor. The amount of any such fee, cost, or expense shall be recoverable on behalf of the united States from the subcontractor or the recipient thereof by set-off of moneys otherwise owing to the subcontractor either directly by the united States, or by a prime contractor under any cost-plus-a-fixed-fee or cost reimbursable contract, or by an action in an appropriate court of the United States. Upon a showing that a subcontractor paid fees, commissions, or compensation or granted gifts or gratuities to an officer, partner, employee, or agent of a prime contractor or of another higher tier subcontractor, in connection with the award of a subcontract or order thereunder, it shall be conclusively presumed that the cost of such expense was included in the price of the subcontract or order and ultimately borne by the United States. Upon the direction of the contracting department or agency or of the General Accounting Office, the prime contractor shall withhold from sums otherwise due a subcontractor any amount reported to have been found to have been paid by a subcontractor as a fee, commission, or compensation or as a gift or gratuity to an officer, partner, employee, or agent of the prime contractor or another higher tier subcontractor.”

 It is of course clear that “a person who knows that another has employed an agent to conduct a transaction with him is subject to liability to the other for secretly employing the [agent] to act on his account in the transaction. * * * The defrauded principal can rescind the transaction with the other principal * * Restatement, Agency 2d § 391, Comment “g”. That principle would have enabled Acme to cancel its agreements with the subcontractors, but it could not give the defendant a right to cancel its contract with Acme. See Acme Process Equipment Co. v. Unites States, Ct. Cl. No. 538-59, decided this day, ante, p. 275, et seq.

 “It is a matter of public importance that good faith contracts of the United States should not be ’lightly invalidated. Only dominant public policy would justify such action. In the absence of a plain indication of that policy through long governmental practice or statutory enactments, or of violations of obvious ethical or moral standards, this Court should not assume to declare contracts of the War Department contrary to public policy. The courts must be content to await legislative action.” (Emphasis added.)

 Like its predecessor, the 1960 statute was given retroactive effect, and thus might conceivably be a “statutory enactment” on the basis of which the contract could be canceled. This would result, however, in the use of legislation enacted in 1960 to condemn conduct taking place in 1953-1954, and to justify a forfeiture. We think the Court in the Muschany case was referring to “statutory enactments” in esse.

 The district court decision in the criminal case does not collaterally estop the Government from asserting the applicability of the 1954 Anti-Kickback Act to the present contract. See United States v. National Ass’n of Real Estate Boards, 339 U.S. 485, 492-94 (1950).

 The defendant urges that a ruling against cancellation wiU render it impossible for the Government to annul an agreement -with a prime contractor after discovering that its agents have secret kickback arrangements with its subcontractors. We see no such consequence. If the defendant wishes to provide itself with that remedy, it may do so by inserting a “covenant against kickbacks” (similar to the covenant against contingent fees) in all its contracts. And the Anti-Kickback Act may be amended to provide that special relief, if it is desirable.

 The conflict-of-interest provisions allegedly violated have since been superseded by Public Law 87-849 (76 Stat. 1119, 18 U.S.C. §§ 201 et seq.), enacted October 23, 1962, an omnibus exposition and revision of all statutes in the field of conflict-of-interest, bribery and graft relating to government employment. Since the acts complained of occurred prior to the omnibus measure they must be tested against the law then extant, but useful information on the purpose of the superseded statutes is available from the legislative bach-ground and content of the latest compendium.

 On his return to Philadelphia Ordnance District from this trip, Hochstuhl submitted a voucher and was paid for his per diem and other trip expenses. An Acme employee had paid $12.50 for Hochstuhl’s hotel room charges on the trip, and this expense was charged by Acme against the contract. The defendant suggests that this payment violates the conflict-of-interest provision discussed in connection with Lee. Even if it were a violation, the $12.50 gratuity would not justify cancellation of a $1,200,000 contract.

 The statute provides: “Forfeiture of fraudulent claims. A claim against the united States shall be forfeited to the united States by any person who corruptly practices or attempts to practice any fraud against the united States in the proof, statement, establishment, or allowance thereof.
In such cases the Court of Claims shall specifically find such fraud or attempt and render judgment of forfeiture.”

 The relevant portions of this statute read as follows : “Liability of persons malting false claims. Any person * * * employed in the service of the united States, who shall make or cause to be made * * * any claim upon or against the Government of the united States, or any department or officer thereof, knowing such claim to be false, fictitious, or fraudulent, * * * shall forfeit and pay to the united States the sum of $2,000, and, in addition, double the amount of damages which the United States may have sustained by reason of the doing or committing such act, together with the costs of suit * *

 Defendant claims that the ceiling price is a reflection of all the items submitted in the claim, and therefore, if allowed, it necessarily includes a proportionate part of the allegedly improper costs. The argument might he more convincing if plaintiff’s costs had not so greatly exceeded the ceiling price. In the present context, the Government’s contention ignores reality.

 Defendant mistakenly relies on Wagner Iron Works v. United States, 146 Ct. Cl. 334, 174 F. Supp. 956 (1959). That case was unlike this one In a number of ways. It involved flagrant padding by inclusion of personal expenses In a cost-plus-a-fixed-fee contract. Furthermore, the scheme was carried out by the corporation’s sole stockholders, whose personal intent to defraud the united States was clearly established.

 Assuming an implied contractual covenant to maintain accurate accounting records, tRe defendant Ras also failed to prove tRat Acme RreacRed sucR a warranty. TRe only reason tRat plaintiff’s accountants could not certify its 1954 cost statement was tRat tRe firm Rad not been present to watcR tRe taking of a pRysical inventory. TRe accountants’ refusal to certify Acme’s statement of costs Rad notRing to do witR any inaccuracy or impropriety of tRe contractor’s records. Cf. Little v. United States, 138 Ct. Cl. 773 (1957).

 The Park Motors case held that the clause of the False Claims Act with which we are concerned requires a finding of specific intent to defraud. But the language of the statute discloses no such element. Since “proceedings [under the False Claims Act] are remedial and impose a civil [rather than a criminal] sanction,” (United States ex rel. Marcus v. Hess, 317 U.S. 537, 549 (1943)), we see no justification for adding a requirement that specific intent to defraud be proved.

 United States ex rel. Susi Contracting Co. v. Zara Contracting Co., supra, 146 F. 2d at 610, a leading case in this area, involved unit prices in a construction contract, and the defendant contends that recovery on the basis of restitution must be limited to cases of that nature. But neither Zara nor any of the other cases or commentaries intimate the existence of such a restriction.

 These cases contain broad statements to the effect that “quantum meruit cannot be allowed where there is a valid contract between the parties.” Frazier-Davis Constr. Co. v. United States, supra, 100 Ct. Cl. at 162. In each one, however, quantum meruit relief appears to have been considered, as an alternative, only after the court found that the contract was not breached.

 Relying on United States v. Penn Foundry & Mfg. Co., 337 U.S. 198 (1949) and Chain Belt Co. v. United States, 127 Ct. Cl. 38, 59, 115 F. Supp. 701, 714-15 (1953), the Government claims that Acme is not entitled to restitution on the basis of its costs, because those costs were in no way caused by the defendant’s breach. The cited cases treat with the disallowance of lost profits as damages when they are too speculative. Since the theory behind, restitution is to restore the status quo mte, potential profits under the rescinded contract are irrelevant.
It is likewise immaterial that, under a convenience-termination, plaintiff’s recovery would be limited by its costs and the ceiling price. The cancellation here was for the contractor’s fault, and in such a situation the rule of John Reiner & Co. v. United States, supra, is inapplicable if there was in fact no default. See Klein v. United States, supra; Goldwasser v. United States, 163 Ct. Cl. 450, 325 E. 2d 722 (1963) ; Litchfield Mfg. Corp. v. United States, 167 Ct. Cl. 604, 607, fn. 9, 338 F. 2d 94, 96 (1964) ; Dale Constr. Co. v. United States, 168 Ct. Cl. 692, 721 (1964) ; Neshitt v. United States, supra.

 Acme’s misrepresentations to the defendant concerning Tucker’s employment form an additional ground in this case for holding that the covenant was breached.

 The legal fees incurred by plaintiff in defending suits brought by subcontractors and in submitting its termination claim did not add to the value of its services, and therefore may not be considered in calculating plaintiff’s recovery.
The computation of recovery should, however, take into account that, on two occasions, the defendant ordered Acme to suspend further operations until given instructions to continue. See findings 42(b), 47. Any stand-by costs incurred by plaintiff during these periods are compensable, since they added to the value of its performance.

 Although the main contract also contained a government-furnished property clause, it was superseded by the more extensive provisions of the separate facilities agreement.

 See, also, E. H. Sales, Inc. v. United States, 169 Ct. Cl. 75, 259 F. 2d 358 (1965) ; Topkis Bros. v. United States, 155 Ct. Cl. 648, 297 F. 2d 536 (1961), rehearing denied, 155 Ct. Cl. 680, 299 F. 2d 952 (1962). In Ekco Products Co. v. United States, 160 Ct. Cl. 75, 312 F. 2d 768 (1963), plaintiff was permitted to recover breach-of-contract damages for costs resulting from defective government-furnished property. In that case, the contract contained no disclaimer, and a warranty of fitness could reasonably be implied from the contractual provisions. See 160 Ct. Cl. at pp. 80-81, 92-93, 312 P. 2d at 771.

 Since no administrative proceedings were held on any item of damage including this one, it may be assessed, together -with the other elements of recovery, under onr Rule 47(c). See Stein Bros. Mfg. Co. v. United States, supra, 162 Ct. Cl. 802, 337 F. 2d 861 (1963).

 The defendant also relies on provisions of the facilities contract which make no mention of liquidated damages, but which require plaintiff to make a written request for an equitable adjustment in the time of performance, if the government-furnished machinery is defective. Assuming that these provisions are applicable to liquidated damages, we think that plaintiff’s letters of May 20 and June 21, 1954 (see infra) satisfied this requirement.

 Since the Army had decided to discontinue the use of 75 mm. rifles at the time Acme’s contract was canceled, proof of actual damages would be virtually impossible.

 Since the issue of liquidated damages has been resolved in Acme’s favor, it is unnecessary to pass on the broad contention advanced by plaintiff that, when the contractor is given restitutionary recovery, the contract is effectively wiped out, and the Government automatically loses any rights it may have had under the liquidated damages clause.

 Foley’s payments were actually made to Neptune Manufacturing Company, a dummy corporation formed by Tucker and Norris to carry out their kickback activities. When it paid the kickbacks, Foley knew of Tucker’s relationship to Neptune. Tr. 657-58.

 The rule that a party knowing of the double agency may not disavow the contract Is traditionally stated in terms of actual knowledge. In the present case, both Foley and Manalapan denied having such knowledge. Tr. 668, 682. Judging from the circumstances, however, these two subcontractors were hardly innocent parties and, at the very least, can plainly be saddled with constructive knowledge.

 The agreements with both All Metals and Manalapan specifically provided that, if the defendant terminated the prime contract, Acme would be liable to the subcontractor only to the extent the latter’s claims were allowed and paid by the united States. See finding 64(b), (c). With regard to these two claimants, if Acme’s purported ratification were allowed to stand, its effect would be to make the defendant exclusively liable.

 Since this principle is determinative for the present, we need not at this stage consider the Government’s defense based on the “Severin’’ doctrine. See Severin v. United States, 99 Ct. Cl. 435 (1943), cert. denied, 322 U.S. 733 (1944).

 This measure of damages is of course far less than that which Acme itself is receiving, since it is recovering the reasonable value of all its services, whether they resulted in actual deliveries to the United States or not. To the extent that the three subcontractors incurred expenses on unfinished or undelivered goods, they may not recover. This disparity is only fair, since Acme is recovering on a contract breached by the united States, while each subcontractor’s agreement must be treated as rescinded because it was fraudulently procured from Acme.

 We do not reach, the issue of -whether there would he a taking (for which just compensation should be paid) if bad faith on the part of the defendant had been shown. In addition, we point out that the statute of limitations bars recovery by the plaintiff on this ground. Acme first alleged a Pifth Amendment taking in an amendment to its petition, filed in September 1961. Since the amendment stated a new cause of action, it had to be filed within sis years after the claim accrued. See Dawnic Steamship Corp. v. United States, 90 Ct. Cl. 537, 580 (1940). But all events fixing the defendant’s liability for the alleged taking had occurred on or before January 1, 1955. Plaintiff’s claim having accrued by that date, it is barred by the six-year statute of limitations. The fact that settlement negotiations continued thereafter is irrelevant. See, e.g., Cuban Truck & Equipment Co. v. United States, 166 Ct. Cl. 381, 387-91, 333 F. 2d 873, 877-79 (1964), cert. denied, 382 U.S. 844 (1965) ; Empire Institute of Tailoring, Inc. v. United States, 142 Ct. Cl. 165, 168, 161 F. Supp. 409, 411 (1958).

 As stated in paragraph (a) of this finding, Tucker’s assignment of his 5 percent commission to Gunn was canceled, so that as of June 1953 All Metals was technically indebted to Tucker for commissions.

 As will be shown later, the data relating to the reported condition of each machine is often unreliable.

 Comparative analysis of the plaintiff’s vouchers and its complaint to defendant of June 18, 1953, indicates some confusion between boring lathes 3990 and 3992.

 A subsequent document gives this figure as $27,750.48.

 These were, of course, cumulative delays. Tile delivery schedule shows that in six of the 15 months of contract performance the plaintiff exceeded the revised requirements for that month.

 The defendant erroneonsly stated in its requested finding No. 39 (to the Commissioner) that Supplemental Agreement No. 7 revised the picture of actual v. required deliveries, so that as of November 30, 1953, the plaintiff had delivered 381 rifles and was required to deliver 326, and the plaintiff employs this erroneous computation as a basis of demonstrating that plaintiff was not delinquent up through March 30, 1954. The error made by plaintiff is in not recognizing the fact that Supplemental Agreement No. 7 did not effect a change in the then existing delivery requirements for the months prior to August 1953.

 Despite the fact that the plaintiff conceded the mathematical correctness of the liquidated damage schedule placed in evidence by the defendant, the court has corrected mutual mistakes. Thus, the $286.53 error referred to involves the requirement of the revised delivery schedule that 100 rifles be delivered in March instead of 102 on which the defendant’s computation erroneously is based. This affects the liquidated damages chargeable for March 1954 and subsequent months.

 Plaintiff correctly contends that the record is not specific as to the precise souree and scope of the Ordnance Corps’ knowledge prior to July 22, 1954, of data developed by the FBI and GAO. It is clear, however, that officials of the Ordnance Corps had enough knowledge to arouse their suspicions, and if the later perfection of their knowledge were to have legally justified their cancellation action, then the only point to the plaintiff’s objection would go to the determination of the controlling motive for cancellation at the time.

 The proof required to attribute base motives to responsible military and civilian officials of tbe Department of Defense should be at least as conclusive as that required to establish fraud on the part of a Government contractor.

 446 rifles had been delivered by December 31, 1953.

 It would appear that the Board of Awards was not aware that the contract had been suspended sis days earlier, for their action was superfluous in the then existing circumstances.

 The defendant has taken no exception to this finding.